IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

JAMES JORDAN, MARY JORDAN, IRENE   *
THOMAS, JAMES THOMAS, GEORGE
RABY, and WILLIAM ROBERTS,          *

    Plaintiffs,                    *       CASE NO. 4:07-CV-80(CDL)

vs.                                 *

THE SCOTT FETZER COMPANY,           *

    Defendant.                     *

_____     *

<u>O R D E R</u>

    Plaintiffs seek discovery materials in this putative class action to provide to their expert who intends to rely upon the materials in support of his aggregate damages theory. Defendant objects to Plaintiffs' discovery requests, contending that Plaintiffs' aggregate damages theory is flawed as a matter of law, and even if it is not, class certification in this case will ultimately be denied, and thus any discovery related to class certification is futile.

    Plaintiffs' presently pending Amended Motion to Compel (Doc. 48) presents the Court with an often recurring challenge in class action litigation: how to determine whether evidence is relevant to the issue of class certification when the specific issue of class certification is not yet ripe for resolution. Plaintiffs seek to represent a proposed class of consumers who allegedly purchased from

1

Defendant[1] used home cleaning systems that Defendant misrepresented to be new.  Plaintiffs contend, among other things, that Defendant violated 18 U.S.C. § 1962(c) of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), and seek benefit of the bargain damages due to Defendant's alleged fraud.[2]  The Court has previously determined that Plaintiffs' Complaint states a claim upon which relief may be granted for the named Plaintiffs' individual claims. *See Jordan v. Scott Fetzer Co.*, No. 4:07-CV-80 (CDL), 2007 WL 4287719 (M.D. Ga. Dec. 4, 2007) [hereinafter Dec. 4 Order].

Plaintiffs seek the following discovery in support of a yet-to-be-filed motion for class certification and to substantiate their RICO aggregate damages theory: (1) 1,000 randomly selected consumer retail purchase contracts per year for each year from 2003 through 2008 for sales by authorized Kirby distributors to consumers of Kirby cleaning systems registered under Gold or Blue Cards; and (2) the registration data for 30,000 randomly selected consumer purchasers of Kirby home cleaning systems in 2007 whose registrations were done under Gold or Blue Cards.  Defendant objects to these requests, contending that they are not relevant to any issue in this litigation and that they are "futile."  Plaintiffs therefore move this Court to

---

[1]The Scott Fetzer Company has several divisions of business.  The Kirby Company ("Kirby") is an unincorporated subsidiary of Scott Fetzer, and most of Plaintiffs' facts and evidence relevant to this case involve only the Kirby division.  The Court will refer to "Kirby" and "Defendant" interchangeably in this Order.

[2]"Benefit of the bargain damages" is used in this Order as shorthand for the difference between the value of the item as new and its actual value in used condition.

2

order Defendant to provide Plaintiffs with the requested information.
For the following reasons, Plaintiffs' motion is granted.

BACKGROUND

I.    **The Kirby Marketing System**

Kirby manufactures home cleaning systems, which consist of
vacuum cleaners and related attachments and accessories for use by
consumers in their homes. (App. A to Pls.' Am. Mot. to Compel Disc.
from Def. or for Relief from Stay to Obtain Additional Disc.
[hereinafter Pls.' Am. Mot.], Nichols Dep. 16:9-11, Sept. 4, 2008;
*see* Ex. 2 to Nichols Dep., Distrib. Agreement 1.) Kirby sells its
products to distributors for the distributors to market to consumers
in door-to-door sales.  The distributors typically contract with
dealers to do the door-to-door demonstrations.  The distributors pay
Kirby a wholesale price for each cleaning system, and the
distributors, through dealers, sell the systems to consumers. (App.
C to Pls.' Am. Mot., Shumay Dep. 22:25-23:2, Jan. 13, 2009.)

In its written Distributor Agreements, Kirby requires its
distributors to use and follow its "Marketing System" for doing the
in-home presentations and sales to consumers. (Distrib. Agreement at
1.) The Kirby "Marketing System" is a uniform and consistent method
for Kirby to ensure that its distributors and dealers use the same
pre-printed sales materials created by Kirby. (Nichols Dep. 61:10-
62:8.)  Under the uniform and consistent "Marketing System," all
purchasers receive the same common printed sales material created by
Kirby containing representations that the systems are new.  Kirby

3

provides the distributors with pre-printed documents and CDs created by Kirby for the distributors, or the dealers, to use in making the in-home sales, including Owner's Manuals, Warranty Booklets, and Purchaser's Registration Cards, all of which contain written representations that the purchaser was the original purchaser and that the vacuum cleaner was new.  Specifically, the Warranty Booklet tells a consumer that he or she is the "Original Purchaser," (Ex. 10 to Nichols Dep., Owner Care Program, Three Year Ltd. Warranty, SF-KY01325); the Owner's Manual tells the consumer that his or her cleaning system is "new," (App. D to Pls.' Am. Mot., Owner's Manual; *see* Nichols Dep. 225:7-226:15); and the Registration Card tells the consumer that he or she is the "Original Purchaser," (Ex. 8 to Nichols Dep., Registration Card; *see* Nichols Dep. 73:10-16).  From 2003 to 2007, nearly 96,164 consumers were allegedly sold previously used Kirby home cleaning systems with these misrepresentations of "newness."  (Nichols Dep. 120:17-120:22; Ex. 15 to Nichols Dep., Chart of No. of Times a Unit Was Sold More Than Once.)

## II.  Registration Cards

During the relevant time period, Kirby provided its distributors with two different sets of Registration Cards for the distributors to use in registering consumer purchasers as the owners of its Kirby systems: Gold Cards and Blue Cards.  The Gold Cards were pre-printed forms that were included with the systems in the boxes when Kirby shipped the systems in the boxes to a distributor.  Each system had a unique serial number, and the Gold Card that was included with the

system had the unique serial number pre-printed on the form. (Nichols Dep. 91:5-10.) The Gold Card contained representations that the purchaser was the "Original Purchaser." (Ex. 3 to Nichols Dep., Gold Card Sample.) If, for some reason, a consumer rescinded his or her purchase of the home cleaning system,[3] the distributor who sold the system would pick up the system and resell it to a second or subsequent purchaser. When distributors provided consumers with these previously sold systems, they registered the subsequent purchasers under a Blue Card instead of a Gold Card.

The Blue Card was identical to the Gold Card, except that the border around the "Original Purchaser" representation on the Blue Card was blue, and not gold, and the unique serial number of the cleaning system was not pre-printed on the Blue Card like it was on the Gold Card; rather the distributor wrote in the serial number on the Blue Card during the in-home presentation. Kirby instructed its distributors and dealers to use Blue Cards when either (1) "[t]he

---

[3]The reasons for consumer rescissions included the following. First, under Kirby's three-day cancellation policy, any purchaser was entitled to cancel the purchase within the first three business days after the purchase for any reason. (Nichols Dep. 149:22-150:20.) Second, under Kirby's "Golden Ager" policy, senior citizens were allowed to cancel their purchases at any time within one year from the date of the purchase. (*Id.* at 149:6-17; *see* Ex. 9 to Nichols Dep., Kirby Distrib. Policies & Recommended Practices, Golden Ager Policy 8.) Third, under the "Patch It Up or Pick It Up" policy, if a distributor could not satisfy a consumer, the distributor would cancel the purchase and return the consumer's purchase price. (Nichols Dep. 150:21-151:17; Kirby Distrib. Policies & Recommended Practices, Patch It Up or Pick It Up Policy 13.) Lastly, a purchase could be rescinded if the crediting or financing that the distributors or dealers arranged to finance a consumer's purchase fell through so that the consumer could not qualify for the purchase. (Nichols Dep. 152:10-22.)

original Gold Card [was] lost," or (2) when "[t]he original customer, who completed the Gold Card, cancel[led] the sale or their financing [was] not approved."   (Ex. 13 to Nichols Dep., U.S. Gold Card Procedures.)  Kirby expected the distributors and dealers to use the printed materials provided with the Blue Cards, such as the Owner's Manuals and Warranty Booklets, to make the second sales.  (Shumay Dep. 147:8-149:18.)  Each of those second or subsequent purchasers received the same written representations of newness and original purchaser status, (*see* Shumay Dep. 147:6-149:18), although Kirby concedes that "unit[s] that ha[d] been previously sold to a consumer and repossessed [were] used," (Nichols Dep. 167:5-7).[4]

## III. Gold Service Record Payment Reconciliation Reports

Defendant provided its distributors with a monthly written report, known as a Gold Service Record ("G.S.R.") Payment Reconciliation Report, that indicated the number of times distributors sold previously sold and returned units in the prior month.  (Nichols Dep. 132:19-134:6; *see* Ex. 16 to Nichols Dep., G.S.R. Payment Reconciliation Report.)  The G.S.R. Reports identify

---

[4]In March 2006, Kirby implemented a new Purple Card policy for its distributors to use when they sold previously returned cleaning systems. (Nichols Dep. 173:28-174:3.)  The Purple Cards were only to be used by distributors "when the Kirby home care system[s] which [were] the subject of the sale ha[d] previously been returned by another customer," which could have occurred "when the original purchaser cancel[led] the sale within the purchaser's right to cancel period, or financing [was] not approved."   (Ex. 18 to Nichols Dep., Mem. to All Domestic Factory Distribs., Mar. 29, 2006.)  The individual distributors were instructed to "inform the subsequent purchaser(s) that the merchandise had been previously purchased by another consumer."  (*Id.*)

by unique serial numbers which of the sales were first sales of new units and which were sales of resold units.  Based on a summary of G.S.R. Payment Reconciliation Reports made between the years 2003 to 2007, 96,164 customers were sold Kirby home cleaning systems that had previously been sold and returned by prior purchasers.  (Nichols Dep. 120:17-120:22; *see* Chart of No. of Times a Unit Was Sold More Than Once.)

## IV.  Plaintiffs' Requested Discovery

Plaintiffs seek certification of a RICO civil fraud class of consumers who had purchased from Defendant used cleaning systems misrepresented to be new.  To support their claim for damages to the class, Plaintiffs rely upon an aggregate damages theory asserted by their expert, Dr. Bruce Isaacson.  Dr. Isaacson proposes to estimate the difference between "(i) the average market price that consumers actually paid for cleaning systems represented to be new and (ii) the price that consumers would have been willing to pay for used systems if there had been disclosure of the fact they were used."  (Pls.' Mem. Supporting Am. Mot. to Compel Disc. from Def. [hereinafter Pls.' Mem.] 11-12; *see generally* App. B to Pls.' Am. Mot., Isaacson Decl., Jan. 2009.)

In order for Plaintiffs' expert to conduct his aggregate damages theory analysis, Plaintiffs seek the following evidence from Defendant: (1) 1,000 randomly selected consumer retail purchase contracts per year for each year from 2003 through 2008 for sales by

authorized Kirby distributors to consumers of Kirby cleaning systems registered under Gold or Blue Cards; and (2) the registration data for 30,000 randomly selected consumer purchasers of Kirby home cleaning systems in 2007 whose registrations were done under Gold or Blue Cards.[5]  (Pls.' Am. Mot. 1-2.)  Plaintiffs contend that this evidence is within the scope of discovery[6] and not unduly burdensome.

> A.   Consumer Retail Purchase Contracts

Plaintiffs seek the discovery of 1,000 randomly selected consumer retail purchase contracts per year in each year from 2003 through 2008 whose registrations were done under Gold or Blue Cards in order to obtain the actual sales prices that consumers paid for their Kirby cleaning systems and data on the quantity and price of the accessories consumers typically purchased along with the purchase of the system.  In order to determine the average market price that consumers actually paid for cleaning systems represented to be new,

---

[5]Plaintiffs contend that the requested discovery must be randomly selected in order "[t]o ensure that the survey and the data it develops will faithfully represent the universe of past purchasers." (Isaacson Decl. ¶ 16.)

[6]Federal Rule of Civil Procedure 26(b)(1) provides, in pertinent part, that

> [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense-including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter.  For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Dr. Isaacson proposes to use the purchase prices of a random sample of 1,000 actual consumer purchase transactions from across the United States in each year from 2003 through 2008.

Because Plaintiffs do not have the data on the actual sales transactions, Plaintiffs seek to obtain the data from Defendant. Plaintiffs contend that this requested discovery is not unduly burdensome because even if Defendant does not have the data, it can obtain the data from its distributors[7] or its financing affiliate, United Consumer Financial Services ("UCFS").

B.   Registration Data of Consumer Purchasers

Plaintiffs also seek the discovery of the registration information for a sampling of 30,000 randomly selected purchasers of Kirby systems in the year 2007 whose purchases were registered under either Blue or Gold Cards.  (Pls.' Mem. 17-21.)  For each purchaser whose purchase Kirby registered, Kirby entered into its AS 400 computer system all of the customer's information on his or her Blue, Gold, or Purple Card.  This information included the following: the customer's name, address, phone number, and age; the serial number;

_____

[7]The distributor contracts provided, in pertinent part, that

[d]istributor[s] shall, upon the Company's request, promptly furnish to the Company such books and records (or summaries thereof if so requested), as well as all other information, including reports, answers to questionnaires, etc., which may assist the Company in the proper conduct of its business and which may be requested by the Company from time to time.

(Distrib. Agreement at 5; see Nichols Dep. 145:6-10 (acknowledging that the distributor agreements required distributors to make the contracts available to Defendant upon request).)

the model purchased; the date of purchase; any accessories purchased; the reason for the purchase; the name of the distributor who sold the system to the customer; and whether the registration was made with a Gold, Blue, or Purple Card. (Shumay Dep. 26:22-33:10, 44:3-23; *see, e.g.*, Registration Card; Gold Card Sample.)  With this discovery, Dr. Isaacson proposes to survey a sampling of the 30,000 purchasers to estimate the amount these consumers would have paid for a used unit if it was represented to be previously sold and returned instead of new.[8]  (Isaacson Decl. ¶¶ 25-29; *see* Ex. 4 to Isaacson Decl., Description of Planned Data Gathering Activities.)

Plaintiffs contend that this requested discovery is not unduly burdensome because Defendant can obtain this information through one of four sources: (1) purchase contracts for 30,000 Blue or Gold Card registration sales by Kirby distributors in 2007 (Isaacson Decl. ¶ 14(i)); (2) purchase contracts for 30,000 Blue or Gold Card registration sales financed by UCFS (*id.* ¶ 14(ii)); (3) the electronic registration data from 30,000 Blue or Gold Card purchase registrations in 2007 from Kirby's AS 400 system (*id.* ¶ 14(iii)); or

---

[8]Although some consumers received Kirby cleaning systems purported to be new but were resold three or more times, (*see* Chart of No. of Times a Unit Was Sold More Than Once), Dr. Isaacson's research "will take a conservative approach by measuring the difference in value associated with a used machine among any past customers whose machines were previously sold at least once," (Isaacson Decl. ¶ 29).  Dr. Isaacson noted that "[i]t is appropriate to analyze the effect of a vacuum cleaner's used status regardless of how many times the machine had been previously sold." (*Id.*)

(4) photocopies of the actual Blue or Gold registration cards for 30,000 purchaser registrations in 2007 (*id.*).

DISCUSSION

Defendant's objections to Plaintiffs' discovery requests do not focus on the burden of obtaining and producing the information, and the Court in fact finds that the requests are not unduly burdensome. Instead, Defendant contends that Plaintiffs' requested discovery is irrelevant and futile, and therefore, Plaintiffs' motion should be denied.  First, Defendant argues that the requested discovery is irrelevant because Plaintiffs have failed to allege a cognizable injury under RICO, and thus, the discovery "would, at best, enable [Plaintiffs] to estimate the amount of alleged damages under a damages model that is deficient as a matter of law." (Def.'s Resp. in Opp'n to Pls.' Am. Mot. to Compel Disc. from Def. [hereinafter Def.'s Resp.] 2.)    Second, Defendant contends that even if Plaintiffs' RICO damages model is not deficient as a matter of law, the requested discovery is nonetheless futile because it would not substantiate any of Plaintiffs' class allegations. (Def.'s Resp. 3.) The Court will address each argument in turn.

I.   **Cognizable Injury Under RICO**

Defendant contends that Plaintiffs have failed to allege a cognizable injury under 18 U.S.C. § 1964(c).[9]  The Court thought it

---

[9]Section 1964(c) provides, in pertinent part, that

[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in

11

had disposed of this argument when it denied Defendant's motion to dismiss. *See* Dec. 4 Order, 2007 WL 4287719, at *9 ("[Plaintiffs] clearly allege[] an injury to property by reason of Defendant's violation of § 1962(c)" where "[Plaintiffs] allege that they, along with other similarly situated consumers, suffered economic damages, measured as the difference in price between a new Kirby vacuum and a used Kirby vacuum, as a result of the alleged scheme to sell used Kirby vacuums as new." (internal quotation marks omitted)). As noted in the Court's previous Order, Plaintiffs have alleged that they suffered benefit of the bargain damages when Kirby and its distributors falsely represented its cleaning systems to be new, when in fact, they were used. Allegations that purchasers of a good received something materially different than what was represented to them in their purchase satisfies the requirement of injury to property under § 1964(c). *See, e.g., RWB Servs., LLC v. Hartford Computer Group, Inc.*, 539 F.3d 681, 683, 688-89 (7th Cir. 2008) (finding that purchasers of used cameras represented to be used had alleged a cognizable injury under RICO); *Living Designs, Inc. v. E.I. Dupont De Nemours & Co.*, 431 F.3d 353, 364 (9th Cir. 2005) (finding that district court erred in determining that plaintiffs failed to allege a RICO injury when plaintiffs alleged that they settled for a

---

any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1982.

12

smaller percentage of their damages than they could have received absent the fraud); *Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 265 (4th Cir. 2001) (concluding that a purchaser of a service falsely represented to be performed under certain specifications but actually performed under inferior specifications "ha[d] been 'injured in its property' to the extent of the difference between the amount it paid and the amount it would have paid under specifications reflecting the actual work performed"); *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 171-72 (2d Cir. 1999) (concluding that plaintiffs—who alleged that but for defendant's misrepresentations they would have invested money in different accounts—had pled a cognizable injury under RICO); *United Healthcare Corp. v. Am. Trade Ins. Co.*, 88 F.3d 563, 572 (8th Cir. 1996) (noting that due to fraudulent acts, plaintiff "failed to receive the benefit of its bargain, and ha[d], as a result, sustained substantial financial damage"); *Bennett v. Berg*, 685 F.2d 1053, 1058 (8th Cir. 1982) (concluding that appellants alleged a cognizable injury in a civil RICO suit based on benefit of the bargain damages they suffered due to appellees' fraud).

Undeterred by the Court's previous ruling, Defendant maintains that Plaintiffs have failed to allege a cognizable injury under RICO, relying upon *McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) and *District 1199P Health & Welfare v. Janssen, L.P.*, Civil Action Nos. 06-3044 (FLW), 07-2224(FLW), 07-2608(JAP), 07-

13

2860(GEB), 2008 WL 5413105 (D.N.J. Dec. 23, 2008).  In *McLaughlin*,
the Second Circuit concluded that the plaintiffs–a group of smokers
who had alleged that a cigarette manufacturer misrepresented the
safety of a cigarette as compared to other cigarettes–failed to plead
a cognizable injury under RICO because there was no reasonable means
to calculate the benefit of the bargain of a "safe" cigarette.  522
F.2d at 229 ("We are asked to conceptualize the impossible–a healthy
cigarette–and then imagine what a consumer might have paid for such
a thing.").  Similarly, in *Janssen*, *L.P.*, the District of New Jersey
found that the plaintiffs–who had alleged that a manufacturer of an
anti-psychotic drug misrepresented the value of the drug as compared
to competing medications–"[did] not plead a concrete financial loss
in the form of overpayment, absent allegations that the drug was
inferior on some level and worth less than what they paid for it."
2008 WL 5413105, at *8.

     With all due respect to the sophisticated marketing of
Defendant's "cleaning system," we are still talking about the value
of a new vacuum cleaner as compared to the value of a used vacuum
cleaner.  The Court is convinced that such an inquiry is far
different than attempting to determine the value of a "safe"
cigarette or a "better" anti-psychotic drug.  Defendant even
recognizes this common sense distinction, acknowledging that a used
Kirby cleaning system would objectively be worth less than a new
Kirby cleaning system.  (Shumay Dep. 112:9-18.)  Therefore, as the

14

Court has previously ruled, the Court finds that Plaintiffs have alleged a cognizable injury under RICO.

## II. Substantiation of Plaintiffs' Class Allegations

Defendant next contends that even if Plaintiffs have alleged a cognizable injury under § 1964(c), the discovery Plaintiffs seek is nonetheless futile because individualized issues predominate as to (1) what oral representations were made to each putative class member by Kirby distributors or dealers during the in-home sales demonstrations, and (2) whether each putative class member relied on the misrepresentations in deciding to purchase a Kirby cleaning system. Defendant's objection thus requires the Court to evaluate issues that are typically reserved for the class certification stage. The Court addresses each of Defendant's contentions in turn.

### A.   Alleged Oral Representations

Defendant contends that individualized issues predominate as to what oral representations a Kirby dealer or distributor might have made to each putative class member. Specifically, Defendant contends that "if a putative class member was told that the Kirby [system] he purchased had been registered to a prior owner, no misrepresentation would have taken place." (Def.'s Resp. 12.) At this stage of the proceedings, the Court finds that Plaintiffs have sufficiently alleged that the misrepresentations were uniform.

Defendant also contends that Plaintiffs will not prevail on class certification because Kirby distributors were contractually

prohibited from selling as new any used Kirby products. (Def.'s Resp. 15-16.) Even if there was a clause in the distributor agreements that prohibited distributors from selling used Kirby cleaning systems as new,[10] the Court finds that Plaintiffs have sufficiently established for purposes of the pending discovery motion that Kirby sold used units as new through the use of its uniform marketing system.

Defendant also argues that class certification will be inappropriate because it provided its distributors with retail sales contracts should they choose to use them, (Nichols Dep. 64:5-9), and thus, Plaintiffs cannot establish what sales materials any Kirby distributors used during any of the in-home sales presentations. (Defs.' Resp. 14-15.) Even if the distributors were not required to use Kirby's retail sales contracts, the Court finds that Plaintiffs have sufficiently established for purposes of the presently pending discovery motion that distributors were *required* to use and distribute certain documents to the purchaser of a Kirby home cleaning system—a Warranty Booklet (*see* Nichols Dep. 87:5-89:25), an Owner's Manual (Shumay Dep. 148:1-25), and a Registration Card (Nichols Dep. 64:10-65:9)—and Plaintiffs' RICO civil fraud case is based upon the evidence of these uniform, printed misrepresentations of newness received by 96,164 consumers between the years 2003 to

---

[10]The distributor agreements provided, in pertinent part, that "[d]istributor[s] shall not sell or offer for sale as new any Kirby Products which have been used, reconditioned or rebuilt." (Distrib. Agreement at 4.)

2008.  Furthermore, the Court notes that although Kirby distributors were not required to use the retail sales contracts made available to them by Kirby, the distributors were nevertheless required to create and use a retail sales contract that contained similar, if not identical, language.  (Nichols Dep. 67:22-72:22.)  Therefore, at this stage of the proceedings, where the Court's inquiry is limited to whether Plaintiffs' discovery requests are reasonably calculated to lead to the discovery of relevant evidence, the Court does not find that Plaintiffs' pursuit of class certification will necessarily be futile because of the alleged predominance of individual issues arising from the in-home sales demonstrations.

> B.    Certification of RICO Classes Based on Uniform, Printed Misrepresentations

Defendant next contends that individualized issues predominate because of the unique nature of each putative class member's alleged reliance on the misrepresentations of newness, and thus, Plaintiffs' motion should be denied as futile.  Again, Defendant seeks to have this Court deny discovery based upon a premature finding that the class will never be certified.  The Court finds that for purposes of the presently pending discovery motion, Plaintiffs have sufficiently established that certification will not necessarily be futile.  As previously explained, Plaintiffs' civil RICO fraud claims are based on a widespread scheme to defraud using common sales material with common misrepresentations.  The Court simply cannot find at this stage of the litigation that class certification is futile.  *See,*

17

*e.g.*, *Williams v. Mohawk Indus., Inc.*, No. 08-13446, 2009 WL 1476702, at *5-*6 (11th Cir. May 28, 2009) (recognizing that RICO claims "are often susceptible to common proof"); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1257-60 (11th Cir. 2004) (certifying class in civil RICO case where plaintiffs alleged "defendants . . . conveyed essentially the same message"); *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 724 (11th Cir. 1987) (reversing district court's denial of class certification based on allegations that defendant "engaged in a common course of conduct to misrepresent" through "widely distributed written information").

Although the Court has found today that Defendant cannot avoid the production of relevant evidence based on its argument that Plaintiffs' pursuit of class certification will be futile, the Court hastens to add that its ruling should not be interpreted to mean that the Court has reached a final decision on class certification. That decision will be made in connection with Plaintiffs' motion for class certification. The Court also observes that it has made no decision on the ultimate admissibility of any of the opinions of Plaintiffs' expert, including whether those opinions will meet the requirements of Federal Rule of Evidence 702. The Court simply finds that Plaintiffs should be able to obtain the requested information upon which their expert intends to rely.

CONCLUSION

As discussed above, Plaintiffs' Amended Motion to Compel Discovery (Doc. 48) is granted.   Plaintiffs are entitled to the following discovery from Defendant: (1) 1,000 randomly selected consumer retail purchase contracts per year for each year from 2003 through 2008 for sales by authorized Kirby distributors to consumers of Kirby cleaning systems registered under Gold or Blue Cards; and (2) the registration data for 30,000 randomly selected consumer purchasers of Kirby home cleaning systems in 2007 whose registrations were done under Gold or Blue Cards.   Within fourteen (14) days of today's Order, the parties shall present the Court with a jointly proposed amended scheduling order that describes how this production shall occur, lifts the present stay, and sets out deadlines that will allow the Court to decide a motion for class certification expeditiously.

IT IS SO ORDERED, this 30th day of June, 2009.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE