# Appendix E

1   Royal B. Lea, III (pro hac vice)
    Texas State Bar No. 12069680
2   royal@binghamandlea.com
    Benjamin R. Bingham (pro hac vice)
3   Texas State Bar No. 02322350)
    **BINGHAM & LEA, P.C.**
4   319 Maverick Street
    San Antonio, TX 78212
5
    C. Lance Gould
6   Alabama State Bar No. ASB-0913-G66C
    Lance.gould@beasleyallen.com
7   W. Daniel Miles, III
    Alabama State Bar No. ASB-7656-M75W
8   Dee.miles@beasleyallen.com
    **BEASLEY ALLEN CROW METHVIN PORTIS & MILES, P.C.**
9   218 Commerce Street
    Montgomery, AL 36104
10
    Attorneys for plaintiffs
11

12                 UNITED STATES DISTRICT COURT

13                 MIDDLE DISTRICT OF GEORGIA

14                     COLUMBUS DIVISION

15

16   **James and Mary Jordan**          Civil Action No.  4-07-cv-80 (CDL)

17          **Plaintiffs,**
                                         **EXPERT REPORT OF DR. BRUCE**
18          **v.**                       **R. ISAACSON, D.B.A., M.B.A.**

19   **The Scott Fetzer Company**

20          **Defendant**

21

22

23

24

25

26

27

28

1.     I have been retained by the attorneys representing the plaintiffs James and Mary Jordan and others ("Plaintiffs") in the above litigation. This report provides the results of a telephone survey I conducted to measure perceptions of the price consumers would expect to pay for a previously-owned Kirby vacuum cleaner.

2.     The facts in this report, except as otherwise stated, are based on my personal knowledge; the opinions expressed are those I have formed based on my consideration of the information I have reviewed in this matter, my expertise, and my experience.

## OVERVIEW AND OBJECTIVES OF THIS REPORT

3.     The plaintiffs in this matter maintain that certain Kirby customers were sold Kirby vacuum cleaners without being told the vacuum cleaner they purchased was in fact refurbished or previously-owned.[1] This report describes research I conducted to measure whether customers expect a previously-owned and/or refurbished Kirby vacuum cleaner to have a different price than a similar Kirby vacuum cleaner that is not previously-owned and/or refurbished.

4.     To measure the difference in price expectations, I conducted a telephone survey among 1,270 actual Kirby customers, using customer names provided by the defendants. The survey relied upon measurement and analysis techniques that reflect principles generally accepted by the market research community and by other professionals conducting surveys in litigation contexts. The defendants also provided copies of actual customer sales contracts, which were used to calculate the prices customers typically pay for a Kirby.

5.     My survey tested seven slightly different interview conditions (or cells). Respondents in six of the cells were told a typical price of a Kirby vacuum cleaner, which varied by cell from $1,000 to $1,900. Respondents in one cell received no price mention. The data from the survey show that 90% of Kirby customers expect the price of a previously-owned Kirby vacuum cleaner to be less than the price of a new Kirby vacuum. The average expected discount off the price of a

---

[1] This declaration refers to vacuum cleaners that have been previously sold to another customer as previously-owned, regardless of any reconditioning efforts. Kirby has described such vacuums as "used." Michael Nichols, Executive Vice President of Kirby, stated in a deposition on 9/4/08 (p. 167), "…a unit that has been previously sold to a customer and repossessed is used."

Declaration of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1   previously-owned Kirby vacuum, compared with the price of a new Kirby, varied from
2   approximately $388 to $667, depending on the cell.  When no price was mentioned, the average
3   expected discount was $427.  Across all telephone interviews in all cells, the average expected
4   discount was $548, or 36% of the average purchase price.

5   6.      In addition, my staff and I conducted research online analyzing selling prices for other
6   goods, such as exercise equipment, computers, or construction tools, which are sold in used but
7   refurbished condition by the original manufacturer or a reseller.  We found that the percentage
8   discount offered for those goods averaged 26% overall, and 29% for goods sold by resellers.
9   These discounts are similar in magnitude to the discounts expected by respondents to the survey.

10  7.      The remainder of this report will describe my qualifications, the contracts and names
11  provided by the defendants, the survey, and the basis for my conclusions.

12

13  **MY FIRM AND QUALIFICATIONS**

14  8.      I am the owner and President of MMR Strategy Group[2] ("MMR"), a marketing research
15  and consulting firm, and I am experienced in research, surveys, and marketing.

16  9.      For approximately 35 years, my firm, MMR, has provided marketing research and
17  consulting, consisting primarily of the design, execution, and analysis of thousands of surveys, as
18  well as expertise related to marketing and strategy.  Our experience includes many surveys used
19  in intellectual property litigation.  Our recent clients include well-known organizations, such as:

20          ▪   Farmers Insurance
21          ▪   Goodyear Tire & Rubber Company
22          ▪   Blue Cross of California/WellPoint
23          ▪   Various regions of the American Automobile Association
24          ▪   Nestlé USA, Inc.
25          ▪   Smart & Final Stores

26  10.     Over MMR's history, the firm has served such well-known organizations as Baskin-

27

28  [2] Until approximately October, 2009, the firm was known as Marylander Marketing Research, or MMR.

- 2 -                     Declaration of Dr. Bruce Isaacson
                          Civil Action No. 4-07-cv-80 (CDL)

1  Robbins, Bumble-Bee Seafoods, Hewlett-Packard, Leslie's Swimming Pool Supplies, Ore-Ida

2  Foods, the Hollywood Bowl, the UCLA School of Public Health, Universal Studios, Denny's,

3  Jack in the Box, and many other organizations, encompassing thousands of studies. Consumer

4  goods and services, which include consumer durables such as vacuum cleaners, constitute a major

5  area of focus for MMR's research and consulting activities.

6  11.    I received a Bachelor of Science degree in engineering from the Technological Institute at

7  Northwestern University in 1985, and Master of Business Administration and Doctor of Business

8  Administration degrees from the Harvard Graduate School of Business Administration in 1991

9  and 1996. At Harvard, I received my MBA with highest distinction as a Baker Scholar and was a

10  Dean's Doctoral Fellow, writing 14 publications on marketing and strategy, including best-selling

11  teaching materials.

12  12.    I have taught marketing and strategy for executive groups and executive MBA programs,

13  and I received research awards from institutions including The Institute for the Study of Business

14  Markets at Pennsylvania State University, and Harvard University.

15  13.    In terms of professional experience, I have been a marketing and strategy consultant at

16  The Boston Consulting Group, Senior Vice President at a publicly traded data processing

17  company that is now a division of Intuit, Division President at a media services company, and

18  Vice President responsible for marketing and strategy at a national financial services company. I

19  also served as the West Coast Practice Leader of Monitor Executive Development, a division of

20  Monitor Group, an international strategy consulting firm, where my responsibilities included

21  developing curriculum and serving as lead faculty for executive education programs in marketing

22  and strategy.

23  14.    I am a member of the American Marketing Association and the Marketing Research

24  Association. My firm is a member of the Council of American Survey Research Organizations

25  and the International Trademark Association. I am also on the editorial board of the *Journal of*

26  *Business to Business Marketing*, and have been appointed to *The Trademark Reporter* Committee

27  for 2010 – 2011 by the International Trademark Association. I regularly consult with clients on

28  issues relating to marketing, research, and strategy, and also address associations and groups on

1   the same issues. My public speaking includes addresses to law firms and bar associations on the

2   use of research and surveys in intellectual property litigation.  In 2008, I was a speaker at the

3   American Marketing Association's annual marketing research conference.  I have co-authored an

4   article published in the Intellectual Property Law Newsletter of the American Bar Association,

5   Intellectual Property Law Section, on the use of surveys on Intellectual Property research.

6   15.    Over my career, I have personally designed, overseen, and analyzed many hundreds of

7   research studies.  I have also provided expertise on topics such as marketing, consumer behavior,

8   and pricing to many clients in a variety of industries.  The subjects of this expert report, which

9   include pricing, survey research, and marketing, are frequently the subject of projects for my firm

10   and for me personally.

11   16.    A copy of my curriculum vitae and litigation expert witness experience is attached as

12   Exhibit 1.

13

14   **COMPENSATION**

15   17.    My firm and I have provided a variety of services in conducting the research described in

16   this expert report.  We have keypunched and checked data from customer contracts, which was

17   billed on a per-contract basis.  We have conducted survey research, which was billed on a project

18   basis.  My time in testimony at trial or deposition, if any, is billed at $6,000 per day, while my

19   time for other follow-up activities after the writing of this expert report is billed at $500 per hour.

20   Other staff members at my firm may assist me, and they bill at equal or lower rates.

21

22   **MATERIALS REVIEWED**

23   18.    For the purposes of this report, I have reviewed materials that include the following:

24        i.    Legal documents, such as the Second Amended Complaint and Jury Demand;  the

25            Order Denying Motion to Dismiss for Failure to State Claim (submitted on

26            December 4, 2007); the Plaintiff's Motion to Compel Discovery from Defendant

27            (submitted September 30, 2008); and Plaintiff's Amended Motion to Compel

28            Discovery (submitted June 30, 2009).

Declaration of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1    ii.   The transcript and exhibits from the deposition of Michael Nichols, taken on

2          September 4, 2008.  Also, I attended the deposition of Robert Shumay, taken in

3          Cleveland, Ohio, on January 13, 2009.

4    iii.  Material provided through discovery in this matter (including the above-mentioned

5          depositions), such as sales training materials, marketing materials, sales presentation

6          materials, materials describing sales policies, registration cards, and electronic disks

7          labeled "Kirby Proof Book Demo Factory Demo By John Pedano," "Kirby Sales

8          Clinchres *[sic]* & The Fundamentals of Selling," and "Kirby Dealer Training

9          Videos."

10   iv.   Data provided by Kirby in the form of customer names and customer contracts,

11         described in the next section of this report.

12   v.    Products on relevant websites such as www.kirby.com and other websites selling

13         new and used products, typically in the same price range as a new Kirby vacuum.

14   vi.   My prior expert report in this matter.[3]

15   19.   I have also reviewed published literature and cases relevant to the issues and theories in

16   this matter, and have received advice and assistance from colleagues and staff at my firm.  I

17   further rely on my knowledge in fields such as consumer surveys and market research.  I reserve

18   the right to supplement this declaration or my opinions based on additional information and/or

19   data gathered between now and the time of the trial in this matter.

20

21   **DATA PROVIDED BY KIRBY**

22   20.   As described in my prior report in this matter, the theory of reference prices, which is

23   well-accepted among marketing practitioners, indicates that consumers develop expectations and

24   perceptions of prices in reference to the prices of known and similar items.  For example,

25   consumer expectations for the price of a used car may be based, at least in part, on similar items,

26   such as the price of a similar new car, or the price of other used cars with like features.  The

27   ─────────────────────

28   [3] The report was entitled, "Declaration of Dr. Bruce R. Isaacson, D.B.A., M.B.A., Requesting Data from Defendant and Describing Proposed Research," and was signed January 29, 2009.

1   reference price may be formed relative to the price of competitive items, identical items, or

2   substitutes, but the essential idea is that consumer expectations of prices for an item are

3   influenced by prices for similar items.[4]

4   21.     With this theory in mind, it is reasonable to expect that consumers form expectations of

5   the value of a previously-owned Kirby vacuum cleaner based, at least in part, in relation to the

6   price of a new Kirby vacuum.  It is also reasonable to expect that the individuals best positioned

7   to evaluate the price difference, if any, between a new vacuum and a previously-owned vacuum

8   are actual Kirby customers, who have experienced an in-home sales demonstration and are

9   familiar with Kirby's products.

10   22.    My previous declaration in this matter requested data from the defendant and described

11   my proposed research. In that declaration, I explained that actual customers who had purchased a

12   Kirby vacuum cleaner are most qualified to evaluate the difference in value between a new and

13   previously-owned Kirby vacuum.  In response, the defendant provided information used to create

14   two data sets for the survey.

15   23.    Kirby Customers Electronic File:  In response to my request for registration data from

16   30,000 gold or blue registration cards, Kirby provided an electronic file with the names of 29,924

17   Kirby customers, selected at random, who purchased Kirby vacuums in 2007.  The file included

18   the following fields: customer name, address, phone number, age code, serial number, model,

19   date of purchase, type of purchase (home or commercial), distributor number and name, and gold

20   or blue card registration status.  After removing incomplete records, duplicates, cell phone

21   numbers, invalid area codes, and do not call numbers, this file provided 21,617 customer records

22   usable for dialing. This file did not have any pricing information.  I had requested that Kirby use a

23   process to randomly select customers from all records available, such as a random number

24   generator or every nth listing, and I have no reason to believe that Kirby did not follow such a

25   process.

26   24.    Kirby Sales Contracts:  I also requested data to evaluate the average selling price of a

27   _____

28   [4] See, for example, Thomas T. Nagle and Reed K. Holden, *The Strategy and Tactics of Pricing:  A Guide to Profitable Decision Making*, Third Edition.  Prentice Hall, 2002, pages 84-88.

Declaration of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1   Kirby vacuum.  Specifically, I requested copies of 5,000 actual sales contracts for blue or gold

2   card registrations, including 1,000 per year for each year from 2003 through 2007.  In response,

3   Kirby extracted from its customer database[5] all blue card or gold card registrations for the

4   appropriate delivery year in which the distributor was active as of July 30, 2009, the sale was

5   within the continental United States, the serial number was valid, and the customer name and

6   address were not blank.  From these records, Kirby used an "nth" selection process, where each

7   nth record was selected, and distributors were requested to provide the selected records.

8   Although I did not oversee Kirby's actual process of generating this data, my understanding of

9   the selection process for customer names and sales contracts suggests that the process is unbiased

10  and sufficiently close to random as to be reliable.

11  25.      In total, Kirby provided copies of 3,279 sales contracts.  To provide a few examples, I

12  have included 24 contracts, selected more or less at random, as Exhibit 2.  Staff at MMR, under

13  my direction, carefully transcribed data from the contracts into an electronic database.  All data

14  entered was checked for accuracy and Spanish-language contracts were translated into English

15  during data entry.  From these 3,279 contracts, we excluded 177[6] contracts that had illegible text,

16  unusual circumstances, illogical or nonsensical entries, significant math errors, or large amounts

17  of missing information,[7] leaving 3,102 contracts in the final data set for pricing analysis.

18  26.      Some of the sales contracts included customer phone numbers.  The phone numbers on the

19  contracts, plus searches conducted by staff at my firm and a database marketing firm,[8] identified

20  phone numbers for 722 Kirby customers who purchased their vacuum cleaner since 2007.  After

21

22  [5] Brian Thomas, Manager MIS at The Kirby Company, described the process by which records were selected in an
     Affidavit notarized November 18, 2009.

23  [6] In total, there were 97 contracts with irreconcilable math errors, 32 illegible contracts,  and 37 other situations (such
     as missing necessary information, confusing crossouts, multiple purchases, duplicate contracts, etc).

24  [7] Here are a few examples of excluded contracts.  The contract Bates numbered SFKY-2008-00976 shows a purchase
25   price of $1,700, a down payment of $100, and a total amount financed of $1,100;  subtracting $100 from $1700 does
     not equal $1,100.  The contract numbered SFKY-2005-00591 has no pricing information other than "Paid in Full".
26   The contract numbered SFKY-2008-00013 has two sets of prices, one crossed out, but it is not clear which was used.
     The contract numbered SFKY-2008-00811 appears to include a vehicle as a trade-in for a Kirby vacuum.

27  [8] The firm, Buxton Company of Fort Worth, Texas, was founded in 1994 and provides data-driven marketing
28   services, including modeling and data appending.  Buxton's database includes information on more than 120 million
     households.

Declaration of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1  removing invalid numbers, duplicates, cell phone numbers, and do not call numbers, there were

2  653 customer records from the contracts usable for potential telephone interviews.  The contracts

3  provided the actual price these customers paid for their Kirby. Exhibit 3 provides a copy of the

4  contracts database, including phone numbers supplied by Kirby and obtained from other sources.

5

6  **AVERAGE PRICING OF KIRBY VACUUM CLEANERS**

7  27.    The specific information on each contract varies somewhat from contract to contract, but

8  typically includes the selling price, the accessories and add-ons purchased, and the dollar amount

9  of any credits for items such as trade-ins or promotional discounts.   Often, other information,

10  such as buyer name, address, and date is included as well.

11  28.    The table below summarizes the number of contracts and the pricing data.  As can be

12  seen, the average selling price including accessories but excluding sales tax, down payments, and

13  trade-ins or other discounts, was $1,616.  The average selling price in all years was no less than

14  $1,517 and no more than $1,649.

15

**Counts and Average Prices of Kirby Contracts by Year**

|  | Total | 2008 | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|---|---|
| Contracts | 3,102 | 717 | 633 | 536 | 489 | 375 | 352 |
| Selling Price | $1,616 | $1,636 | $1,649 | $1,645 | $1,612 | $1,575 | $1,517 |

19  29.    The selling price paid varied somewhat from customer to customer.  The percentiles[9]

20  associated with different price levels are shown in the table that follows this paragraph.  The

21  prices in the table include accessories, but not sales tax, down payments, or trade-ins/other

22  discounts.  As can be seen, customers who paid $1,000 paid a price in the bottom 10th percentile,

23  meaning that approximately 10% of customers paid less than $1,000 and 90% of customers paid

24  $1,000 or more for a Kirby vacuum. In addition, the top 10% of customers paid a price equal to or

25  greater than $2,019.

26

27

28  [9] Percentiles represent the percentage of respondents who paid prices below the given number and were calculated
from the Kirby contracts database.

Declaration of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

| Percentile | Price Level |
|---|---|
| 10th | $1,000 |
| 20th | $1,200 |
| 30th | $1,440 |
| 40th | $1,570 |
| 50th | $1,688 |
| 60th | $1,785 |
| 70th | $1,888 |
| 80th | $1,949 |
| 90th | $2,019 |

## THE TELEPHONE SURVEY

30.     The survey interviewed 1,270 actual Kirby customers who had purchased Kirby vacuums since 2007.  I was personally responsible for and involved in survey administration and analysis. Exhibit 4 shows the survey questionnaire in English and Spanish.

31.     The survey began with certain admonitions.  Respondents were told to answer every question to the best of their ability, not to guess, that there are no right or wrong answers, and not to consult any other sources.  Initial questions in the questionnaire evaluated whether a potential respondent qualified to be interviewed.  Although every respondent was called from a list of those who had actually purchased a Kirby vacuum, Questions 2 and 3 confirmed that potential respondents had bought, or participated in buying, a Kirby vacuum cleaner in the past three years. To disguise the true purpose of the survey, qualifying responses to these questions were disguised among other, non-qualifying responses.

32.     After qualifying to take the survey, potential respondents whose names were obtained from the electronic file of Kirby customer names were randomly assigned to Cells 1-6, while potential respondents located from the contracts were assigned to Cell 7.  Respondents were asked to answer all questions keeping in mind the Kirby vacuum they most recently purchased. Questions 4 and 5 asked respondents if they purchased accessories and if they traded in another vacuum when they purchased their Kirby vacuum.  Question 6 then described a hypothetical situation that formed the basis for the survey.  Respondents were told the following:

Declaration of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1
2
3
4

I am now going to describe a hypothetical situation so that I can receive your opinion. I am not saying this actually happened. Imagine that when you purchased a new Kirby vacuum, you could have instead bought an identical Kirby vacuum that had been previously sold to and returned by another customer. Imagine as well that the previously-owned Kirby vacuum had been cleaned, polished, repaired if necessary, and came with the same accessories, warranty and packaging as a new Kirby vacuum.

33.    The theory of reference prices, as well as everyday experience, suggests that a consumer considering the price of a previously-owned vacuum would likely compare that price with a similarly-featured new vacuum. Sellers in the real-world sometimes facilitate this comparison in advertisements and sales communications by telling buyers how much they would save for buying a previously-owned product instead of a new product, or by comparing the price for a new product when selling a pre-owned product. For example, on its website for refurbished products, HP lists the original price ($1,599) of a HP LaserJet printer above the refurbished price ($1,123.65).[10] Since the survey measured the discount that consumers would expect for a previously-owned vacuum both on a total dollar and percentage basis, it was necessary to measure this discount relative to the original price that the consumer paid or might have paid. However, for most of the customers in the database, the data provided by Kirby did not show what each actually paid for their Kirby vacuum.[11]

34.    Consequently, immediately after reading the prior text, interviewers provided respondents in Cells 1-6 with a typical price for a Kirby vacuum including accessories, creating a context in which consumers could evaluate a potential purchase situation and give reliable feedback about pricing. The prices read to respondents in Cells 1-6 covered the range of selling prices of new Kirby vacuums that I observed in the 3,102 usable sales contracts provided by Kirby. Cell 7 provided a comparison, because consumers in this cell were not provided with a typical price of a Kirby vacuum. Gathering data in both ways measured the expected discount both with and without a price mention provided in the interview.

25

[10] HP LaserJet P4515n printer for sale at http://h71016.www7.hp.com/dstore/ctoBases.asp?oi=E9CED&BEID= 19701&SBLID=&ProductLineId=435&FamilyId=1849&LowBaseId=&LowPrice=&familyviewgroup=2079&viewt ype=Matrix.  Prices collected on October 23, 2009.

[11] Asking consumers what they paid was not an ideal solution, given that the purchase occurred a number of years ago and that Kirby pricing reflects a number of elements, such as trade-ins, money down, taxes and other items.

- 10 -

1    35.    As described earlier, the data from the Kirby contracts database shows that the average

2    selling price of a new Kirby vacuum is approximately $1,616. The table below shows the sample

3    size in each cell, along with the prices mentioned as a typical selling price, and the percentiles of

4    each price. This is a conservative set of prices to test; across cells 1-6, the percentiles average to

5    43rd percentile, and 90% of Kirby customers pay prices at or higher than the price tested. In

6    addition, the sample sizes themselves are sufficiently large as to provide reliable estimates with

7    reasonable levels of confidence.

**Cells and Prices Mentioned**

| Cell | Sample Size | Price Mentioned | Percentile |
|------|-------------|-----------------|------------|
| Cell 1 | 200 | $1,000 | 10th |
| Cell 2 | 200 | $1,300 | 23rd |
| Cell 3 | 200 | $1,500 | 35th |
| Cell 4 | 200 | $1,650 | 48th |
| Cell 5 | 200 | $,1800 | 66th |
| Cell 6 | 200 | $1,900 | 75th |
| Cell 7 | $70^{12}$ | n/a | n/a |

14   36.    Following the previously-described hypothetical situation, respondents were asked

15   questions to measure their price expectation for the previously-owned vacuum:

16          i.     Question 7 asked whether the respondent would expect the price of a previously-

17                 owned vacuum to be more, less, or the same as the price of a new Kirby vacuum.

18          ii.    Question 8, asked only of respondents who answered "less" to Question 7, inquired

19                 how much price difference they would expect off the price of a previously-owned

20                 Kirby vacuum, compared with the price of a new Kirby vacuum.

21   37.    To confirm the answers recorded accurately reflected price differences, and to avoid any

22   potential overstatement of expected discounts, the survey included two questions to verify that

23   respondents understood Question 8. Question 9 asked:

24   >>

25   >>

26   >>

27

28   [12] The smaller sample size in this cell reflects the smaller number of contracts provided by Kirby. Kirby has
     indicated that they could not locate any additional contracts beyond those provided.

Declaration of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

"Is the number you just gave me the price you would expect a previously-owned vacuum to be or the **price difference**[13] you would expect between a previously-owned Kirby vacuum and a new Kirby vacuum?"

38.    If a respondent said their prior answer reflected the price of a previously-owned vacuum, they were re-asked Questions 8 and 9.  If a respondent said "price of a previously-owned Kirby vacuum" a second time, they were then terminated from continuing in the survey.

39.    Question 10 confirmed the answer for any response where the price difference was at least 50% of the original price.  When a respondent answered with this magnitude of price difference, Question 10 was asked, in which interviewers restated the amount provided by the respondent and made sure they were recording the answer correctly.  Respondents who answered "No" or "Don't know" to Question 10 were asked Questions 8, 9 and 10 (if necessary) a second time.  Similar to Question 9, respondents who failed to answer "Yes" after two such cycles were terminated from the survey.

40.    The final price-related question was Question 12, which asked respondents in Cells 1-6 to evaluate the difference between the average price mentioned by the interviewer and the price they actually paid.  Respondents could indicate the average price was "not very different"[14] from what they paid, "somewhat different," "very different," or that they don't know or can't recall.

41.    Remaining questions in the survey gathered additional information relating to the Kirby vacuum owned and the demographics of the respondent.  Question 13 asked if the respondent still owned their Kirby vacuum; respondents who did not own their vacuum were asked in Question 14 why they no longer owned the vacuum.  Questions 15-17 inquired if and who has contacted the respondent about their Kirby vacuum.  Finally, interviewers gathered demographic information, including education, income, age, and gender.

42.    Survey participants were contacted by trained and experienced marketing research interviewers using computer-assisted telephone interviewing to conduct the interview.[15]  Prior to

---

[13] Interviewers were instructed to emphasize words in bold and underline.

[14] An alternate, less conservative phrasing would have phrased answers using the word "similar."

[15] This is a method of data collection commonly used in surveys, where interviewers follow on-screen instructions as they question respondents and enter the responses into survey software.

Declaration of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1   fielding, a supervisor at each call center reviewed written study instructions, which are presented

2   in Exhibit 5.  The instructions specify calling times, bilingual interviewing instructions,

3   interviewing and validation procedures.  Supervisors participated in a phone briefing during

4   which staff at my firm explained the research design and methodology.  MMR staff also

5   monitored 20 calls during the initial phases of interviewing to confirm that proper interviewing

6   methods were followed.

7   43.      Western Wats of Orem, Utah, conducted the interviewing.  Western Wats has specialized

8   in programming and conducting CATI surveys for more than 20 years.  The survey was available

9   in both English and Spanish, with bilingual interviewers available for Spanish-speaking

10  respondents.  The English and Spanish versions were translated back and forth between English

11  and Spanish for consistency, and Spanish-language responses were translated into English for

12  analysis.  Out of the 1,270 interviews, 92 were conducted in Spanish.

13  44.      Survey experts often recommend validation of a percentage of the interviews to confirm

14  that the interview took place and that the interviewer was qualified.[16]  All of the interviews were

15  recorded for validation purposes, and call center supervisors monitored approximately 25% of all

16  interviews.  During monitoring, supervisors listened to at least 75% of each call monitored to

17  verify that the call occurred, that the respondent qualified for the survey, and that the interviewers

18  recorded the answers correctly.  Each day, supervisors monitored a selection of each interviewer's

19  calls to ensure quality control; a minimum quality control score of 85 out of 100 was required for

20  the interview to pass the monitoring.  Bilingual supervisors monitored the bilingual interviews.

21  Summary of the monitoring validation results are provided in Exhibit 6.  In total, 25% of

22  interviews were monitored, and 100% of monitored interviews passed.

23  45.      In addition to monitoring, 25% of respondents were re-contacted by an independent

24  survey firm to verify that the respondent participated in the survey and had purchased a Kirby

25  vacuum in the past three years.  The validation survey was conducted by Interviewing Service of

26

---

27  [16] For example, two respected sources define validation as contacting about 15% of respondents.  See Shari Seidman
    Diamond, "Reference Guide on Survey Research" from *Reference Manual on Scientific Evidence*, 2nd Edition, 2004.
28  See also J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition, Fourth Edition*, updated March
    2009, 32:170.

Declaration of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1   America (ISA), in Van Nuys, California. Exhibit 7 provides the validation questionnaire and a
2   summary report for independent validation. In total, 100% of the respondents who were re-
3   contacted for validation were in fact validated.

4   46.   In total, between the monitoring and independent validation, 41% of all interviews were
5   validated, well above relevant standards for this type of research. Questions 13-17 were used to
6   further check the responses and ensure that no respondent had any extraneous factor which might
7   bias or otherwise affect the reliability of their responses. In response to Question 13, 98% of
8   respondents indicated they still own their Kirby vacuum. Of those who no longer own their Kirby
9   vacuum, I removed one respondent who indicated in Question 14 that their Kirby vacuum had
10  been repossessed; this respondent was removed in case the repossession may have affected his or
11  her responses. Other respondents who parted with their vacuum by voluntary means were kept in
12  the database, but represent only 22 respondents.

13  47.   In response to Questions 15 and 16, 12% of respondents reported they were contacted by
14  someone regarding their vacuum. Most were contacted by a salesperson (57%) or the distributor
15  (27%), and no respondent mentioned they had been contacted by a party with direct ties to this
16  litigation (such as an attorney) in their response to this question.

17

18  **DETAILED FINDINGS FROM THE SURVEY AND ANALYSIS**

19  48.   Exhibit 8 provides the detailed cross-tabulations of the data from all questions in the
20  survey, while Exhibit 9 lists responses provided by each respondent.

21  49.   As shown in Table 7 and Table 8 of Exhibit 8, 59% of respondents bought accessories
22  when they bought their Kirby vacuum, while 54% of Kirby customers traded in another vacuum
23  when they bought their Kirby vacuum. Table 9 in the same exhibit shows that the vast majority
24  of respondents expected the price of the previously-owned vacuum to be less than the price of a
25  new Kirby vacuum. Across all cells, 90% expected the price of the previously-owned vacuum to
26  be less than the price of a new Kirby vacuum, while 4% expected it to be the same, 4% said they
27  don't know, and 2% expected the price to be more.

28  50.   Those who answered "less" in Question 7 were then asked Questions 8, 9, and possibly 10

Declaration of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1   regarding the magnitude of the price difference.  The following table presents the average price

2   differences expected by cell.

3

| **Average Expected Price Difference Between Previously-Owned and New Kirby Vacuums** | | | | |
|---|---|---|---|---|
| | | | **Q.8 Average expected discount** | |
| **Cell** | **Price mentioned** | **Sample size** | **$** | **%** |
| **All Cells** | **$1,523[17]** | **1,140** | **$548** | **36%** |
| Cell 1 | $1,000 | 179 | $388 | 39% |
| Cell 2 | $1,300 | 183 | $501 | 39% |
| Cell 3 | $1,500 | 179 | $551 | 37% |
| Cell 4 | $1,650 | 180 | $572 | 35% |
| Cell 5 | $1,800 | 176 | $647 | 36% |
| Cell 6 | $1,900 | 178 | $667 | 35% |
| Cell 7 | n/a | 65[18] | $427 | n/a |

11   51.     As can be seen above, the average expected discount generally increases as the price

12   mentioned increases, but even Cell 1, where the price mentioned was lowest, the average discount

13   expected was $388.  As described earlier, more than 90% of respondents in the contracts database

14   paid a price greater than the $1,000 price mentioned to respondents in this cell.  Even when no

15   price was mentioned, the average discount was $427, which is within the range of average

16   expected discounts when an average price was mentioned.

17   52.     The table also provides the expected discount as a percentage of the price mentioned.

18   Across all respondents, the average discount expected was 36% and varied from 35%-39%.

19   53.     As shown by the answers for all respondents across all cells (see Exhibit 9),

20   approximately 80% of respondents who expected a discount[19] expected that discount to be at least

21   $250 and less than $900.  Similarly, across all cells, only 10% of respondents who expected a

22   discount expected that discount to be less than $250, and 50% of those respondents expected the

23   discount to be at least $350 and less than $700.

24   54.     As mentioned earlier, the survey gathered sufficiently large sample sizes as to provide

25

26   [17] Weighted average of expected price mentioned in Cells 1-6.

27   [18] The small sample size in this cell is as large as could be obtained based on the number of contracts provided.
    [19] Numbers in this paragraph based to respondents who selected "less" for Question 7, and stated a number in
28   response to Question 8.

Declaration of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1    reliable estimates of these variables. For example, at a 95% level of confidence, and with the level

2    of variability (measured by standard deviation) shown in Table 10 of Exhibit 8, the confidence

3    interval around the $548 estimate across all cells is approximately +/- $15.  Individual cells have

4    larger confidence intervals;  for example, the confidence interval around the Cell 1 estimate of

5    $388 is approximately $21.[20]

6    55.    Question 12 asked respondents the degree to which the price mentioned was different

7    from what they actually paid.  Table 15 of Exhibit 8 shows that 66% of respondents reported that

8    the price prompt they were given was not very or somewhat different from what they paid.  Only

9    28% of respondents said that the price they were given was very different than what they paid,

10   and the greatest concentration of people who gave this response were in Cells 5 and 6, which

11   prompted with higher prices than most people paid.

12   56.    Because the actual price paid by respondents in Cells 1-6 is not known, Question 12 can

13   be used to measure results among respondents who believe the interviewer mentioned a price

14   reasonably close to what they remember paying.  The table below compares the average price

15   discount expected based on all respondents, respondents who said the price mentioned was not

16   very different from what they paid, and respondents who said the price mentioned was not very or

17   somewhat different from what they paid.

18   >>

19   >>

20   >>

21   >>

22   >>

23   >>

24   >>

25   >>

26

27   [20] Formulas for confidence interval calculations can be found in texts such as Moore, David S., George P. McCabe,
     and Bruce A. Craig (2009), *Introduction to the Practice of Statistics, 6th Edition*, W. H. Freeman and Company: New
28   York, pages 488-489.

Declaration of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

| | | | Q.8 Average expected discount, for | |
| | | | Respondents who said the price is not very different | Respondents who said the price is not very or somewhat different |
| Cell[21] | Price mentioned | All respondents | | |
| **Cells 1-6** | | **$548** | **$514** | **$523** |
| Cell 1 | $1,000 | $388 | $350 | $366 |
| Cell 2 | $1,300 | $501 | $489 | $479 |
| Cell 3 | $1,500 | $551 | $524 | $530 |
| Cell 4 | $1,650 | $572 | $540 | $543 |
| Cell 5 | $1,800 | $647 | $678 | $644 |
| Cell 6 | $1,900 | $667 | $534 | $610 |

**Average Expected Price Difference Between Previously-Owned and New Kirby Vacuums (Based to answers in Question 12)**

57.     As shown by the table, the average expected discount does not change meaningfully based on limiting the sample to those respondents who said the price mentioned matches the price they actually paid.  The average expected discount is $548 for all respondents who answered this question, versus $514 for respondents who said the price mentioned is not very different and $523 for respondents who said the price mentioned is not very or somewhat different.

58.     The remaining questions, 18-21, gathered demographic information from the respondents. More than two-thirds (68.5%) of respondents[22] have attended some college or less. The median annual income is $55,600.  Almost half of the respondents are 55 years or older and 68% are female.  The table below compares the demographics of Kirby customers and the U.S. population based on U.S. Census data.  As shown in the table, Kirby customers skew older and more likely to be female than the U.S. population.

>>

>>

>>

>>

---

[21] Cell 7 is not included in this table because this cell involved no price mention.

[22] Excludes respondents who selected "Prefer not to answer."

- 17 -

1

2

3

4

5

6

**Demographics of Kirby Customers and U.S. Population[23]**

| Demographic | Kirby Customers | US Population |
|---|---|---|
| **Age** | | |
| 18-54 years old | 51% | 69% |
| 55 years old or older | 49% | 31% |
| **Gender** | | |
| Male | 32% | 49% |
| Female | 68% | 51% |

7

8   ## DISCOUNTS ON OTHER PREVIOUSLY-OWNED GOODS

9   59.    As described earlier in this report, the average discount expected by consumers for a

10   previously-owned vacuum was 36%. My staff and I conducted research to evaluate common

11   selling prices for other types of goods sold in a previously-owned and/or refurbished condition by

12   the original manufacturer or a reseller. We examined goods that were similar to vacuum cleaners

13   in that they are consumer durables, priced in or near the price points for Kirby vacuum cleaners,

14   and sold in previously-owned and/or refurbished condition by either the original manufacturer or

15   by a reseller. For example, the computer manufacturer Dell operates the Dell Outlet, which

16   provides, among other items, refurbished products.

17   60.    In total, the analysis located 82 cases from a variety of different categories and

18   manufacturers, including computers (Dell, HP, Apple), home electronics (Bose, Philips, Toshiba),

19   tools (Bosch, DeWalt, Makita), and home appliances (Oreck, Dirt Devil, KitchenAid). The

20   analysis was not intended to sample every category or every manufacturer, but rather to compare

21   the survey data with a variety of items sold in previously owned and/or refurbished condition by

22   the original manufacturer or that manufacturer's reseller.

23   61.    All cases compared the price of a refurbished and/or previously-owned product with the

24   price of a new product that was exactly or nearly identical. The analysis was conducted online,

25   and excluded sites, such as eBay and CraigsList, where an individual consumer or party other

26   than an authorized or official reseller might sell a used product. The previously-owned and/or

27   refurbished prices were those at which the product was offered for sale when it was located. The

28   [23] Source: U.S. Census Bureau, 2005-2007 American Community Survey

- 18 -

1   new prices for goods were based on prices at which an identical or a highly similar item in new

2   condition was offered for sale by the original manufacturer or other reseller.[24]

3   62.     A summary of the research is provided in the table below, while the individual examples

4   that form the basis for the summary are provided in Exhibit 10.  Screen captures showing a

5   selection of the new and refurbished products researched are provided in Exhibit 11.[25]

| Average Prices and Discounts for Comparable Items and Kirby Vacuums | | | | |
|---|---|---|---|---|
| | Prices of Comparable Items | | | Kirby Survey and Contracts Data (all cells) |
| | All Examples | Sold by Original Manufacturer | Sold by Reseller | |
| Observations[26] | 80 | 49 | 31 | 1,140 |
| Average New Price | $1,153 | $1,235 | $1,025 | $1,523[27] |
| Average Discount (%) | 26% | 25% | 29% | 36% |
| Average Discount ($) | $293 | $299 | $284 | $548 |

13  63.     As can be seen, across all 80 cases, the average discount is 26%, which differs by 10%

14  from the 36% average discount expected by consumers in the survey.  The average discounts are

15  similar for products sold through manufacturers and resellers.

16

17  **CONCLUSIONS**

18  64.     In conclusion, my survey, using names of Kirby customers provided to my firm by the

19  defendants, shows that 90% of recent Kirby customers would expect the price of a previously-

20  owned Kirby vacuum cleaner to be less than the price of a new Kirby vacuum.  The average

21  discount expected by consumers for the price of a previously-owned Kirby vacuum, compared

22  with the price of a new Kirby, ranged from approximately $388 to approximately $667.

23  65.     The average expected discount across all cells was $548 or 36%.  Approximately 90% of

24

---

25  [24] The analysis did not rely on "compare at" prices listed by a reseller.  Rather, the price for the product in new condition was noted only if we could actually locate the product for sale in new condition.

26  [25] Due to file size, Exhibit 11 provides examples from each category of goods analyzed.  Printouts from all products analyzed are available upon request.

27  [26] Observations refers to number of products for the online research, or number of interviews for the survey data.

28  [27] Weighted average of expected price mentioned in Cells 1-6.

Declaration of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1    Kirby customers paid a price equal to or higher than the price referenced ($1,000) in Cell 1, and

2    the average expected discount in this cell was $388.

3    66.    The average discount for comparative products, which included other types of refurbished

4    goods in similar price ranges (such as computers, construction tools, home electronics, and home

5    appliances), sold by the manufacturer or resellers, was 26%. This suggests that the discounts

6    expected by survey respondents for previously-owned Kirby vacuums are approximately in the

7    range of discounts provided for other types of refurbished and/or previously-owned goods

8    included in the analysis.

9    >>

10   >>

11   >>

12   >>

13   >>

14   >>

15   >>

16   >>

17   >>

18   >>

19   >>

20   >>

21   >>

22   >>

23   >>

24   >>

25   >>

26   >>

27   >>

28   >>

Declaration of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1  I declare under penalty of perjury under the laws of the United States that the foregoing is true

2  and correct to the best of my belief.

3

4  Executed in Encino, California, on January 5, 2010.

5

6

7

8                                            Dr. Bruce R. Isaacson

9

10  **EXHIBITS INCLUDED WITH THIS EXPERT REPORT**

11        Exhibit 1:  Dr Bruce Isaacson CV and Testimony Experience

12        Exhibit 2:  Samples of Kirby Contracts

13        Exhibit 3:  Kirby Contracts Database

14        Exhibit 4:  Survey Questionnaires

15        Exhibit 5:  Study Instructions

16        Exhibit 6:  Summary of Monitoring Validation

17        Exhibit 7:  Re-contact Validation Questionnaire and Summary

18        Exhibit 8:  Data Tabulations

19        Exhibit 9:  Survey Results by Respondent

20        Exhibit 10:  Pricing of New and Refurbished Products

21        Exhibit 11:  Selected Screen Captures of New and Refurbished Products

22

23

24

25

26

27

28

Declaration of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)