# EXHIBIT D

Bruce Isaacson, DBA, MBA

Page 1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF GEORGIA

COLUMBUS DIVISION

JAMES and MARY JORDAN,         )
        Plaintiffs,      )
        VS.              ) NO. 4-07-cv-80(CDL)
THE SCOTT FETZER COMPANY,      )
        Defendants.      )
_____)

DEPOSITION OF:

    DR. BRUCE ISAACSON, D.B.A., M.B.A.

      WEDNESDAY, JANUARY 20, 2010

           9:13 a.m.

Reported by:  EMILIA JACALONE

           CSR NO. 7182

Rennillo Deposition & Discovery
Cleveland 216.523.1313    www.rennillo.com    888.391.3376 (Depo)

Bruce Isaacson, DBA, MBA

Page 22

1   A   I believe so. But I don't recall how many
2   drafts we prepared.
3   Q   Did you retain the drafts?
4   A   No. Well, the draft that was sent to the
5   attorneys, I would have a copy of that. That's the only
6   draft that I, that I know of that's available.
7   Q   Directing your attention to paragraph one of
8   Exhibit A, second sentence provides or states:
9            "This report provides the results
10           of a telephone survey I conducted to
11           measure perceptions of the price
12           consumers would expect to pay for a
13           previously-owned Kirby vacuum cleaner."
14           Did I read that correctly, sir?
15  A   Yes.
16  Q   And that was and is your understanding of the
17  purpose of the survey that you conducted; is that
18  correct?
19  A   Yes.
20  Q   You provided an earlier declaration to the court
21  describing the survey work that you intended to do.
22           Is that correct?
23  A   Yes.
24  Q   Is it your view that the survey you conducted
25  and that is reported and is the subject of your report,

Bruce Isaacson, DBA, MBA

Page 78

1      I don't recall whether there's a officially
2   suggested price.
3      Q   Did you make any inquiry, prior to determining
4   how you would approach the survey which you conducted, to
5   know whether or not Kirby had established over time a
6   manufacturer's suggested retail price for the Kirby
7   systems?
8      A   I made inquiry as to whether or not there was a
9   standard pricing or a suggested way of pricing the Kirby
10  system.
11     Q   Of whom did you make that inquiry?
12     A   Of counsel, and also of the documents that I
13  reviewed that I've listed in my expert report.
14     Q   And based on that inquiry, what did you
15  conclude?
16     A   I concluded that I wasn't sure exactly how a
17  Kirby was priced when sold at retail.  And that even if
18  there were specific standards that Kirby used to set
19  pricing, that the distributor had considerable leeway in
20  how they priced the vacuum cleaner.
21     Q   So you understood that the way in which Kirby
22  vacuum cleaners were priced in sales to ultimate
23  consumers was determined by distributors, and that varied
24  from distributor to distributor; is that correct?
25     A   That was my understanding.

Page 79

1  Q   Was that understanding considered by you to be
2  in any way relevant to the way that you would construct
3  the survey which you conducted?
4      A   Yes.
5      Q   How?
6      A   I thought that it was necessary at some point to
7  understand how much a Kirby was sold for.  And it didn't
8  seem to me that we could understand how much a Kirby was
9  sold for by using any official M.S.R.P. or standard of
10 pricing documents from Kirby, but in order to understand
11 that, we'd have to actually gather some data that we,
12 from past sales to analyze.
13     Q   And the reality of that data is that the pricing
14 for Kirbys ranges widely; isn't that correct?
15     A   The prices for Kirbys varies from transaction to
16 transaction.  That's correct.
17     Q   And indeed, it varies widely; isn't that
18 correct?
19     A   I don't want to quibble with you over the word
20 "widely," but I would agree with you that it varies from
21 transaction to transaction.
22     Q   Well, the prices in Exhibit A-3 reflected on the
23 contracts that you analyzed vary from as low of prices at
24 five hundred or below, to over 2,000; isn't that correct?
25     A   The prices vary considerably down into the

Bruce Isaacson, DBA, MBA

Page 82

1   come up with an arithmetic average.
2           Isn't that correct?
3       A   That is correct.  And -- that is correct.
4       Q   Now, the prices that you included in your
5   average were the gross selling price reflected on the
6   contracts, correct?
7       A   I don't, you used the word "gross."  Which I
8   don't recall as being reflected on, on any of the
9   contracts.  But it was the selling price including
10  accessories and excluding certain other items.
11          I don't know what you mean by "gross."
12      Q   Let me ask you to look at Exhibit A-2, and bates
13  number, last three digits 222 in Exhibit A-2.
14      A   Yes, sir.
15      Q   And then look at Exhibit A-3, page 13, and the
16  entry that is made there for bates numbers ending in 222.
17  That's the contract for Joan Snyder, correct?
18      A   Yes, sir.
19      Q   And in the selling price for Joan Snyder on page
20  13 of Exhibit A-3 is entered the amount 1445, correct?
21      A   Yes, sir.
22      Q   Now, the contract from Exhibit A-2 ending in
23  bates 222 shows a Kirby at 1395, and then an entry bags,
24  et cetera, $50, correct?
25      A   Yes, sir.

Bruce Isaacson, DBA, MBA

Page 83

1  Q   And you included the bags in the selling price
2  that you entered in, and made part of your average from
3  Exhibit 3, correct?
4  A   Yes, sir.
5  Q   What's your justification for adding the $50 for
6  bags into the selling price of the Kirby?
7  A   Well, it says bags, et cetera.  So that may be
8  bags, that may be various kinds of accessories.  It
9  doesn't say whether or not these are disposable bags or
10 these are hard items that are permanently attached, or,
11 or always used with the Kirby.
12         We included the Kirby plus all accessories, and
13 we would view these as an accessory.
14 Q   Did you make any inquiry to determine any of the
15 information that you just said you didn't know?
16 A   No, sir.
17 Q   So if there was a number on the contract, you
18 just included as price no matter what it was for?
19 A   We had thousands of these to sort through.  I
20 think --
21 Q   I'm just asking a question what you did, sir.
22 A   I don't think that it would be -- I think that
23 we used our best judgment and used appropriate judgment
24 to make a determination what was and wasn't an accessory.
25         And as we indicated, we included the selling

Rennillo Deposition & Discovery
Cleveland 216.523.1313   www.rennillo.com   888.391.3376 (Depo)

fb9d380e-7b80-4004-82f1-42029929c96b

Bruce Isaacson, DBA, MBA

Page 84

1  price including all accessories.
2     Q   But in any event, the prices that are reflected
3  in Exhibit 3 and that were included in your calculations
4  of averages included for some items like bags on the Joan
5  Snyder contract, and for others, no such entry, correct?
6     A   I don't understand your question.
7     Q   Well, my question simply says that in some
8  contracts, you had an entry like bags on Joan Snyder's
9  contract, you included that in price.  In other
10 contracts, you didn't have similar entry and you just
11 wrote the price for that contract, correct?
12    A   When you say "an entry like bags," what do you
13 mean by "an entry like bags"?
14    Q   I mean just what I said.  Just like typical
15 means typical.  I mean just what I said.
16    A   I haven't looked at every one of these
17 contracts, and I haven't looked at every one of them
18 recently.  But I don't imagine that many of them
19 specified entries using the word "bags."
20        I think that the vast majority of the entries
21 that we located that had the word "accessories" referred
22 to things that are clearly and obviously accessories of a
23 Kirby vacuum cleaner.
24    Q   Okay.  But some of the contracts had accessories
25 and others did not, correct?

1    A    That's correct.
2    Q    And so for purposes of pricing, you included
3  those with accessories and those without, correct?
4    A    Partially correct.
5    Q    Why only partially correct?
6    A    Because in some cases, the price of the
7  accessories was included in the total price of the vacuum
8  cleaners.  And in other cases, we couldn't determine from
9  the information that was available to us on the contract
10 whether or not accessories were sold as part of that
11 purchase.
12   Q    And so you don't know one way or the other,
13 correct?
14   A    That's correct.
15   Q    You took issue with my use of the word "gross"
16 price.  It's true, is it not, that the price that you
17 entered into Exhibit 3 and that was used in calculating
18 the arithmetic averages reflected on page 8 of Exhibit A
19 were the top line price on the contract, and did not take
20 into account trade-ins, correct?
21   A    Correct.
22   Q    And why not?
23   A    Well, really for two reasons.  One is for the
24 approximately 12 percent of the contracts, when you look
25 at the trade-in or discount line, you would see that that

Page 86

1   is included in the, in the, in that what you just
2   referred to as a top line price.
3           In other words, in, in the line on the contract
4   where the, where they could -- in fact, let me refer you
5   to one example.  If you look on Exhibit 2, the contract
6   that is bates numbered ending in 00255, it's the contract
7   for Michelle Borne.
8           And oh, I'm sorry, this one is not a good
9   example of that.  But this shows that for sales tax, it
10  has the word "included" written after sales tax.
11          In other cases in contracts we had the word
12  "included" written, was written on the contract under the
13  line that would normally be devoted towards trade-in or
14  discount.
15          So, so in, so in those cases, we knew that there
16  was a trade-in and a discount, but we had no way to sort
17  the value of that trade-in and discount from the overall
18  selling price.
19          The second issue is that when you look at
20  trade-in and discount, those are two potentially
21  different things.  A discount, I'm reducing the price of
22  the vacuum.  A trade-in, I'm providing something of value
23  in exchange for a reduction in price.  It's in many ways
24  a payment in kind.
25          So for both of those reasons, the fact that we

1  couldn't separate trade-in from discount, and the fact
2  that there were so many contracts for whom the trade-in
3  and discount was included in the overall selling price,
4  we decided that to keep things apples to apples, we would
5  stay with that, with that overall, what you've referred
6  to as the top line price.
7       Q  And you couldn't determine, could you, sir,
8  whether or not the trade-in value reflected on a contract
9  actually was, should be characterized fully as payment in
10 kind without knowing the actual trade-in and the
11 condition of that at the time, could you?
12      A  No, I don't believe so.
13      Q  That's not true with a discount, is it?  A
14 discount is a discount, isn't it?
15      A  Not necessarily.  There's some gray area between
16 the two.
17      Q  And the gray area would be what?
18      A  My sense, and I haven't sat in any negotiations,
19 but my sense is that there's a negotiation happening.
20 And there may be some trade-ins that are given extra
21 value, to include both a trade-in and perhaps a discount.
22          And there may be some -- so that there may be
23 some overlap between the two.  An analogy would be I go
24 to trade in my car on the purchase of a new car, and
25 let's imagine my car is worth a thousand dollars.