# Appendix B

1   Royal B. Lea, III (pro hac vice)
    Texas State Bar No. 12069680
2   royal@binghamandlea.com
    Benjamin R. Bingham (pro hac vice)
3   Texas State Bar No. 02322350)
    **BINGHAM & LEA, P.C.**
4   319 Maverick Street
    San Antonio, TX 78212
5
    C. Lance Gould
6   Alabama State Bar No. ASB-0913-G66C
    Lance.gould@beasleyallen.com
7   W. Daniel Miles, III
    Alabama State Bar No. ASB-7656-M75W
8   Dee.miles@beasleyallen.com
    **BEASLEY ALLEN CROW METHVIN PORTIS & MILES, P.C.**
9   218 Commerce Street
    Montgomery, AL 36104
10
    Attorneys for plaintiffs
11

12                  UNITED STATES DISTRICT COURT

13                  MIDDLE DISTRICT OF GEORGIA

14                     COLUMBUS DIVISION

15

16  **James and Mary Jordan**          Civil Action No. 4-07-cv-80 (CDL)

17         **Plaintiffs,**

18          v.                         **REPLY DECLARATION AND EXPERT
                                        REPORT SUBMITTED BY DR. BRUCE
                                        ISAACSON, IN RESPONSE TO THE
19  **The Scott Fetzer Company**        EXPERT REPORTS OF MR. RODNEY J.
                                        BOSCO, PROFESSOR MARIAN
20         **Defendant**                CHAPMAN MOORE AND DR. MICHAEL
                                        J. MOORE**

21

22

23

24

25

26

27

28

1.     I have been retained by lawyers representing the plantiffs in the above-captioned matter. Mr. Rodney J. Bosco has provided an expert report in this matter. Professor Marian Moore and Dr. Michael Moore have provided expert reports in this matter that address my expert report and survey. This report sets forth my opinions in response to those reports.[1]

2.     After providing a summary of my opinions relating to these three reports, I will provide a more detailed response to each in turn.

3.     The statements in this report, except as otherwise stated, are based on my personal knowledge; the opinions expressed are those I have formed based on my consideration of the information I have reviewed in this matter, my expertise, and my experience.

## I.     OVERVIEW OF MR. BOSCO'S RESEARCH AND MY OPINIONS OF THE BOSCO RESEARCH

4.     Mr. Bosco states that he was, "asked to design, administer and summarize the results of a survey of operational and sales practices utilized by distributors of The Kirby Company."[2] Mr. Bosco gathered survey data by conducting 107 telephone interviews with Kirby distributors.

5.     The Kirby Company sent a letter to 464 distributors stating that they will be contacted to participate in a survey about their sales practices. The Bosco survey gathers data from distributors on topics relating to how distributors and dealers sell Kirby Home Care Systems.[3] The questionnaire was organized into seven sections, including questions on the following topics:

    A.    Experience

    B.    Selecting prospects

    C.    Importance of the in-home demonstration

    D.    Kirby's involvement in the demonstration

    E.    Training of dealers

---

[1] My expert report was filed January 5, 2010. Mr. Bosco's report is dated March 18, 2010, Professor Marian Moore's report was executed on March 18, 2010, and Dr. Michael Moore's report was executed on March 19, 2010.

[2] Report of Mr. Bosco, page 2.

[3] It is my understanding that Kirby uses the term "distributor" to refer to a local company that sells Kirby vacuums, while "dealer" refers to individual salespeople at the distributor.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

F.      Sales practices regarding returned Kirby Home Care Systems

G.      Pricing practices

6.      As can be seen by the list above, Mr. Bosco's questionnaire covers a range of topics, presenting approximately 45 questions in total.  Most of the questions are closed-ended, with respondents selecting a response from specific options.  A small number of questions asks for open-ended (verbatim) responses.

7.      Mr. Bosco does not provide a summary of his key findings.  Instead, his report provides a series of graphs showing what percentage of respondents selected each response option, along with lists of verbatim comments when appropriate.  I was unable to find any opinion in Mr. Bosco's report regarding what the graphs mean or imply for this matter, or which graphs he considers particularly important or relevant.   The graphs describe factors such as:

    i.      The methods distributors use to select prospective customers.

    ii.     The reasons for returning Kirby vacuum cleaners.

    iii.    The percentage of distributors who would tell a prospect that a Kirby vacuum has been previously sold, under a variety of hypothetical conditions.

8.      The Federal Judicial Center, in a resource entitled "Reference Guide on Survey Research," identifies factors that are important to sound and reliable research.[4]  Among other factors, the article specifies that reliable research should pass the following evaluations:

    i.      Was the survey designed to address relevant questions?

    ii.     Was participation in the design, administration, and interpretation of the survey appropriately controlled to ensure the objectivity of the survey?

    iii.    Was an appropriate universe or population identified?

    iv.     What procedures were used to reduce the likelihood of a biased sample?

    v.      Were questions on the survey framed to be clear, precise, and unbiased?

    vi.     What approach was used to avoid or measure potential order or context effects?

    vii.    What did the interviewers know about the survey and its sponsorship?

---

[4] Shari Seidman Diamond, "Reference Guide on Survey Research" from *Reference Manual on Scientific Evidence*, 2nd Edition, 2004.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

viii.  What procedures were used to ensure and determine that the survey was administered to minimize error and bias?

9.     In my opinion, Mr. Bosco's survey is flawed and unreliable.  Mr. Bosco's research violates a number of foundational principles that form commonly-accepted practices relevant to litigation surveys.  The problems with the Bosco survey include:

i.     <u>Respondents are told the survey will be used for litigation</u>:  The introduction letter sent to respondents prior to the survey states that the survey will be used for defense of litigation involving Kirby.  This is a serious violation of the basic expectation that survey research is conducted under double-blind conditions.

ii.    <u>The survey respondents have reason to answer untruthfully</u>:  The respondent base for the survey is Kirby distributors, who have reason to provide answers that they believe will reflect favorably on them.  The central assumption of the Bosco survey, that distributors can be expected to be truthful about reporting their own sales practices, is highly questionable.  Common sense and the research literature suggest that survey respondents may not give truthful answers to questions on sensitive topics, such as whether they fully disclose information during the sales process.

iii.   <u>Items in the Bosco questionnaire are biased and/or leading</u>:  The Bosco questionnaire violates basic principles in questionnaire construction, presenting questions and possible responses that are biased and/or leading, and may implicitly encourage results that would be favorable from Kirby's point of view.

iv.    <u>The Bosco survey does not meet generally-accepted standards for administering and reporting litigation surveys</u>:  The Bosco questionnaire conflicts with survey principles that researchers commonly use in administering surveys, including the following:

a.     The survey starts with a small sample of only 107 respondents, and then exacerbates the problem of small sample size by analyzing the data in categories that are even smaller and less reliable.  At no point does Mr. Bosco address the level of confidence in such small numbers.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

b.  The survey does not rotate responses, instead presenting the respondent first with the more positive response from Kirby's perspective. This could induce order bias.

c.  The survey may also fail to conduct validation, which would confirm that calls were actually performed by interviewers.

10.  The first two items listed above, violation of double-blind conditions and the reliance upon a potentially-biased respondent base, are themselves serious. In conjunction with the other issues listed above, I have concluded that the Bosco survey is flawed and unreliable. Most of the biases inherent in the Bosco survey would tend to bias it towards answers that are more favorable to Kirby's point of view.

## II.   OVERVIEW OF MY OPINIONS RELATING TO THE REPORT FROM PROFESSOR MARIAN MOORE

11.  Professor Marian Moore[5] states that she was retained to comment on the research I conducted. In her report, she claims that my survey:

i.  does not account for contextual variables,

ii.  was not appropriately pre-tested,

iii.  did not allow respondents to understand the questions asked,

iv.  should not have used the term "previously-owned," and

v.  used leading phrasing in referencing the possibility of cleaning, polishing and repairing the vacuum, and in referencing the retail prices paid.

12.  I believe Professor Moore's comments are without merit, and that my survey reliably and conservatively measured how consumers interpret pricing for previously-owned vacuum cleaners.

i.  With regard to contextual variables, Professor Moore does not explain which contextual variables she wishes to measure, how they would be measured, or why they matter.

---

[5] For clarification, this rebuttal report refers to Professor Marian Chapman Moore as "Professor Moore" or "Professor Marian Moore," and refers to Dr. Michael J. Moore as "Dr. Moore" or "Dr. Michael Moore."

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

ii.   With regard to pre-testing, my survey was pre-tested, in a manner that meets the standards outlined in the sources cited by Professor Moore.

iii.   With regard to understanding survey questions, the comments provided by respondents to my survey show that respondents understand the survey questions, and appropriately considered the subject matter.

iv.   With regard to the phrase "previously-owned" the phrase is composed of only two words, both of which are easy to understand, and the phrase is used by Kirby on materials given to Kirby customers.

v.   With regard to phrasing of survey questions, Professor Moore does not explain why the phrasing is leading or what would provide a better alternative.

13.   In general, Professor Moore's comments lack specifics, and lack suggestions for alternatives that would be better.  It is worth noting that Professor Moore, by her own admission, has little experience or familiarity with litigation surveys, and her comments seem to be made without understanding practices and authorities relevant to litigation surveys.

III.   **OVERVIEW OF MY OPINIONS RELATING TO THE REPORT FROM DR. MICHAEL MOORE**

14.   Dr. Michael Moore states that he was asked to examine my report and the report of Dr. Jeffrey Harrison and provide opinions relating to common impact and damages methodologies.[6] This expert rebuttal report addresses two critiques offered by Dr. Michael Moore:

i.   Dr. Moore suggests that a previously-sold vacuum cleaner returned within a few days of purchase "almost certainly provide the same lifetime flow of services as a Kirby that has not been previously sold" and will be "physically and economically identical to a brand new Kirby."[7]

ii.   Dr. Moore also states that my estimates have a false degree of precision because, he asserts, I used the wrong statistical measure of dispersion.  Specifically, he states I

---

[6] Report of Dr. Michael Moore, page 3.

[7] Report of Dr. Michael Moore, pages 3, 7 and 8.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1    should have used the standard deviation of individual responses, not the standard

2    deviation of the mean response.

3    15.    Relating to the first issue, Dr. Michael Moore has used an abstraction of the lifetime of a

4    Kirby vacuum, ignoring the uncertainty, risk, and emotional aspects of a previously-owned item,

5    and contradicting Kirby's statements on this issue, the positioning of the Kirby brand, research

6    cited by Professor Dr. Marian Moore, the sales practices of comparative companies, and common

7    sense.

8    16.    Dr. Michael Moore's argument about which standard deviation to use is both technical

9    and puzzling, since my interest is in averages and not individual responses.  Dr. Michael Moore

10   cites no references in support of his argument, even to explain why he wishes me to deviate from

11   the method for calculating confidence intervals which is both most commonly-used and most

12   intuitively appealing in this matter.

13   17.    After reviewing my qualifications and certain background information, I will discuss in

14   detail my opinions to Mr. Bosco, Professor Marian Moore, and Dr. Michael Moore.

15

16   **IV.    MY FIRM AND QUALIFICATIONS**

17   18.    I am the owner and President of MMR Strategy Group ("MMR"), a marketing research

18   and consulting firm,[8] and I am an expert in research, surveys, and marketing.  I have described

19   my qualifications in my prior expert report, and I will summarize them briefly here.

20   19.    For approximately 35 years, MMR has provided marketing research and consulting,

21   including many surveys used in intellectual property litigation.

22   20.    I received a Bachelor of Science degree in engineering from the Technological Institute at

23   Northwestern University in 1985, and Master of Business Administration and Doctor of Business

24   Administration degrees from the Harvard Graduate School of Business Administration in 1991

25   and 1996.  At Harvard, I received my MBA with highest distinction as a Baker Scholar and was a

26   Dean's Doctoral Fellow, writing 14 publications on marketing and strategy, including best-selling

27

28   [8] Until approximately November, 2009, the firm was known as Marylander Marketing Research.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

teaching materials.  I am a member of numerous relevant professional organizations, am on the
editorial board of the *Journal of Business to Business Marketing*, and am a member of the *The
Trademark Reporter* Committee for 2010 – 2011 at the International Trademark Association.  I
regularly consult with clients regarding marketing, surveys, and strategy, and also address
conferences and groups on the same issues.

21.     I have provided testimony (including deposition, trial, or report) for about 20 intellectual
property matters involving surveys, and have conducted hundreds of surveys during my career.  A
copy of my curriculum vitae and litigation expert witness experience was attached as Exhibit 1 to
my prior report in this matter.


## V.     COMPENSATION AND MATERIALS REVIEWED

22.     For the research and writing of his report, my firm charged a total of $40,000.  This
amount reflects costs for my time and my staff's time.

23.     For purposes of this report, I have reviewed the materials that include the following items:

     i.      The report of Mr. Rodney Bosco and related exhibits.

     ii.     The report of Professor Marian Moore and research cited by that report.

     iii.    The report of Dr. Michael Moore.

     iv.     The deposition transcript of Professor Marian Moore, taken in Charlottesville,
          Virginia on April 29, 2010.

     v.      The deposition transcript of Dr. Michael Moore, taken in Charlottesville, Virginia
          on April 29, 2010.

     vi.     Other documents related to this matter, such as those I reviewed in preparing my
          original expert report.

     vii.    Articles and sources, including those cited in this expert report.

24.     I further rely on my personal knowledge in fields such as marketing, surveys, and
marketing research.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

## VI.  DETAILED BASIS FOR OBJECTIONS TO THE BOSCO RESEARCH

25.    As I indicated earlier, Mr. Bosco's research suffers from a number of significant flaws, biases, and limitations.  This section describes my objections to the Bosco survey.

### A.  The Bosco survey tells respondents in advance that the survey will be used for litigation.

26.    Typically, survey research in litigation contexts is done under double-blind conditions, in which neither the respondent nor the interviewer knows the true purpose of the research.  As the "Reference Guide on Scientific Research" states, "Any potential bias is minimized by having interviewers and respondents blind to the purpose and sponsorship of the survey."[9]  Many sources agree that interviewers should not know the name of the organization sponsoring the survey or the purpose of the research project,[10] and the same applies to respondents.

27.    There are good reasons for this well-accepted principle.  Interviewers who know the true purpose of a study may influence responses by verbal or nonverbal actions, even if they make efforts not to influence the results.[11]  When interviewees know the true purpose of a study, they may consciously or unconsciously use this knowledge to influence results in a particular direction.  As one source states, "When respondents know in advance who is sponsoring the survey, their feelings towards the sponsor may bias their answers to the questions."[12]

28.    The Bosco survey violates the well-accepted expectation of double-blind research by telling respondents and interviewers the purpose and sponsor of the research.  Exhibit 1 provides a copy of a letter sent to distributors before the interviews were conducted.  The letter is printed on Kirby letterhead, is signed by Mike Nichols, Executive Vice President of Business Operations at Kirby, and starts with the following text:

---

[9] Shari Seidman Diamond, "Reference Guide on Survey Research" from *Reference Manual on Scientific Evidence*, 2nd Edition, 2004, page 242.

[10] See, for example, Fred W. Morgan, "Judicial Standards for Survey Research: An Update and Guidelines", *Journal of Marketing*, Vol 54, January 1990, pages 59-70.

[11] Pamela L. Alreck and Robert B. Settle, *The Survey Research Handbook*, 2004, page 417.

[12] Alreck and Settle, page 104.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

"The Company currently is involved in a lawsuit about the sale of Kirby vacuum cleaners. Lawyers representing The Kirby Company have asked that a survey be conducted for their use to advise the Company in the lawsuit. You will be contacted by phone by a company named Tele-Survey Plus, Inc., which is conducting a survey asking questions about your sales practices. The information from this survey will be provided to lawyers representing The Kirby Company to help them make decisions about what is necessary to defend the Company in this lawsuit."

29.    The purpose of the research was also disclosed to the distributors at the beginning of the survey. As shown by the questionnaire in Exhibit 5 of Mr. Bosco's report, the introduction to the survey tells the interviewer to state the following if the distributor asks about confidentiality or use of the information: "This survey is being conducted for the use by the lawyers who are representing The Kirby Company in a lawsuit." A copy of that page of the questionnaire is also included in Exhibit 1.

30.    Distributors earn their livelihood, at least in part, from The Kirby Company. It is difficult to imagine that a distributor could receive a letter like this and still provide answers that were objective and not biased. Even TSP, the company who conducted the interviews, voiced concerns of possible bias if the purpose of the research was disclosed to respondents. In an email dated February 2, 2010, Marouchka Cidroff, President of TSP, wrote to Mr. Bosco:

"I am concerned about the referral to the lawsuit in the invitation letter and at the introduction of the questionnaire. We may get biased response or perhaps a high non-participation. Is it necessary to indicate the lawsuit in the letter/introduction section?"

31.    It appears that not disclosing the information may have been considered and unfortunately rejected. In a later email, dated February 16, 2010, Ms. Cidroff states, "As for the 3rd paragraph, if you decide not to disclose the lawsuit information to the respondent in the invitation letter, the questionnaire intro text would have to be revised." Copies of both Cidroff emails are enclosed as Exhibit 2.

32.    The lack of blinding of the study may extend beyond the interviewers and respondents, all the way to the client. Mr. Bosco states that he spoke with Kirby employees about topics such

- 9 -

1   as how to phrase questions, possible response options, and length of survey.  We do not know

2   whether and what these employees communicated to Kirby distributors regarding the survey, but

3   it is reasonable to expect that Kirby distributors have regular contact with The Kirby Company,

4   making it possible that Kirby might tell distributors what would be asked or how to answer.

5   33.   One indication of this potential bias is that after the survey, one distributor contacted TSP

6   and asked to be removed from the interview database.  A copy of Ms. Cidroff's communication

7   on this matter is also included in Exhibit 2.  Mr. Bosco's report does not provide the reasons

8   given by the distributor for asking to be removed.  However, removing a respondent is unusual

9   and may be one demonstration of a broader concern over the sensitive nature of the topic.

10   34.   Kirby's own expert, Professor Marian Moore, agrees with me that telling respondents the

11   sponsor and purpose of the study is highly problematic, as demonstrated by this exchange:

12        Q.   If he had -- if whoever the interviewer was had said something like, listen,

13             this survey is going to be used by the lawyers for the plaintiff in this

14             lawsuit where they are trying to get some money in this lawsuit, and

15             knowing that now, I want you to answer these questions for me, how

16             would you feel about that?

17        A.   That would be a violation of everything in marketing research community.

18        Q.   Would that just make the survey so biased that then you would say, we

19             can't use that, that's not reliable?

20        A.   Reliability as a technical term means would you get the same answer

21             every time you ask, so that's not the way I would approach it.  I would say

22             that's one of the first things you would never did.[13]

23

24   **B.   The survey respondents have reason to answer untruthfully.**

25   35.   Survey researchers differentiate between different kinds of bias in research.  Response

26   bias, the tendency to provide answers biased in a particular direction, can be introduced by the

27

28   [13] Deposition of Professor Marian Moore, page 34.

1    mental state or predispositions of respondents.  Survey researchers understand that certain topics
2    motivate a respondent to present themselves in a favorable light, making it "more likely that the
3    respondent will bend the report of his behavior in that direction."[14]  Response bias is more likely
4    in surveys that involve certain conditions, such as those that occur when a particular response is
5    socially desirable, when a certain pattern of responses might make the respondent look good, or
6    when a survey addresses threatening or sensitive topics.

7    36.    The Bosco survey asks questions on topics that are highly sensitive, such as whether
8    distributors modify materials provided to them by The Kirby Company, whether distributors read
9    and are familiar with items such as the Proof Book, how much training distributors provide to
10   dealers, and whether they would tell a prospect that a Kirby vacuum has been previously owned.
11   Distributors could believe that The Kirby Company expects them to answer in certain ways.
12   They may also believe that The Kirby Company needs them to answer in certain ways to defend
13   the litigation, or that the survey measures and evaluates their sales practices.[15]   All of these
14   beliefs could bias their answers.

15   37.    Any survey relies on the assumption that respondents can be reasonably expected to
16   provide truthful answers.  In my opinion, the Kirby distributor may not be a reliable witness
17   regarding the above issues, particularly when the distributor knows their answers are for use in a
18   litigation proceeding.

19

20   **C.    The Bosco questionnaire has items that are biased and leading.**

21   38.    A core principal of survey research is that survey questions should be direct, clear,
22   unambiguous and not leading. [16]  Many sources on survey research discuss how a survey's
23   validity may be threatened if questions systematically distort responses by misleading

24

25   [14] Seymour Sudman and Norman M. Bradburn, *Response Effects in Surveys:  A Review and Synthesis.* National
26   Opinion Research Center, 1974.  See page 40, and other pages as well.

     [15] At the beginning of the survey, they are told, "Please be assured that all responses will be kept confidential." This
27   statement, however, is brief and neither indicates to whom the confidence applies nor whether it extends to Kirby
     management.

28   [16] Morgan, page 63.

1  respondents in a particular direction.[17]  Before I address how questions in the Bosco survey are

2  biased and leading, some background is appropriate regarding how respondents respond to

3  surveys.

4  39.     Respondents obtain cues from survey questions and instructions, just as they pick up cues

5  from language in everyday conversation.  However, a survey is an unusual environment.  Unlike

6  everyday conversation, survey procedures prohibit two-way feedback, so respondents may look

7  at even subtle cues as providing context and information, and they may use such cues to make

8  inferences that may affect their answers.  Respondents may determine the meaning of an

9  ambiguous question by remembering back to prior questions, and may assume that certain

10 information is relevant simply because it is provided.

11 40.     Respondents may seek cues in survey items, in a series of survey items, or even in the

12 order of survey items.  Respondents sometimes find cues where none are meant to exist, and they

13 respond according to the cues they believe they have found. In a survey, respondents make the

14 best sense they can of questions provided to them, and will answer questions even when they are

15 not quite sure what has been asked.[18]

16 41.     This background on surveys explains why the phrasing of questions is so important. The

17 Bosco survey repeatedly violates the principle that surveys should be direct, clear, unambiguous,

18 and not leading.   The most egregious example occurs during Questions F3B, F3C, F3D, F3E,

19 F3F, F3G, F3H, and F3I, which asks whether a prospect would be told during the sales process

20 that a machine had been previously sold.  This section includes the following questions:

21        i.    F3B: "If a machine has been returned during the three-day right to cancel period, if

22              you or your dealers were to try to sell that machine again, is it your practice to state

23              during the demonstration that it has been previously sold, or words to that effect?"

24        ii.   F3C: "If a machine has been returned during the three-day right to cancel period, if

25

26 _____
   [17] "Reference Guide on Survey Research," page 248.

27 [18] See, for example, Herbert Bless, Fritz Strack and Norbert Schwarz, "The Informative Functions of Research
   Procedures: Bias and the Logic of Conversation," *European Journal of Social Psychology*, Vol. 23, 1993, 149-16;
   or Norman Bradburn, Seymour Sudman, and Brian Wansink, *Asking Questions: The Definitive Guide to*
28 *Questionnaire Design*, 2004, Jossey Bass.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

you or your dealers were to try to sell that machine again, is it your practice to state during the demonstration that it has been previously sold, or words to that effect, **if the customer asked?"**

    iii.  <u>F3D</u>: "If a machine has been returned by a golden-ager, if you or your dealers were to try to sell that machine again, is it your practice to state during the demonstration that it has been previously sold, or words to that effect?"

    iv.  <u>F3E</u>: "How about **if the customer asked**?

    v.  <u>F3F</u>: "If a machine has been returned because a customer's financing was not approved, if you or your dealers were to try to sell that machine again, is it your practice to state during the demonstration that it has been previously sold, or words to that effect?"

    vi.  <u>F3G</u>: "How about **if the customer asked**?

    vii.  <u>F3H</u>: "If a machine has been returned as a result of a payment default, if you or your dealers were to try to sell that machine again, is it your practice to state during the demonstration that it has been previously sold, or words to that effect?"

    viii.  <u>F3I</u>: "How about **if the customer asked**?

42.    These questions are leading in a number of regards. First, they address a sensitive topic, namely whether distributors tell prospective customers that a vacuum cleaner has been "previously sold." When encountering such a question, distributors may feel it appropriate to bend the truth if they feel that it is possibly viewed negatively to not state that the vacuum was previously sold.

43.    Even distributors who do not feel this way initially may be encouraged to feel this way after the long series of suggestive questions. The first question asks whether they would disclose the previously-sold status if a machine was returned during the three-day right to cancel period. The next question asks if they would disclose the previously-sold status if the customer asked. The following series of questions asks about senior citizens ("golden-agers"), lack of financing, and payment defaults. With such a long series of questions, the sequence may feel to some interviewees as if the interviewer is fishing for the conditions under which they would disclose.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1    44.    This concern might be heightened because the questions present a series of specific

2    conditions under which the machine is returned, including three-day right to cancel, senior

3    citizens, financing, and payment default.  Respondents may induce "cues" from the fact that each

4    of these conditions are specified in such detail, particularly when, in answer to Question F3A,

5    many distributors stated that they had no returns falling into the relevant categories about which

6    they are asked later.  According to the data file of survey results provided by Mr. Bosco, in

7    Question F3A, 23 respondents said that zero percent of their returns are from a golden-ager, 61

8    respondents said that zero percent of their returns are due to financing not approved, and 25

9    respondents said that zero percent of their returns are due to a payment default.  All of these

10   respondents were later asked questions (such as F3D, F3E, F3F, F3G, F3H and F3I) inquiring

11   whether "is it your practice" to disclose that a machine had been returned for reasons such as

12   golden-ager policy, financing not approved, and payment default.   It is not clear what "practice"

13   these distributors had in mind when they answered a question about a circumstance that they said

14   constitutes zero percent of their returns.

15   45.    Other questions are similarly biased, leading or ambiguous in their phrasing.  In many

16   places, the survey fails to present all the options a distributor might consider, or does not instruct

17   interviewers to read certain responses out loud to the respondent.  For example:

18          i.     Question D1 asks whether Kirby requires "that you and your dealers conduct the in-

19                 home demonstration in a particular manner."  The response options are "Yes,"

20                 "No," "Don't know," and "Refused."  There is no response option suitable for the

21                 respondent who feels that only some of the demo must be in a particular manner.

22          ii.    Question D2 has a similar problem relating to what the distributors and dealers are

23                 required to say during the in-home demonstration.  Again, there is no option for the

24                 respondent who feels that some portion of the demonstration must be in a particular

25                 manner.

26          iii.   Question F1 asks when customers are shown the Owner Care Program.

27                 Interviewers are instructed not to read options for "Not at all," "Don't Know," or

28                 "Refused."  Only those options that suggest the program is shown to the customer,

- 14 -

1        such as "Before the demonstration begins" or "During the demonstration," are read.

2        It is less likely that distributors select responses that are not read, effectively biasing

3        towards answers that suggest that the Owner Care Program is shown to customers.

4    iv.    Question F2 asks when the customer is shown the warranty card.  This question has

5        the same problems as described above for Question F1.

6    v.    The entire series of questions relating to disclosing that a vacuum is previously sold,

7        including Questions F3B, F3C, F3D, F3E, F3F, F3G, F3H, and F3I may have a

8        similar kind of bias in responses. The interviewer is instructed to read the options

9        relating to "Yes," and "No," but not to read "Don't Know" and "Refused."  Again,

10        there is no "Sometimes" option for a distributor who might sometimes disclose.

11  46.    Without a "don't know" option, respondents are more likely to guess.  As the "Reference

12  Guide on Survey Research" states, "By signaling to the respondent that it is appropriate not to

13  have an opinion, the question reduces the demand for an answer and, as a result, the inclination

14  to hazard a guess just to comply. Respondents are more likely to choose a 'no opinion' option if

15  it is mentioned explicitly by the interviewer than if it is merely accepted when the respondent

16  spontaneously offers it as a response. The consequence of this change in format is substantial."[19]

17  47.    As far as I can tell, the Bosco survey fails to instruct interviewers to read the "Don't

18  Know" and "Refused" responses for most questions.  By not explicitly reading these options, the

19  Bosco survey has likely suppressed the proportion of people who might have selected these

20  options, while simultaneously increasing the percentage of people who are guessing at other

21  options.

22  48.    Also, many survey researchers recommend that surveys include an explicit instruction at

23  the beginning that respondents should not guess and that "don't know" responses are acceptable.

24  The Bosco survey provides no such instruction.

---

[19] "Reference Guide on Survey Research," page 250.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1   **D.      Mr. Bosco's study fails to match accepted standards for executing litigation**

2           **surveys.**

3   49.     Mr. Bosco's research also fails basic survey standards in a number of respects.  First, the

4   survey suffers from the unreliability caused by very small sample sizes.  Mr. Bosco starts with

5   only 107 interviews.  He then repeatedly breaks up this database into items with multiple

6   categories, creating smaller and highly unstable samples.  For example:

7           i.      Question A1 (page 8):  The biggest category in the chart has only 37 responses.

8           ii.     Question F3C (page 30): The chart is based on 21 total responses.

9           iii.    Question F3E (page 31):  The chart has 3 categories, and the largest category is

10                  based on only 5 responses.

11          iv.     Question F3G (page 33): The chart is based on 7 total responses.

12          v.      Question F3I (page 34): The largest category in the chart has only 3 responses.

13  50.     The level of confidence one can have in numbers based on such small sample sizes is

14  low, making in many cases for unreliable numbers.  In some cases, the sample sizes are so small

15  that confidence intervals cannot be reliably calculated, and the data would not be accepted as

16  having sufficient sample size for statistical analysis.

17  51.     A second problem relating to administering the survey is that the survey may fail to rotate

18  responses.  Responses to survey questions can potentially suffer from "order bias," where the

19  responses likely to be selected may be affected by the order in which responses are presented to

20  respondents.  Standard sources on litigation surveys, such as the "Reference Guide on Survey

21  Research," state that, "To control for order effects, the order of the questions and the order of the

22  response choices in a survey should be rotated."[20]   Typically, the order of sequential items is

23  varied or randomized, so that individual questions clearly appear to be distinct and the

24  respondent must separately consider each item rather than just selecting a response located in the

25  same position each time.[21]

26  52.     Mr. Bosco's report never mentions rotation, and all of the Bosco survey responses appear

27  _____

    [20] "Reference Guide on Survey Research," page 255.

28  [21] Alreck and Settle, page 105.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1    to have a similar order, where the first option presented to respondents is typically the most

2    positive from Kirby's perspective.  For example, in the questions relating to whether the

3    distributor would reveal that a vacuum was previously sold (such as F3B) the "Yes" option is

4    always read first, before the "No" option.  This also appears to be true for other questions, such

5    as whether the distributor read the Proof Book.  This is a basic violation of standard survey

6    practice, and calls in question the validity and reliability of the resulting data due to possible

7    order bias.  Professor Marian Moore agrees that order bias, if not corrected for, can invalidate a

8    survey.[22]

9    53.    A third possible flaw in the administration of the Bosco survey is that Mr. Bosco fails to

10   indicate that the interviews were not validated.  Validation is a technique where a percentage of

11   interviewees are called back to confirm that the interview took place and that the respondent was

12   qualified.  Professor McCarthy refers to validation as one of the "standard procedures" that

13   minimize error and bias,[23] and "lack of validation has been criticized as casting doubt on a

14   survey's reliability."[24] Validation is particularly important in contexts, such as in the Bosco

15   survey, where live interviewers conduct interviews by telephone, because it validates that the

16   interviewer actually conducted the interview.[25]  The Bosco survey provides no evidence of

17   validation.

18

19   **VII.    RESPONSE TO THE OPINIONS EXPRESSED BY PROFESSOR MARIAN**

20          **MOORE**

21   54.    Professor Marian Moore expresses a number of opinions in her report regarding my

22   survey.  In evaluating her opinions, it is important to note that Professor Moore seems to lack

23   experience with litigation surveys and possibly with some of the facts in this matter.  In her

24   deposition, Professor Moore stated that:

25

26   [22] Deposition of Professor Marian Moore, page 80.

27   [23] *McCarthy on Trademarks and Unfair Competition*, 32:170.

     [24] See Paco Sport, Ltd. V. Paco Rabanne Parfums, Southern District of New York, 2000.

28   [25] Floyd J. Fowler, Jr., *Survey Research Methods, Third Edition*. Sage Publications, 2002, page 133.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

i.      She has never designed, implemented or managed a survey for use in litigation.

ii.     She has never before testified in litigation where a topic was a survey for use in litigation.

iii.    This is the first time she has commented on a survey in litigation.

iv.     The first time she became familiar with the rules for use of surveys in litigation was when she prepared her report in this matter.[26]

v.      She also stated in deposition that she has never even spoken with anyone from The Kirby Company.  At deposition, she said she had not seen the Bosco Survey, did not know who Mr. Bosco is, and wasn't sure who he surveyed.

55.    Professor Moore's specific comments, and my responses, are as follows:

A.      **Professor Marian Moore claims that my survey does not account for contextual variables.**

56.    Professor Moore states in her report that my survey does not account for the differences in respondents with respect to variables such as "price consciousness," "risk aversion," "willingness or ability to negotiate," or other variables relating to the context when they bought their Kirby, such as the "sales demonstration" and "sales process."[27]

57.    This claim is puzzling on a number of counts. First, Professor Moore never explains what she means by terms such as "price consciousness," "risk aversion," or "willingness or ability to negotiate," such as how these terms are defined, what they are meant to measure, and why they should be measured.  In support of her arguments that these are important variables, she cites an article by Kent B. Monroe, but mentions in deposition that this article applies to pricing in general and not specifically to litigation surveys involving pricing.

58.    Professor Moore also suggests that I should consider the effect of the sales process and sales demonstration.  As is well-known, Kirby has stated that Kirby vacuum cleaners are sold via an in-home sales process and demonstration.  Because I surveyed actual Kirby customers, who

---

[26] Deposition of Professor Marian Moore, pages 8-9.

[27] Report of Professor Marian Moore, page 4.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1   have experienced an in-home sales process and demonstration, my survey inherently takes these

2   variables into account.

3   59.      In deposition, Professor Moore stated that she made no assumption about whether my

4   survey respondents received an in-home sales demonstration, and could make no such

5   assumption during deposition.  Professor Moore cites the deposition of Mr. Robert Shumay in

6   her report, but she could not recall whether Mr. Robert Shumay stated in his deposition anything

7   about how Kirby vacuum cleaners are marketed,[28] even though Mr. Shumay talked extensively

8   and multiple times about in-home demonstrations during his deposition,[29] and the word

9   "demonstration" is used more than 30 times during Mr. Shumay's deposition.  In other words,

10  Professor Moore seems to lack basic knowledge of how Kirby vacuum cleaners are marketed.

11

12         **B.      Professor Marian Moore claims that my survey was not pre-tested.**

13  60.      Professor Marian Moore further states that my "survey instrument was not pre-tested."[30]

14  I have previously stated that my survey was pre-tested, with the pre-test consisting of recording

15  and listening to the first 20 interviews to make sure that questions were asked properly and that

16  respondents understood the questions and were able to provide reasonable answers.

17  61.      Professor Moore, in her paragraph 16, suggests that because I did not talk with

18  respondents, ideally in a focus group, my survey was not pre-tested.  When discussing pre-

19  testing, Professor Moore cites authorities including an article by Dr. Fred Morgan,[31] a book by

20  Floyd Fowler entitled *Survey Research Methods*,[32] and a textbook by Iacobucci and Churchill

21  entitled *Marketing Research:  Methodological Foundation*.[33]

22  62.      Professor Moore and I both agree that pre-testing is generally appropriate in survey

23

24  [28] Deposition of Professor Marian Moore, pages 18, 19, and 20.

25  [29] Deposition of Robert Shumay, taken in Cleveland, Ohio on January 13, 2009.

    [30] Report of Professor Marian Moore, page 4.

26  [31] The Morgan article was originally cited in my first declaration in this matter describing my proposed research. See
    Morgan, F. W. (1990) "Judicial Standards for Survey Research:  An Update and Guidelines", in *Journal of
    Marketing*, pages 54, 59-70.

27  [32] Published by Sage Publications, Inc., 2009

28  [33] Tenth Edition, published by South-Western CENGAGE Learning.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1    research and, further, is frequently recommended by sources that discuss how to conduct surveys.

2    Judging by her comments in deposition, Professor Moore agrees with me that pre-tests are

3    defined in a variety of ways, and that she cannot locate a source stating that there is only one

4    specific way to conduct a pre-test:

5         Q.     Can you name a reliable, authoritative source, a textbook or an article or

6                something in your field, Doctor, that defines what a pre-test is for a survey

7                that's to be used in litigation?

8         A.     The only one I'm familiar with, and I'm not sure it says what a pre-test is,

9                it just says pre-testing is important, and that's in Professor Morgan's article

10               that's cited -- that I reference in my report.

11        Q.     And do you know of any others?

12        A.     Again, that was -- that's the only one that I read that said for survey for

13                judicial purposes specifically, but if you pick up any good, and that's in

14                quotes, marketing research textbook or survey research textbook, it would

15                mention the importance of pre-testing in some form, and there are a lot of

16                forms of pre-testing.

17    63.    The sources cited by Professor Moore are clear that there are a wide variety of accepted

18    methods for pre-testing.  For example, the Morgan reference has a brief three sentences on pre-

19    testing, stating that pre-testing is "routine in most survey research, and it should always be

20    carried out in court-bound research."  I believe, judging from this exchange during her

21    deposition, that Professor Moore agrees with me that Morgan does not indicate how to carry out

22    pre-testing:

23        Q.     So Morgan is a source that tells us pre-testing is important for a survey

24                that's to be used in litigation?

25        A.     Right.

26        Q.     But do we agree, Doctor, that Morgan doesn't tell us what constitutes a

27                pre-test for a survey for use in litigation?

28        A.     Yes.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1   64.     Fowler, another source mentioned by Professor Moore, recommends pre-testing of 20-50

2   interviews, and recommends audio-recording, the exact method I used, as a "more important, and

3   probably more useful, innovation with respect to the field pre-test."[34]  Later in the same

4   exchange during her deposition, Professor Moore comes to a similar conclusion about Fowler:

5          Q.      Does Fowler define what constitutes a pre-test for a survey for use in

6                  litigation?

7          A.      I'm not aware whether he does or doesn't.  His is a very general text, and I

8                  do not recall whether there's -- and he has -- I cited one or two; he's been

9                  doing research on research for 30 years.  There may be something he said

10                 somewhere about judicial, but I did not find it.

11  65.     Professor Moore claims that focus groups are key to pre-testing, stating that, "Focus

12  groups are the typical method used for pre-testing"[35] but she cites no authority or reference for

13  this claim.  In deposition she states that she is not aware of any focus groups ever used in pre-

14  testing surveys for litigation,[36] and I too am not aware of any researcher using focus groups as a

15  pre-test for a litigation survey.[37.]

16

17      **C.      Professor Marian Moore claims that respondents did not understand the**

18              **questions asked in my survey.**

19  66.     Professor Moore has listened to the recordings from my interviews and claims that "…18

20  of the first 20 recorded interviews reflected a problem with a question or inconsistency in

21  interviewer procedures."[38]  Her expert report includes excerpts of interviews apparently intended

22  to show locations where respondents did not understand questions.  There are two significant

23  problems with her critique.

24  _____

25  [34] Floyd J. Fowler, Jr., page 123.

    [35] Report of Professor Marian Moore, page 6.

26  [36] Deposition of Professor Marian Moore, pages 40-41.

27  [37] In deposition, Professor Moore seems to back off from her in statement that focus groups are the "typical method,"
    instead stating that they are a typical way but not the only way.

28  [38] Report of Professor Marian Moore, page 8.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

67.     First, although Professor Moore indicates that 18 of the 20 interviews were problematic,
she lists excerpts from only 12 interviews.  The other 8 interviews, including those with Ms.
Richmond, Ms. Whigham, Mr. Luigs, Ms. Koogler, Ms. Dixon, Ms. Knotson, Ms. Hanlin, and
Ms. Gerald are not addressed at all in the excerpts that Professor Moore provides.  Professor
Moore has not even provided a comprehensive list of all the interviews she views as problematic.

68.     Out of the examples she does provide, the excerpts listed by Professor Moore show
respondents who are grappling with complex subject material and are able to answer questions as
intended in the questionnaire.  For example, pages 10-11 of her report show excerpts from an
interview with Ms. Holiman, who was given $1,650 as the typical price of a new Kirby.
Professor Moore states that the excerpt shows "an example of the complexity of the central
questions."  My survey concerns pricing, which is inherently complex, but the price questions are
manageable for respondents.

69.     As an example, Ms. Holiman, when told that the typical price of the vacuum cleaner is
$1,650 and asked for an opinion about the price difference between a new and used Kirby,
provides the following response:

      i.      She states that she expects a discount of "A couple hundred dollars at least."

      ii.     She then provides a number of $1,400 or $1,350.

      iii.    She then clarifies that $1,300 or $1,350 or $1,400 is the price she would expect to
           pay for the $1,650 vacuum cleaner.

      iv.     She then states she would expect a discount of at least three or $400 and settles on
           $400 as the expected discount for the previously-owned vacuum.

70.     Ms. Holiman, in a thoughtful manner, has provided prices that are internally consistent.
The $300-$400 discount she expected, plus the $1,300-$1,400 price she would expect to pay, is
between $1,600 and $1,800, which includes the $1,650 price point she was given.  The math
works out similarly well for other respondents, including Ms. Misplay, Ms. Ball, and Ms. Jones.
The miscellaneous comments picked up by Professor Moore are simply examples of how
respondents in the survey arrive at a reasoned and thoughtful response.[39]

---

[39] On page 13 of her report, Professor Moore also criticizes my survey for the response options provided for Question

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

71.     As we consider the transcripts of interviews conducted in the survey, it is worth noting the demographics of Kirby customers.  As shown by Table 20 in Exhibit 8 of my prior expert report, 45% of the respondents to my survey have annual income less than $50,000, and 49% are 55 years old or older.  Kirby customers appear to be older than the U.S. population as a whole. [40] For any respondent, and particularly these respondents, answering questions about pricing may involve some thinking and reasoning, some of which might be conducted out loud.

72.     My survey questionnaire was very conservatively phrased and included numerous checks to make sure that respondents understood the questions they answered.  For example, one of the key questions in the survey was Question 8, which asked the respondent, "How much less would you expect the price of a previously-owned Kirby vacuum to be compared to the price of a new Kirby vacuum?"  After Question 8, interviewers asked a follow up to make sure answers to Question 8 reflected the price difference between a new and a previously-owned Kirby.  The follow up, Question 9, asked the following:  "Is the number you just gave me the price you would expect a previously-owned vacuum to be or the price difference you would expect between a previously-owned Kirby vacuum and a new Kirby vacuum?"

73.     The example cited by Professor Moore on pages 10-11 of her report is from an interview with Ms. Holiman, where Question 9 served exactly the confirmatory purpose it was intended to provide.

74.     Professor Moore also criticizes my survey for asking questions about hypothetical conditions, claiming that customers would somehow know to ask specifics and follow-ups.  As she states, "…if a previous-owned Kirby vacuum cleaner had been available at the time the customer purchased his/her new Kirby, and the respondent was aware of its availability, the customer probably would have asked questions regarding the nature of its prior use."  A central allegation of this case is that Kirby did not inform customers that certain vacuums sold as new

---

12. However, the data from responses to this question were only used to compare responses from consumers who paid prices close to Kirby typical prices versus other consumers, and are not otherwise relevant to my findings regarding the average price discount expected for a previously-owned Kirby vacuum cleaner.

[40] See, for example, U.S. Census Bureau, 2005-2007 American Community Survey.  The percentage of people 55 and older is about twice as high for Kirby respondents as for the US population as a whole.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1    were in fact previously owned.  If a customer does not know the vacuum is previously owned,

2    they would not know to ask about prior use, so my survey matched the conditions alleged in this

3    matter.  Even if they knew the vacuum was previously owned, the consumer may not know

4    whether it has been used, or the extent of prior use.

5    75.     Professor Moore also suggests that I should have presented all respondents with the

6    manufacturer's suggested retail price (MSRP), rather than a typical price.  In her deposition,

7    Professor Moore did not know what percentage of Kirby customers pay MSRP, or whether any

8    Kirby customer actually pays MSRP, or whether MSRP would provide a realistic comparison for

9    any respondent.[41]   My understanding is that Kirby frequently sells at prices that differ from

10   MSRP, and this understanding is confirmed by my extensive analysis of actual sales contracts

11   provided by Kirby customers.

12   76.     In his deposition, Mr. Shumay provides three manufacturer's suggested retail prices,

13   including $1,331 for "the basic unit," "just short of $1,800" for the "entire package," and $1,575

14   for a setup that "includes the Sentria, the rug renovator, and the zippbrush," but not "the floor

15   care kit or the handi-butler."[42]  Professor Moore never indicates which of these three prices I

16   should use.  In addition, the contracts research that I provided in my prior report, which used

17   sales contracts to measure the actual prices that Kirby customers paid, shows that few

18   respondents paid these specific prices.

19   77.     Professor Moore does not explain why a theoretical manufacturer's price, which customer

20   contract data shows is used only infrequently, is a better measure of price than the price actually

21   paid by real Kirby customers.

22

23        **D.     Professor Marian Moore claims that my survey used leading questions in**

24             **referencing the possibility of cleaning, polishing, and repairing the vacuum.**

25   78.     Professor Marian Moore also suggested that my survey's phrasing was leading and

26   biased.  As support for this criticism, she suggests in paragraph 32 that stating that the vacuum

27   ───────────────────

[41] Deposition of Professor Moore, pages 62-63.

28   [42] Deposition of Robert Shumay, pages 118-220.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1    cleaner had been cleaned, polished, and repaired if necessary could lead the consumer to believe

2    it needed such services. Later, in paragraph 33, she suggests that this phrase is included at the

3    initial part of the survey but not later in the survey, so that consumers (in her opinion) may not

4    have taken these and other qualifiers into account when answering subsequent questions.

5    79.   The critique raised by Professor Moore is problematic on two counts.  First, her criticism

6    is internally inconsistent.  If it was biasing of my survey to mention once that the vacuum may

7    have been cleaned, polished, and repaired if necessary, then it would have been even more

8    biasing if this statement, as Professor Moore suggests, had been mentioned twice.  The second

9    problem is that Professor Moore does not indicate what would have been a better alternative.

10   Had the survey not specified that the machine had been cleaned, polished, and repaired if

11   necessary, then respondents could have been left wondering what condition the machine they

12   received was in when it was provided to them.

13   80.   Professor Moore also claims that my survey used ambiguous wording, citing my use of

14   the phrase "previously-owned" to describe the vacuums in question.  This phrase is not complex.

15   It consists of two words, "previously" and "owned."  Both are relatively simple words, easy to

16   understand.  Together, they describe in literal and objective terms the key qualities of the Kirby

17   vacuum cleaners that are the subject of this litigation, namely that those vacuums have been

18   owned beforehand.  As I described in my prior expert report, Kirby employs the word "used" to

19   describe any vacuum cleaner that has been previously-owned, but the word "used" implies actual

20   use.[43]  A vacuum cleaner which was sold to a prior owner was definitely previously owned, but it

21   may or may not have been used.

22   81.   My choice of "previously-owned" also matches phrasing used by Kirby.  Exhibit 3 shows

23   a purple registration card, used by Kirby, that states, "I acknowledge that this Kirby cleaning

24   system may have previously been used, owned, and/or returned by another consumer."

25   82.   Professor Moore agrees that the phrase "previously-owned" is not difficult to understand,

26   as demonstrated by this exchange during her deposition:

27   _____

28   [43] Michael Nichols, Executive Vice President of Kirby, stated in a deposition on 9/4/08 (page 167), "...a unit that has
     been previously sold to a customer and repossessed is used."

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1      Q.      What does previously mean to you?

2      A.      Happened before.

3      Q.      And what does owned mean?

4      A.      Someone had title to it.

5      Q.      Previously isn't unclear to you, is it?

6      A.      Not to me.

7      Q.      And owned isn't unclear to you, is it?

8      A.      No.[44]

9  83.     Professor Moore suggests in paragraph 35 of her report that my survey should have used phrases such as "like-new, in the box," "used only for demonstration purposes," and "sold but never used." The problem with these suggested alternatives is that one of the central allegations of this matter is that consumers do not know what happened previously to the vacuum they purchased, such as whether it was used or not.[45] For example, a vacuum that was sold and used by a prior owner cannot be called "sold but never used." Also, one of the phrases, "like-new, in the box" was found in research cited by Professor Moore to be a phrase that generated considerable skepticism among survey respondents in unpublished research cited by Professor Moore.[46]

84.     My survey used very neutral language that reflected the only factor known for sure about the vacuum, namely that "previously" it was "owned" by another consumer.

## VIII.   RESPONSE TO THE OPINIONS EXPRESSED BY DR. MICHAEL MOORE

85.     As I indicated earlier, Dr. Michael Moore has expressed two primary opinions regarding my research. This section responds to those opinions in greater detail.

---

[44] Deposition of Professor Marian Moore, page 41.

[45] When asked in deposition, Professor Moore did not know of any evidence indicating that salespeople had information about the prior history or use of their vacuum cleaner.

[46] Anton Ovchinnikov, "Revenue and Cost Management for Remanufactured Products," cited by Professor Moore, pages 2 nd 15.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

A.   **Dr. Moore claims that a vacuum returned within a few days of purchase is virtually identical to a vacuum that has not been returned.**

86.   Dr. Michael Moore's argument rests on a number of assertions:[47]

i.   A vacuum cleaner that has never been used will provide the same flow of services as a new vacuum cleaner.

ii.   A vacuum cleaner that has been sold and returned within a few days of purchase will "almost certainly" provide the same usage as a Kirby that has never been sold, so that the "mere fact of a prior sale cannot reduce remaining life independent of usage."

iii.   Any buyer concerns over quality will be addressed by factors such as the product warranty and Kirby's reputation.

87.   These assertions are abstractions based in economic principles and do not necessarily hold when consumers have no way to judge the extent of prior usage of a given Kirby, when consumers tend to view products that are previously owned as possibly having lower quality and more potential problems than new products, and when consumers are used to encountering previously-owned goods in a different category than new goods.

88.   Consumers and companies often differentiate between new and used goods.  For example, Kirby has stated that they view any previously-owned vacuum cleaner as used. Michael Nichols, Executive Vice President of Kirby, stated in his deposition on 9/4/08 (p. 167), "…a unit that has been previously sold to a customer and repossessed is used."

89.   My previous expert report in this matter analyzes previously-owned goods sold by a variety of other manufacturers. The goods are household durable goods, as are vacuum cleaners, and are sold by well-known companies such as Dell, Hewlett-Packard, Apple, Bose, Philips, Toshiba, Bosch, DeWalt, Makita, Oreck, Dirt Devil, and KitchenAid.  The goods are sold by the

---

[47] Report of Dr. Michael Moore, pages 3 and 8.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1  manufacturers in a variety of conditions, all of them are previously owned and some refurbished.

2  They are all differentiated from new goods by virtue of the fact that they are sold in conditions

3  other than new, and in most or all cases the consumer does not know the extent of the prior use.

4  90.    For example, Dell operates a website called the Dell Outlet, which sells three types of

5  personal computers:  refurbished PCs, previously ordered but new PCs, and Scratch and Dent

6  PCs.  A consumer buying a computer from that website may or may not know the extent of use

7  of the computer by the prior owner.  KitchenAid states on their website for factory refurbished

8  products that, "Refurbished products may or may not have been used by a consumer."[48]

9  91.    Dr. Moore's paper addresses the example of a used car.  However, cars have odometers to

10  tell the consumer the amount of use, while vacuum cleaners have no such measurement device.

11  A previously-owned car and a vacuum cleaner are similar in that the mere fact of ownership can

12  cause either to become no longer "new."  For example, Wikipedia defines a used car as "…a

13  vehicle that has previously had one or more retail owners."  WordNet, a database of words and

14  concepts housed at Princeton, defines a used car as "a car that has been previously owned; not a

15  new car."[49]  Neither of these two definitions reference actual use.

16  92.    There are many other examples where even a small amount of use can cause a product to

17  become no longer new.  The paper cited by Professor Marian Moore describes a major wireless

18  carrier which uses a standard which it believes to be industry-wide, that only cell phones with

19  less than 3 minutes of airtime are considered to be new.  Devices with more air time, "even if

20  they look new and are fully functional," can only be sold as refurbished.[50]

21  93.    There is a reason for the fact that products can become used with little use or even with

22  only having had prior ownership. The newness of a product often suggests that the product is

23  new, clean, and likely to be problem-free.  Prior ownership, particularly in a situation where the

24  new owner cannot tell whether a product has been used or the extent of prior use, conveys

25  uncertainty.  Uncertainty is one of many emotions that can affect prices.  A paper cited by

26
27  [48] From www.shopkichenaid.com/cc_reburb.asp, May 18, 2010.
     [49] See http://wordnet.princeton.edu
28  [50] Anton Ovchinnikov, page 2.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1   Professor Marian Moore and written by Kent Monroe focuses on how psychological factors

2   contribute to "buyer's subjective perceptions of price," and how such perceptions can "shake the

3   belief" in the standard shape of a relationship between price and demand suggested by

4   economics.[51]

5   94.    My research showed an average price of $1,650 for a Kirby vacuum cleaner. There are

6   many less expensive vacuum cleaners on the market, but a Kirby vacuum sells for a premium

7   price in part based on trustworthiness and peace of mind. Prior ownership may introduce

8   uncertainty and consumers may wonder how much the product was used, who used it, for what

9   purpose, and how that might affect future usefulness.

10   95.    All things otherwise equal, a rational consumer would prefer to reduce risk and

11   uncertainty, and the lower price may tradeoff for the risk inherent in accepting a previously-

12   owned product. The Ovchinnikov paper cited by Professor Marian Moore suggests that

13   consumers harbor a negative perception towards remanufactured products, which they believe to

14   be of inferior quality. This was true even when the product was not necessarily used, and applied

15   even to products described as "previously opened but never used," because consumers worried

16   about hidden defects in these products.[52]

17   96.    Dr. Michael Moore assumes that the value of a Kirby is only related to the number of

18   hours left on the service life of the vacuum, but in deposition was unable to cite any research

19   indicating that a consumer will pay the same or more for a used appliance as for a new appliance,

20   or any similar research for cars, even though he had looked. He was also not aware of anywhere

21   a consumer could get an estimate of the useful life of a vacuum cleaner to calculate or estimate

22   the percentage of useful life remaining.[53] He was, however, aware that purchases of products

23   such as Kirby vacuum cleaners have an emotional context and consumers generally prefer new to

24   used. I believe it is reasonable to think that consumers may expect a discount for a previously-

25

26   [51] Kent B. Monroe, "Buyer's Subjective Perceptions of Price," from *Marketing Management: A Comprehensive*
*Reader*, 1983, page 546.

27   [52] Anton Ovchinnikov, pages 2 and 15.

28   [53] Deposition of Dr. Michael Moore, page 48.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1   owned product.  As Dr. Moore stated in deposition:[54]

2       "Maybe some people have a preference for new versus used that's independent of useful

3       life, a difference in the -- if you think about a car with a certain useful life remaining,

4       there could be differences in, you know, willingness to pay per unit for that car based on

5       preferences for new versus used.  Preferences vary, certainly."

6   97.     Similarly to an argument made by Professor Marian Moore, Dr. Michael Moore also

7   claims (in paragraph 44) that Kirby salespeople would present a vacuum cleaner as previously

8   sold, after which there would be questions and answers about the extent of prior use and the

9   amount of refurbishment and repair. There are two significant problems with this assumption.

10  This first is that, as Dr. Moore admitted in deposition, the salesperson may not know about prior

11  use.  The second is that a central allegation of this matter is that the prior ownership may be

12  concealed from the consumer, either in some cases or most cases.

13

14      **B.     Dr. Michael Moore claims that the best measure of variation relates to**

15              **individual estimates as opposed to the mean.**

16  98.     Dr. Michael Moore also claims that the best measure of variation relates to individual

17  estimates as opposed to the average. Dr. Moore and I agree on the formulas that should be used,

18  as Dr. Moore stated in deposition several times that I used the right formula to calculate the

19  standard error of the mean.[55]

20  99.     We are left then with a philosophical or technical discussion.  On the one hand, I have

21  calculated a series of averages using responses from my survey, and then calculated the standard

22  deviation around those averages using the accepted formula for calculating confidence intervals

23  around the mean.  A wide variety of statistical textbooks discuss the formula and the type of

24  calculation that I performed.[56]

25  _____

    [54] Deposition of Dr. Michael Moore, page 15.

26  [55] Deposition of Dr. Michael Moore, pages 29, 30, and 32.

27  [56] Formulas or discussion of calculating a confidence interval around a mean can be found in texts such as Moore,
    David S., George P. McCabe, and Bruce A. Craig (2009), *Introduction to the Practice of Statistics, 6th Edition*, W.
    H. Freeman and Company: New York, pages 488-489, or in Pamela L. Alreck and Robert B. Settle, *The Survey*

28  *Research Handbook*, 3rd Edition.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-80 (CDL)

1    100.    On the other hand, Dr. Moore has suggested I conduct a different type of calculation

2    based on a highly unusual formula.  He can provide no citation or authority for the claim that the

3    formula should be calculated as he suggests.  I too cannot recall any standard statistical textbook

4    that describes the type of calculation recommended by Dr. Moore.

5    101.    Dr. Moore's estimates of the size of the confidence interval are not only inconsistent with

6    generally accepted practices and with sources and authorities, but also inconsistent with the topic

7    of interest.  I have calculated a confidence interval focused around the mean, which is consistent

8    with the idea that we are interested in means and percentiles in this matter.  I do not believe there

9    is interest in predicting estimated values for specific individuals, but rather I am interested in the

10   averages that describe an entire class of individuals.  By definition, individual estimates describe

11   the individual and are not projectable, which is why surveys and related statistics (including

12   confidence intervals) rely on averages.

13   102.    Even given these issues, it is worth noting that Dr. Moore's calculations in his report

14   provide an inflated view of the margin of error, because his calculations rely on individual cells

15   rather than the overall sample size.  My survey had a sample size of 1,270 interviews, which is a

16   very large sample for a litigation survey.  Dr. Moore does no calculations with the large sample

17   size, instead choosing to focus on two cells, including Cell 7, my smallest cell.  At no point does

18   he provide calculations with the entire database, which would greatly reduce the size of the

19   intervals he calculates, even using his method.

20   103.    Even within an individual cell, I cannot reconcile his calculations with experience and

21   common sense.  Cell 1 in my survey had a sample size of approximately 200 interviews.  The

22   average expected price discount in that cell was $388, and Dr. Moore would have us believe that

23   the confidence interval for that cell is +/-$281, or +/- 73% of the average expected price discount.

24   This defies my experience, defies common sense, and defies existing sources.  For example, the

25   classic Morgan article,[57] cited by Professor Marian Moore, states that a sample of 200-300 is

26   sufficient to achieve validity in court.

27

28   [57] See article by Fred Morgan, page 64.

- 31 -

104.    In summary, Dr. Moore's argument about sample size defies common sense, does not focus on the primary issue of interest in this matter, and is not consistent with recognized authorities or generally accepted practice.

## IX.    SUMMARY OF MY OPINIONS REGARDING THE REPORTS OF MR. BOSCO, PROFESSOR MARIAN MOORE, AND DR. MICHAEL MOORE

105.    As described in this rebuttal expert report, in my opinion:

i.      The research conducted by Mr. Rodney Bosco suffers from numerous flaws and is unreliable.

ii.     The critiques raised by Professor Marian Moore and Dr. Michael Moore are without merit.

106.    This report provides my opinions at this time.  I may supplement the report as additional information is made available to me related to this matter.

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

1   I declare under penalty of perjury under the laws of the United States that the foregoing is true

2   and correct to the best of my belief.

3

4   Executed in Encino, California, on May 24, 2010.

5

6

7   _____

8                    Dr. Bruce R. Isaacson

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Expert Report of Dr. Bruce Isaacson
Civil Action No. 4-07-cv-80 (CDL)

**EXHIBIT 1**
**Invitation Letter Used in Mr. Bosco's Survey**
**and Mr. Bosco's Survey Introduction**

**** Date ****

Ramon Navarro
800 N Zaragoza Rd  Ste K
El Paso, TX  79907

Dear Ramon,

The Company currently is involved in a lawsuit about the sale of Kirby vacuum cleaners.
Lawyers representing The Kirby Company have asked that a survey be conducted for
their use to advise the Company in this lawsuit.  You will be contacted by phone by a
company named Tele-Survey Plus, Inc., which is conducting a survey asking questions
about your sales practices. The information from this survey will be provided to lawyers
representing The Kirby Company to help them make decisions about what is necessary to
defend the Company in this lawsuit.

To show our appreciation for you taking the time to respond to the survey, the Company
will provide each respondent who completes the survey with a $50 credit against the
respondent's account with the Company.

We at the Company encourage you to speak openly and candidly with Tele-Survey Plus,
Inc. representatives.  We appreciate your assistance with this matter, and anticipate your
prompt participation in the survey.

Sincerely,

Mike Nichols
Executive Vice President of
Business Operations

MN/dh



**Exhibit 5**

**Final Version**

### THE KIRBY COMPANY DISTRIBUTOR SURVEY

<u>Introduction:</u>
Hello, my name is _____ from Tele-Surveys Plus, a market research firm.  You recently received a courier letter on behalf of The Kirby Company letting you know that we would be contacting you to complete a survey about your sales practices.

To show our appreciation for your taking the time to respond to the survey, the Company will provide each respondent who completes the survey with a $50 credit against the respondent's account with the Company.

*<u>Response if the distributor asks about confidentiality/use of the information:</u>*
This survey is being conducted for the use by the lawyers who are representing The Kirby Company in a lawsuit.  The results of this survey are for the company's lawyers only at the present time.  It is possible that the survey results ultimately might be disclosed to the court in a summary form (i.e., not on an individual respondent basis).

Please be assured all responses will be kept strictly confidential.  The survey will take about 15 minutes, depending on your answers to some of the questions.

Is this a convenient time?

      1.  Yes, continue the survey
      2.  No, arrange for a callback date & time
      3.  Refused to participate, thank & terminate the call

*[Please note that all comments written in CAPS are for interviewer instructions only and will not be read to the respondent]*

AUDIO. This call may be monitored and/or recorded for quality and training purposes. Is that ok?

      1.  Yes, ok
      2.  No, don't record (**turn off recording device**)

<u>A.  Experience</u>

QA1.  What year did you first begin selling Kirby home care systems?

      01. Enter year: _____
      98. [DO NOT READ] Don't Know
      99. [DO NOT READ] Refused

QA2.  What year did you become a factory distributor?

      01. Enter year: _____
      98. [DO NOT READ] Don't Know
      99. [DO NOT READ] Refused

**EXHIBIT 2**
**Emails from Ms. Cidroff to Mr. Bosco**

**From:** Marouchka Cidroff [mailto:marouchka@tsp.ca]
**Sent:** Tuesday, February 02, 2010 2:58 PM
**To:** Rodney Bosco
**Subject:** Study Quotation approval

Hi Rod,

Attached please find the revised study quotation for your approval.  I have made a few adjustments to the proposal based on the questionnaire that you sent and the phone discussion that we had yesterday. Please review and return a signed copy of the last page – by fax 514-392-4749 or by email to me.

In addition, I would like to bring to your attention the following points:

1) We did a few mock interviews internally and the duration was on average 20-25 minutes, which is in-line with what you had estimated.

2) I am concerned about the referral to the lawsuit in the invitation letter and at the introduction of the questionnaire. We may get biased responses or perhaps a high non-participation. Is it necessary to indicate the law suit in the letter/introduction section? Would you consider mentioning it at the end of the survey?

3) Questionnaire format – some questions do not have response categories. Each question should be written as a separate question (e.g., do not have 2 questions in one question) and each should have its own response categories.

I will have the Project Manager, Natasha Mondoux, modify the questionnaire so you can review the suggested text and format. Can we change the numbering of the questions? Usually each question has its own unique number. We can either number them as Q1, Q2, Q3, Q4, etc.. or as A1, A2,... B1, B2... C1, etc. based on your sections. Let us know your preference.

Thanks,

*Marouchka*

-------------------------------------------------------------------
Marouchka Cidroff | President | Tele-Surveys Plus Inc. | Télé-Sondages Plus Inc.

**Rodney Bosco**

| | |
|---|---|
| **From:** | Marouchka Cidroff [marouchka@tsp.ca] |
| **Sent:** | Tuesday, February 16, 2010 5:25 PM |
| **To:** | Rodney Bosco |
| **Subject:** | Kirby- Distributor survey |
| **Attachments:** | ATI_2409471_3_Proposed Questions for Distributors (v3 0)_Feb 15_TSP.DOC |

Hi Rod,

Attached please find the revised and formatted (for telephone interviewing) questionnaire for your review.

The revisions that I have made are the ones that we discussed during our telephone conversation with Kirby. In addition, I have made some suggestions throughout the questionnaire (highlighted in yellow). Let me know if I agree with them.

As for the 3rd paragraph, if you decide not to disclose the lawsuit information to the respondent in the invitation letter, the questionnaire intro text would have to be revised.

Thanks for sending the distributor list. I will wait for your input before proceeding with the pretest.

Regards,

*Marouchka*

--------------------------------------------------------------------------------------------
Marouchka Cidroff I President I Tele-Surveys Plus Inc. I Télé-Sondages Plus Inc.
505, René-Lévesque Blvd. West, Suite 1400, Montréal, Québec, Canada, H2Z 1Y7
Tel: +1-514-392-4702  ext. 24 I Fax: +1- 514-392-4749
E-mail: marouchka@tsp.ca I Web Site: www.tsp.ca

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the intended addressee and/or you have received this message in error, you must take no action based on the information in this email and you are hereby notified that any dissemination, misuse or copying or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by email and delete the original message.

Le présent courriel et, s'il y a lieu, ses pièces jointes sont confidentiels et strictement réservés à l'usage de la personne ou de l'entité à qui ils sont adressés. Si vous n'êtes pas le destinataire désigné ou que vous avez reçu ce message par erreur, vous ne devez prendre aucune mesure basée sur l'information contenue dans ce courriel et, par la présente, vous êtes avisé que toute diffusion, utilisation abusive, copie ou divulgation de cette communication est strictement interdite. Si vous avez reçu cette communication par erreur, veuillez nous en informer immédiatement par courriel et supprimer le message original.

**Rodney Bosco**

| | |
|---|---|
| From: | Marouchka Cidroff [marouchka@tsp.ca] |
| Sent: | Friday, March 12, 2010 6:38 PM |
| To: | Rodney Bosco |
| Subject: | FW: Case to remove |
| | |
| Importance: | High |

Hi Rod,

Could you please confirm me that you removed the record # 159?

Thanks and have a nice week-end.

*Marouchka*

---

**From:** Marouchka Cidroff [mailto:marouchka@tsp.ca]
**Sent:** Friday, March 12, 2010 16:47
**To:** 'Rodney Bosco'
**Subject:** Case to remove
**Importance:** High

Hi Rod,

I hope your analysis is going well.

One respondent, who completed the survey, contacted Kirby and requested that their answers be excluded from the survey results.

Could you please remove record # 159 from your database?

Thank you,

*Marouchka*

--------------------------------------------------------------------------------------------------
Marouchka Cidroff I President I Tele-Surveys Plus Inc. I Télé-Sondages Plus Inc.
505, René-Lévesque Blvd. West,  Suite 1400, Montréal,  Québec,  Canada,  H2Z 1Y7
Tel: +1-514-392-4702  ext. 24 I Fax: +1- 514-392-4749
E-mail:  marouchka@tsp.ca I Web Site:  www.tsp.ca

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed.  If you are not the intended addressee and/or you have received this message in error, you must take no action based on the information in this email and you are hereby notified that any dissemination, misuse or copying or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by email and delete the original message.

Le présent courriel et, s'il y a lieu, ses pièces jointes sont confidentiels et strictement réservés à l'usage de la personne ou de l'entité à qui ils sont adressés. Si vous n'êtes pas le destinataire désigné ou que vous avez reçu ce message par erreur, vous ne devez prendre aucune mesure basée sur l'information contenue dans ce courriel et, par la présente, vous êtes avisé que toute diffusion, utilisation abusive, copie ou divulgation de cette communication est strictement interdite. Si vous avez reçu cette communication par erreur, veuillez nous en informer immédiatement par courriel et supprimer le message original.

**EXHIBIT 3**
**Kirby Purchaser's Registration Card**



SF-KY02159