# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
### COLUMBUS DIVISION

WILLIAM ROBERTS,

§
§

    Plaintiff,

§

v.

§          Civil Action No. 4:07-cv-80 (CDL)

§
§

THE SCOTT FETZER COMPANY,

§
§

    Defendant.

§

---

## PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION TO MOTION FOR CLASS CERTIFICATION

---

Plaintiff, William Roberts, files this Reply to Defendant's Response in Opposition to Motion for Class Certification.

## SUMMARY OF THIS REPLY

Mr. Roberts replies to Kirby's Response opposing his Motion for Class Certification in five parts below as follows:

**Part One—Two Important Factual Issues and Two Important Legal Issues for Certification**.................................................................................................2

**Part Two—Kirby's Statement of the "Factual Background" Has Significant Errors**...........6

    A.    There is No Evidence Most Distributors Disclose Prior Sales ...............................6

        (i)    There is No Evidence of Actual Disclosure to the Class ...............................6

        (ii)   A Supposed "Policy" With No Evidence of Implementation Does NOT Prove Disclosure Was Ever Actually Given.....................................................8

        (iii)  If Bosco's Survey is Admissible, Certification is Still Proper.....................11

    B.    Previously Sold and Returned Machines Are Not New.........................................12

    C.    Common Evidence of a Common Misrepresentation That Caused Injury............15

        (i)    Common Misrepresentation ........................................................................15

(ii)   Causation ............................................................................................16

D.   The Parol Evidence Rule Bars Kirby's Arguments Based on Supposed Oral
Disclosures ...........................................................................................20

E.   Differences Between In-Home Presentations Do Not Preclude Certification .......21

**Part Three—Mr. Roberts' Legal Theory of Damages is Valid** ...............................................24

**Part Four—Impact or Fact of Injury and Calculation of Damages** .........................................26

A.   Impact ..................................................................................................26

B.   Negotiation Does Not Diminish Common Impact ...................................................28

C.   Calculating Aggregate Damages and Allocating Them to the Class ......................29

**Part Five—Superiority** ..............................................................................................33

## PART ONE—TWO IMPORTANT FACTUAL ISSUES AND
## TWO IMPORTANT LEGAL ISSUES FOR CERTIFICATION

Mr. Roberts suggests two overarching factual questions for the Court in analyzing predominance under Rule 23(b).[1]   The only evidence before the Court of what actually happens

---

[1] The issues under Rule 23(a)(1) and (4) are undisputed.  Kirby does not dispute numerosity or adequacy of Mr. Roberts to serve as class representative or of his counsel to serve as class counsel.

Kirby seems to challenge commonality.  But with the relatively easy standard for satisfying commonality, Mr. Roberts suggests the Court focus on the real debates, predominance and superiority for Rule 23(b)(3).  Commonality is satisfied here.  Kirby admits that thousands of purchasers of previously sold and returned vacuums were told in writing they were the original purchasers of new vacuums.  Kirby does not challenge Mr. Roberts' allegations and evidence of an enterprise between Kirby and its distributors or the repeated use by that enterprise of the mails and wires.  There is no serious question that Mr. Roberts and thousands of other Blue Card buyers like him can allege RICO claims.

Kirby seems to say Mr. Roberts' claim is not typical of the class because, in addition to receiving the printed misrepresentations of newness and original purchaser status, Mr. Roberts also was told orally that his vacuum was new.  This is not a meaningful challenge to typicality.  Typicality does not require that Mr. Roberts' claim be identical to the claims of everyone in the class.  Typicality requires only that his claim share the same essential characteristics as the claims of the other class members.  *In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 613 (N.D. Ga. 1997).

in in-home demonstrations of previously sold and returned Kirby vacuums registered under Blue Cards is that consumers receive false written representations of newness and original purchaser status. Kirby conjectures that there could have been some oral disclosure that its written misrepresentations were false. But as demonstrated below, Kirby can only conjecture; it has no evidence of any actual disclosure.

So in analyzing what Kirby conjectures, first, is it more reasonable to believe that most dealers (or sales agents) selling Kirby vacuums represent the vacuums consistently with Kirby's pre-printed sales material, or should the Court ignore the actual, hard evidence and simply believe Kirby's assertions that most of the dealers tell purchasers to disregard Kirby's pre-printed sales material? None of Kirby's six distributor witnesses testifies he or she tells dealers to disregard anything in Kirby's standard, pre-printed documents. In fact, the evidence shows that they do *not* tell purchasers to disregard Kirby's misrepresentations.

Second, the standard set of pre-printed sales documents represent newness and original purchaser status. It provides common evidence of false representations for Mr. Roberts' proposed class. It is reasonable to presume that dealers represented the vacuums consistently with Kirby's false representations of newness and original purchaser status, and it is reasonable to presume that the class members would have paid less for a previously owned and returned vacuum if they had known that truth than they actually paid for one represented as new. In addition, Mr. Roberts has gathered evidence including expert testimony that confirms this common sense conclusion that a consumer would pay less for a properly disclosed used vacuum.

---

Mr. Roberts' claim, like everyone else's in the class, is based on the same enterprise of Kirby and its distributors and dealers scheming to defraud consumers by selling used vacuums as new. Mr. Roberts claims the same form of injury—*i.e.*, that he overpaid.

If, after rigorous analysis, the Court concludes that the purchasers were provided with Kirby's printed representations and that representations of newness and original purchaser status probably do impact price, the Court should certify the class.

Two legal principles should guide this Court's inquiry. First, certification does not require the Court to find that 100% of the class members were injured by Kirby's scheme. It is enough that impact or fact-of-injury to class members resulting from the scheme was widespread. *In re Wellbutrin SR Direct Purchaser Antitrust Litig.*, No. 04-5525, 2008 U.S. Dist. LEXIS 36719, at *42-43 (E.D. Pa. May 2, 2008) ("certification … appropriate where … violation has caused widespread injury to the class" and court can remove uninjured plaintiffs from the class after certification); *see also Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 676-78 (7th Cir. Jul. 7, 2009) ("possibility or … inevitability" that "class will … include persons who have not been injured" "does not preclude class certification"; citing *Carnegie v. Household Int'l*, 375 F.3d 656, 661 (7th Cir. 2004)); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 307-09 (E.D. Mich. 2001) (certification proper if "generalized evidence exists" showing class-wide impact; plaintiffs "are not required to show … fact of injury actually exists for each class member"; whether there is actually fact of injury for each member "is a merit-based question … not considered at … certification stage"); 1 A. Conte & H. Newberg, Newberg on Class Actions § 2:4, pp. 73-75 (4th ed. 2004)); J. Davis & E. Cramer, *Of Vulnerable Monopolists?: Questionable Innovation in the Standard for Class Certification in Antitrust Cases*, 41 Rutgers L.J. (forthcoming 2010).[2]

---

[2] According to the Rutgers University School of Law website, the Davis/Cramer article is scheduled for publication later this year. The article is available now at http://ssrn.com/abstract=1542143. *See* p. 30, n.104 (and cases collected there) of the SSRN copy of the article. Mr. Roberts refers to this article below as "Davis & Cramer at ___," with page numbers in the SSRN version.

A few people may have received disclosure.  Or, perhaps a few people were not hurt because, somehow, as Kirby's economist imagines, they are happier knowing they received a used vacuum rather than the new one that was represented.  In either event, a small number of these people does not preclude certification.

Second, the Court is conducting a "rigorous analysis" to decide if common factual and legal questions exist and if common evidence supports Mr. Roberts' position on the common fact issues.  *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009) (on "rigorous analysis" standard).  *The Court is not adjudicating facts on the merits.  Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1358 (11th Cir.), *cert. denied*, 130 S. Ct. 500 (2009) ("court should not determine … merits of a claim at the certification stage") (citation omitted); *Vega*, 564 F.3d at 1266 (same).  The Court should look past the pleadings and merely "*consider* the merits" of the case in determining if the requirements of Rule 23 are satisfied.  *Vega*, 564 F.3d at 1266 (emphasis added).  But the Court does not answer the questions on the merits.  The Court simply decides if the elements of Rule 23 are satisfied.

Mr. Roberts does not ask the Court to adjudicate that Kirby and its distributors are an enterprise, that they participated in a scheme to defraud, or that the scheme in fact injured most of the people Mr. Roberts proposes to represent.  Mr. Roberts asks the Court to conclude that the questions of the existence of an enterprise, a scheme to defraud, and impact or fact of injury resulting from the scheme are common to the class and that he has evidence common for the class that supports affirmative answers to those questions.

Under *Williams*[3] and *Klay v. Humana, Inc.*[4], if the Court concludes those questions and Mr. Roberts' evidence answering them are common, they predominate over individual issues, and certification is proper.

## PART TWO—KIRBY'S STATEMENT OF THE "FACTUAL BACKGROUND" HAS SIGNIFICANT ERRORS

### A.   There is No Evidence Most Distributors Disclose Prior Sales

First, Kirby claims "*most*" of its "distributors follow the practice of telling consumers if a machine was sold previously."[5] This claim does not pass rigorous analysis, and even if the Court accepts the claim, Kirby's evidence is common and class-wide and, therefore, does not defeat certification.

### (i)   *There is No Evidence of Actual Disclosure to the Class*

In support of its claim that most distributors tell customers if a vacuum has been sold before, Kirby cites three sources—the Declaration of its survey expert, Rodney Bosco, and the Declarations of two of its distributors, William Bigelow and Dennis Graham.  None of those Declarations offers a shred of evidence that any Blue Card class member ever actually received an honest disclosure.  Kirby offers no evidence that anyone made disclosure to the Blue Card purchasers in Mr. Roberts' proposed class.

Mr. Roberts proposes a class of Blue Card purchasers who received false written representations of newness and original purchaser status.  Mr. Roberts does not include Purple Card purchasers in the class because Purple Cards disclose at least the *possibility* of a prior sale and return.[6]  The disclosure is inconspicuous, and warns only of the possibility of a prior sale.

---

[3] 568 F.3d at 1356.
[4] 382 F.3d 1241, 1257 (11th Cir. 2004).
[5] Docket No. 85 at p. 10.
[6] *See* Nichols Dep., Docket No. 49-18, ex. 2 at p. SF-KY02159 for a copy of a Purple Card.

Nevertheless, it is there.  Kirby did not have or use Purple Cards until April 2006 at the earliest. Kirby created Purple Cards in late March 2006 when it learned this lawsuit was coming.  Purple Card disclosures, therefore, cannot absolve Kirby from liability for purchasers who received Kirby's false representations of newness and original purchaser status in Blue Card sales.

The Declarations Kirby cites for its statement either clearly refer to Purple Card purchasers, or are at least ambiguous about Purple Cards.  Bigelow and Graham clearly refer to the Purple Card policy.[7]  Boldon testified that she is referring to the Purple Card policy in her Declaration.[8]  The Declarations of Sean Taylor-Sears and Dennis Yurcisin also provide evidence that if some distributors now have a policy or practice of disclosing the fact of a prior sale and return, it is Kirby's recent Purple Card policy.[9]

Kirby's survey expert, Rodney Bosco, does not say whether he is referring to Purple Card sales.  Bosco did not distinguish between Blue and Purple Card registrations in his survey questions to Kirby distributors.  Mr. Roberts has explained the significance of Kirby's adoption of its Purple Card policy.[10]  The Court has described Purple Cards.[11]  Kirby plainly understands the difference between Blue Cards and Purple Cards.  Yet Kirby either did not explain the difference to Bosco; or it asked him to ignore it.  In either event, Bosco's survey findings on this point are meaningless because they do not distinguish between Blue Card and Purple Card sales. For this reason and others, Mr. Roberts has filed a motion (or *Daubert* challenge) to exclude Bosco's testimony.[12]

---

[7] Bigelow Decl., Docket No. 85-3 at ¶ 9; Graham Decl., Docket No. 85-7 at ¶ 6.
[8] Boldon Dep., Docket No. 103-6 at p. 96.
[9] Taylor-Sears Decl., Docket No. 85-5 at ¶ 6; Yurcisin Decl., Docket No. 85-8 at ¶ 7.
[10] Ptf.'s Mem. Supporting Mot. for Class Cert., Docket No. 72-1 at pp. 2-3 & 13.
[11] June 30, 2009, Order, Docket No. 63 at p. 6 n.4.
[12] Docket No. 103.

Kirby cites no evidence that any purchaser registered under a Blue Card ever received truthful disclosure that the vacuum had been sold before and returned—either before or after March 2006.  There is no evidence that anyone actually told Blue Card purchasers in the class of the fact of a prior sale.  Kirby claims to have more than 500 distributors.[13]  Two of them referring to Kirby's Purple Card policy is no evidence of anything that precludes certification. On the other hand, Mr. Roberts has presented evidence that all class members receive written misrepresentations of newness and original purchaser status.

The sale of returned Kirby vacuums in 1959 as new is the source of the 1969 FTC policy on this issue.[14]  The Purple Card policy is compelling proof that what Kirby has done is wrong. Kirby should not be absolved by its March 2006 Purple Card policy, which came too late to help serve as an excuse for 100,000 second purchasers under Blue Cards.

### (ii)   *A Supposed "Policy" With No Evidence of Implementation Does NOT Prove Disclosure Was Ever Actually Given*

Kirby's claim that most distributors follow the practice of telling consumers if a machine was previously sold is actually only an assertion that some Kirby distributors *now* say they have a "*policy*" of telling their dealers to disclose prior sales.  There is no evidence that any distributor has such a policy in writing.  *Not one of Kirby's six distributor witnesses has such a written policy*, and nothing in Bosco's survey findings indicates such a policy was ever written down anywhere.  Indeed, as shown above, it appears what the distributors really mean to say is that some of them follow Kirby's Purple Card policy, which began in 2006, and applies only to purchasers *who are not in the class.*

---

[13] Docket No. 85 at p. 5.
[14] Ptf.'s Mem. Supporting Mot. for Class Cert., Docket No. 72-1 at p. 14.

Nor is there any evidence that any distributor actually implemented such a policy before the Purple Card policy. *There is no evidence of any actual disclosure by any dealer to any class member. Not one class member says he or she actually received disclosure that his or her vacuum had been sold before and returned. Not one dealer says he or she actually gave that disclosure. Kirby cannot identify anyone who actually gave or received that disclosure.*

Thus, what Kirby actually offers is evidence it conveniently came up with for the first time almost three years into this case[15] of a supposed "*policy*" that applies to no one in the class. Kirby offers no evidence of any implementation of that policy for the Blue Card purchaser class.

Dealers receive no salary.[16] Distributors consign vacuums to dealers, whose only compensation is the portion of a total sale price above an amount set by the distributor.[17] Distributors charge dealers the same cost in a vacuum regardless of whether it is genuinely new or sold and returned.[18] So to make any money, a dealer has to sell a returned vacuum for at least as much as he would sell a genuinely new one. That is the Kirby construct.

The economic realities of Kirby's distribution system, thus, push strong incentives on dealers not to disclose—even after the Purple Card policy. When Kirby chose to make the Purple Card disclosure in 2006 it did so in tiny print.[19] Even after Kirby "adopted" its Purple Card "policy," distributors continued to register second sales with Blue Cards,[20] and Kirby continued to accept them.[21] One of Kirby's six distributor witnesses admitted on May 19, 2010,

---

[15] *See* Ptf.'s Mot. to Exclude Evid. for Disc. Sanction, Docket No. 95.
[16] Boldon Dep., Docket No. 103-6 at p. 58-59; Graham Dep., Docket No. 103-5 at pp. 26-27; Peters Dep., Docket No. 103-7 at p. 41.
[17] Boldon Dep., Docket No. 103-6 at pp. 58-59; Graham Dep., Docket No. 103-5 at pp. 30-31.
[18] Boldon Dep., Docket No. 103-6 at p. 59.
[19] Nichols Dep., Docket No. 49-28, ex. 18 at p. SF-KY02159.
[20] Nichols Dep. Docket No. 49-7 at pp. 120-25 & Docket No. 49-27 at ex. 15.
[21] *Id.*

that he is still using Blue Cards to register sales of previously sold and returned vacuums.[22]
*Kirby is still accepting them![23]   Today, three years into this case, Kirby has not a single witness
saying he or she actually gave or received actual disclosure.*

A policy honored more by breach than by observance is not disclosure.  Kirby's claimed
"policy" among its distributors under these circumstances is no evidence of disclosure.  Indeed,
Kirby's claim of the supposed "policy" with no evidence of any actual implementation is itself
arguably proof of non-disclosure in practice.

Moreover, Kirby's "evidence" to prove the supposed policy is inadmissible.  Kirby is
trying to prove the routine practice of an organization under Rule 406 of the Federal Rules of
Evidence.  But Kirby's evidence (whether from Bosco or two or six of its distributors) is not
admissible under Rule 406 for two reasons.  First, Kirby goes to great lengths to say how
independent and differentiated each of its distributors is.  As a matter of law, such a loose-knit
group is not an organization for the purposes of Rule 406.  *See, e.g., United States v. Rangel-
Arreola*, 991 F.2d 1519, 1523 (10th Cir. 1993) (loose knit group of freelance truck drivers not an
organization and could not have routine practice).  Second, admission of a routine practice
requires more than one or two anecdotes; there must be numerous and systematic examples of
the practice to constitute a routine.  *G.M. Brad & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1533
(11th Cir. 1985).

Here, Kirby gives not one example of actual disclosure.  Kirby tries to reverse the
requirement of Rule 406.  The rule requires evidence of numerous, systematic examples from
which one then can infer a standard practice.  Kirby asks the Court to start with the inference, but
offers nothing to support it.  Kirby's evidence of a supposed "policy" should not be received as

---

[22] Peters Dep., Docket No. 103-7 at pp. 20-21, 27-31, 33 & 51.
[23] *Id.*

any evidence of a routine practice.  Mr. Roberts objects to Kirby's evidence in the Declarations of Bosco and its distributor witnesses as evidence of a routine practice of disclosure.

### (iii)   *If Bosco's Survey is Admissible, Certification is Still Proper*

The Declarations of two (or six) distributors who say they have a "policy" of telling their dealers to give disclosure of the fact of a prior sale out of more than 500 distributors is no evidence that most dealers actually gave disclosure or that most second purchasers actually received disclosure.  Two out of more than 500 distributors is hardly "most."

To support its claim that "most" distributors have such a policy, Kirby could only point to the Bosco survey.  As pointed out above and in his separate Motion to Exclude, Mr. Roberts asks the Court to exclude Bosco's testimony because it is not admissible under FRE 702 or 406.  But even if the Court takes Bosco's survey finding that most dealers have a "policy" of disclosure as evidence that most of their dealers actually gave disclosure, then Bosco's survey supports certification.

There is common evidence of class-wide false representations of newness and original purchaser status.  Kirby counters this evidence not with individualized testimony of actual purchasers or dealers saying they actually received or gave disclosure.  Kirby offers common evidence of disclosure through Bosco's survey findings of a supposed "policy" to defeat the claim of class-wide misrepresentation.  *Thus, Kirby offers common, class-wide evidence to try to defeat common, class-wide evidence.  Kirby's method of providing evidence is powerful proof of commonality, predominance, and superiority.*

Mr. Roberts maintains the Court should exclude Bosco.  But if the Court allows Bosco's testimony, Kirby can use it as common, class-wide evidence at a trial on the merits.

### B.   Previously Sold and Returned Machines Are Not New

Kirby tries to create a distinction between vacuums that are previously sold and returned and those that are used.  If there are differences between those categories, they do not matter for the proposed class.  What matters is that previously sold and returned vacuums are not *new*, and the second purchasers are not the original purchasers as Kirby represents.

Purchasers are entitled to know the fact of a prior sale and return, regardless of the amount of time the vacuum was switched on and run by the first purchaser.  One of Kirby's distributor witnesses likened a used vacuum to a used toothbrush.[24]  Every piece of evidence before the Court on this point—and there are many of them—clearly shows consumers who are told they are buying a previously sold and returned appliance require some discount off the price of a new one.  Vacuums that get a lot of use by their first purchaser before they are returned may merit a larger discount, but all second purchasers require some discount regardless of amount of use by the first purchaser.

Mr. Roberts' theory of class impact and damages focuses on the difference in value for the fact of the prior sale and return and does not include any additional discount for significant use.  Mr. Roberts' position is that approximately 100,000 easily identifiable Blue Card purchasers were told in writing that they were the original purchasers of new vacuums when those statements were false.  They were not the original purchasers because Kirby's records prove that for each of those vacuums there was a prior purchaser.[25]  And the vacuums were not genuinely new because each had been sold to a prior purchaser, and no one can say the vacuums

---

[24] Peters Dep., Docket No. 103-7 at p. 37 ("[Used vacuums] are like a used toothbrush.  Nobody wants them.").
[25] *See* Ptf.s Mem. Supporting Mot. for Class Cert., Docket No. 72-1 at pp. 15-16 (discussing Kirby's "G.S.R. Reconciliation Reports").

were not used and operated by the first purchasers.[26]  Promising "newness" when Kirby and its distributors have every reason to believe there was some use is misleading.

Kirby's evidence supports this.  Kirby's expert, Marian Moore, provided the Ovchinnikov study that shows that purchasers of returned goods are "skeptical" of the quality of returned goods even when the goods are said to be "new, out-of-box."[27]  The same study reports an industry standard among manufacturers of an electronic consumer good labeling the appliance as "used" if it is switched on for more than three minutes.[28]  With a used vacuum being more like a used toothbrush, there is every reason to apply a similar standard here.

One of Kirby's distributor witnesses explained how he now operates under Kirby's Purple Card policy:[29]

> A Kirby home care system [is] new if it has not previously been turned on and used, even if only for an in-home demonstration. Once a Kirby cleaner has been turned on ... from its first demonstration, I do not sell it as new.

Dr. Isaacson's study shows that if a Kirby vacuum has been sold and returned, purchasers require a discount.[30]  His study shows the same is true for other appliances.[31]  The Ovchinnikov study demonstrates the same thing but takes it further.  Ovchinnikov used different labels to describe different levels of "usedness," varying from "new, out-of-box" to "scratch and dent." Regardless of the label, consumers required a discount to choose a returned unit over a new

---

[26] Taylor-Sears Dep., Docket No. 105-4 at pp. 18 & 39-40; Graham Dep., Docket No. 103-5 at pp. 45-47; Boldon Dep., Docket No. 103-6 at p. 81.
[27] Marian Moore Dep., Docket No. 103-4 at ex. 1, p. 15.
[28] *Id.* at ex. 1, p. 2 n.† ("device with less than 3 minutes of airtime …").
[29] Bigelow Decl., Docket No. 85-3 at ¶ 4 (emphasis added); *see also* Taylor-Sears Dep., Docket No. 105-4 at p. 18.
[30] Isaacson Report, Docket No. 72-3 at ¶¶ 5, 48-54 & 64-65.
[31] *Id.* at ¶¶ 59-63.

one.[32]  And when Ovchinnikov's survey respondents were given a chance to buy one of the returned units or a genuinely new unit, not one consumer chose to purchase a returned unit.[33]

As the Court has already observed in its June 30, 2009, Order,[34] Kirby admits that a vacuum sold and then taken back is used:[35]

> 2    Q.  And so if you have no position on
> 3    it, then it's not Kirby's policy that it should
> 4    be represented as being used?
> 5    A.  Our -- our position is a unit that   11:58:41
> 6    has been previously sold to a customer and
> 7    repossessed is used.

In 2006, when Kirby realized it was caught in its deception, Kirby adopted the Purple Card policy.  Kirby's distributor witnesses who have used Purple Cards since then confirm that those sales require a discount.[36]

And finally, Kirby's own words show it knows previously sold and returned goods are not new.  Again in 2006, Kirby changed the prohibition in its Distributor Agreement on certain sales of Kirby products from prohibiting the sale as new of "used, reconditioned, or rebuilt" vacuums also to prohibit the sale of "*vacuums returned by other consumers*" as new.[37]

Kirby never intended for the prohibition to be anything other than a cover it could hide behind when caught.  Kirby undoubtedly knew since 1959 that its distributors sold returned vacuums as new.[38]  Kirby facilitated the practice for years by instructing distributors to use Blue

---

[32] Ovchinnikov paper, Docket No. 103-4 at ex. 1, pp. 15-20.

[33] *Id.* at ex. 1, p. 16.

[34] Docket No. 63 at p. 6.

[35] Nichols Dep., Docket No. 49-9 at p. 167.

[36] Bigelow Decl., Docket No. 85-3 at ¶ 4; Taylor-Sears Decl., Docket No. 85-5 at ¶ 7; Yurcisin Decl., Docket No. 85-8 at ¶ 7; Taylor-Sears Dep., Docket No. 105-4 at pp. 34-38.

[37] Compare Nichols' deposition exhibits 2 (at p. SF-KY00027, ¶ 6(b)) and 6 (at p. SF-KY00008), filed with this Reply as **Appendix A**.  Exhibit 2 is the 2002 version of Kirby's Distributor Agreement.  Exhibit 6 is Kirby's revised 2006 version of that Agreement.

[38] Ptf.'s Mem. Supporting Mot. for Class Cert., Docket No. 72-1 at p. 14.

Cards to register second sales, by providing the pre-printed Blue Cards, and by keeping the books for the enterprise in G.S.R. Reconciliation Reports sent to distributors.[39]

Neither the 2006 change in the Distributor Agreement nor the Purple Card "policy" statement reflects what Kirby and its distributors actually did—*i.e.*, they continued to sell previously sold and returned vacuums as new and register the sales under Blue Cards. Kirby admits it continued to process Blue Card registrations of sales to second purchasers at least well into 2008.[40] Kirby's distributors are still using Blue Cards, and Kirby is still accepting them to register second sales *today*.[41]

But the 2006 change in the Distributor Agreement and the Purple Card policy do show Kirby knew it needed some cover for its practice of facilitating the sale of returned vacuums as new. Vacuums previously sold and returned are not new vacuums, and second purchasers are not first purchasers.

## C.   **Common Evidence of a Common Misrepresentation That Caused Injury**

### (i)   ***Common Misrepresentation***

Kirby says there is no evidence of a common misrepresentation that caused injury. Kirby says its printed misrepresentations of newness and original purchaser status, which it admits were delivered to everyone in the class, do not suffice.

Kirby seems to misunderstand the issue. The Court is not adjudicating whether Kirby and its distributors engaged in a scheme to defraud, or if so, whether that scheme hurt the class. The Court is deciding if, after rigorous analysis, those questions are common to the class, and if they are, if there is common evidence by which class members can present their case to the jury.

---

[39] *Id.* at pp. 15-16.
[40] Nichols Dep., Docket No. 49-7 at pp. 131-32.
[41] Peters Dep., Docket No. 103-7 at pp. 20-21, 27-31, 33 & 51.

There are undeniably common claims.   Kirby cannot dispute that it made written misrepresentations to everyone in the class of newness and original purchaser status.   Kirby admits in its opposition to Mr. Roberts' Motion for Class Certification "that it may be true" that each class member received those printed false representations of fact from Kirby.   Docket No. 85 at p. 19.   Representations of newness and original purchaser status are material to purchasers of consumer goods, and there is evidence in Kirby's computerized records showing the representations are false.   The Court's decision to certify a class does not decide that Kirby did or did not defraud the class.   Clearly, there is significant evidence showing a scheme to defraud. Everyone in the class who bought a used vacuum represented to be new would allege precisely the same issues under a civil RICO claim.

And the evidence is common.   Kirby admits that the same Blue Card registration forms, Owner's Care Program documents, and Owner's Manuals containing representations of newness and original purchaser status were given to all of the approximately 100,000 members of the class.[42]   Its distributor witnesses agree that those documents are given to every purchaser.[43] These representations were false for the class.[44]

### (ii)   *Causation*

Kirby says its false representations caused no harm.   That misses the point.   The question is not who wins and loses on the merits.   The question is simply if, after rigorous analysis, there is common proof of causation.

---

[42] June 30, 2009, Order, Docket No. 63 at pp. 3-4; Ptf.'s Mem. Supporting Motion for Class Cert., Docket No. 72-1 at pp. 11-12 (and evidence cited there); *see also* Def.'s Resp. in Opp'n to Mot. for Class Cert., Docket No. 85 at p. 19 (Kirby admitting "it may be true ...").

[43] *See, e.g.,* Graham Dep., Docket No. 103-5 at pp. 67-70; Boldon Dep., Docket No. 103-6 at pp. 48-51; Peters Dep., Docket No. 103-7 at pp. 25-28 & 32; Taylor-Sears Dep., Docket No. 105-4 at pp. 47-50, 54-55, 58-60 & 80.

[44] *See, e.g.,* Peters Dep., Docket No. 103-7 at pp. 21-22 & 26-28; Taylor-Sears Dep., Docket No. 105-4 at pp. 58-60 & 72-74; Yurcisin Dep. at pp. 33-35, filed with this Reply as **Appendix B.**

As Mr. Roberts shows in his opening Memorandum, reliance is not an element of his RICO claim or those of the other class members.[45] *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2145 (2008). He need only show common evidence of causation. *Id.* at 2144 & 2145.

Causation in a RICO case means harm caused by the scheme; for certification purposes, Mr. Roberts only must show that he and the class members received Kirby's pre-printed documents containing uniform material misrepresentations of newness and original purchaser status. In certifying a consumer RICO class in *Spencer v. The Hartford Financial Services Group, Inc.*, the court said,

> After *Bridge*, a RICO plaintiff need not demonstrate that a material misrepresentation was made to the plaintiff. A material misrepresentation still must be made … to establish a scheme to defraud. And there must be proof … the material misrepresentation was made in the case of each class member, in order to make that person a part of the class.

256 F.R.D. 284, 297 (D. Conn. 2009); *see also Johnson v. KP Homes*, No. CV-09-00972-PHX-FJM, 2010 U.S. Dist. LEXIS 30686, at *17-19 (D. Ariz. Mar. 30, 2010) (no requirement of reliance; scheme to inflate appraisals was direct cause of overpayment for homes); *Robinson v. Fountainhead Title Group*, 257 F.R.D. 92, 95 (D. Md. 2009) (post-*Bridge*, plaintiff need only show reliance on scheme or on apparent legitimacy of defendant and not on specific misrepresentation). Mr. Roberts satisfies that standard.

Mr. Roberts recognizes that some courts, including this one, have still required some showing of reliance even after *Bridge*.[46] Even if reliance is still required, the common inference for all class members of reasonable reliance on a common representation of newness and original purchaser status suffices here. When it is reasonable and common sense to infer reliance on a

---

[45] Docket No. 72-1 at pp. 20-24.
[46] *See G&G TIC, LLC v. Ala. Controls, Inc.*, No. 4:07-cv-162 (CDL), 2008 U.S. Dist. LEXIS 75269, at *3 (M.D. Ga. Sept. 29, 2008) (Land, J.).

material misrepresentation made uniformly to a class—*i.e.*, one that objectively would matter to a reasonable person—the Court makes that inference on a class-wide basis. *Cf. Klay*, 382 F.3d at 1259 (each doctor "assumed they would be paid the amounts they were due"); *Spencer*, 256 F.R.D. at 301-03[47]; *Robinson*, 257 F.R.D. at 95 ("reasonable inference to assume that a class member who purchased services from [defendant] relied … in paying the rate charged"); *Negrete v. Allianz Life Ins. Co.*, 238 F.R.D. 482, 492-93 (C.D. Cal. 2006) (certifying RICO class based on common printed sales material and evidence that all annuities were worth less than amount paid); *Peterson v. H&R Block Tax Servs., Inc.*, 174 F.R.D. 78, 83 (N.D. Ill. 1997) ("inconceivable that the class members would rationally choose to pay a fee for a service they knew was unavailable"); *Smith v. MCI Telecom. Corp.*, 124 F.R.D. 665, 678 (D. Kan. 1989) ("implausible" that plaintiff "salespersons did not rely on the commission plans … they were required to sign").

It is undisputed there were widespread, class-wide representations of newness and original purchaser status.   Kirby gave its distributors the documents containing the representations, expected the distributors to give those documents to their dealers to use in making sales, and the distributors did exactly that.   Kirby provided printed and video training materials to its distributors to train dealers to make sales.   The training materials all depict and suggest the use of Kirby's printed representations of newness and original purchaser status.   All

---

[47] The Court rejected reliance as an element for certifying the RICO claim in *Spencer*.   256 F.R.D. at 297.   The Court also certified the class for the common law fraud claim for which reliance was an element, using the inference of reasonable reliance on a common material misrepresentation.   *Id.* at 301-03.

but one of Kirby's distributor witnesses confirm that they use Kirby's training materials like the Kirby "proof book" (or something very similar) to train their dealers.[48]

*There is no testimony that any consumer actually was told to disregard Kirby's printed representations of newness and original purchaser status. Nor is there any testimony by any dealer or sales agent saying he actually disclosed the fact of a prior sale and return to anyone.*

Kirby says the dealers generally do not give the documents containing printed representations of newness and original purchase to purchasers until the end or "close" of a sales demonstration. By then, Kirby says, the pitch is over, the sale is concluded, and the purchaser has not relied on the misrepresentations. Why then does Kirby provide written representations of newness and original purchaser status in its standard set of documents given to purchasers of previously sold and returned vacuums? Those uniform representations are some evidence of what matters to those purchasers and what they rely on.

The Court should make the reasonable inference that what is said in the sales pitch is probably consistent with Kirby's pre-printed documents. Kirby's distributors probably tell their dealers to explain a Kirby purchase consistently with the documents, not inconsistently.[49] They tell purchasers to read the documents.[50] The essence of the parol evidence rule is that oral representations contrary to printed terms do not matter. Kirby asks the Court to conclude that it is more likely that to most members of the class the dealers said things that are contrary to what Kirby's pre-printed documents say. Kirby's unlikely conjecture might be enough for the finder of fact on the merits, but it does not defeat certification.

---

[48] Bigelow Decl., Docket No. 85-3, at ¶ 14; Boldon Decl., Docket No. 85-4, at ¶ 12; Graham Decl., Docket No. 85-7, at ¶ 10; Peters Decl., Docket No. 85-9, at ¶ 4; Boldon Dep., Docket No. 103-6 at pp. 46-47; Graham Dep., Docket No. 103-5 at pp. 24-25; Peters Dep., Docket No. 103-7 at pp. 41-42; Taylor-Sears Dep., Docket No. 105-4 at pp. 59-60 & 116-17.
[49] *See, e.g.*, Boldon Dep., Docket No. 103-6 at p. 49; Peters Dep., Docket No. 103-7 at p. 26.
[50] Taylor-Sears Dep., Docket No. 105-4 at pp. 51 & 153-54.

The parol evidence rule should serve as a legal bar to what Kirby argues. But an absolute legal bar is not necessary. The question simply is whether there is common evidence that reasonably supports the inference that there is wide-spread causation. Is it reasonable to believe that many consumers purchasing Kirby vacuums believed what Kirby itself said to them in writing about the vacuums? Is it reasonable to believe that Kirby dealers selling Kirby vacuums on commission represent the vacuums in the way that Kirby itself describes the vacuums in writing? This need not be true for 100% of each and every person in the class. It need only be widespread among them.

Or, is it more likely, as Kirby suggests, when there is not one witness testifying to anyone actually giving or receiving any disclosure and no evidence of any written policy on disclosure, that many dealers selling on commission told purchasers not to believe what Kirby put in writing so that most purchasers did not believe what Kirby itself put in writing?

Rigorous analysis supports Mr. Roberts' request for certification.

### D. The Parol Evidence Rule Bars Kirby's Arguments Based on Supposed Oral Disclosures

Kirby should not be permitted even to argue that supposed oral disclosures contrary to unambiguous written representations to consumers of newness and original purchase status preclude certification. Of course, there is no evidence that any salesperson actually gave such a contrary oral disclosure; nor is there any evidence that any purchaser received such a contrary disclosure. But even if there were some evidence like that, the parol evidence rule precludes evidence of oral statements contradicting unambiguous written representations. *Cone Mills Corp. v. A.G. Estes, Inc.*, 399 F. Supp. 938, 943 (N.D. Ga. 1975) ("as a general rule, the express terms of a written contract … may not be materially varied by parol evidence of a prior agreement or of a contemporaneous oral agreement between the parties").

Imagine one of the supposedly irrational consumers who Michael Moore, Kirby's expert economist, believes might prefer a used vacuum to a new one. Imagine, hypothetically, that this purchaser relies on a dealer's oral statement that the vacuum really is used, not new as all of Kirby's preprinted sales material promises. This purchaser prefers to pay more for a used vacuum. Imagine this irrational purchaser purposefully pays more for used status as Michael Moore supposes someone in the class might do. And imagine after the purchase this irrational consumer learns to his great disappointment that the vacuum actually is new, not used.

If this hypothetical consumer complained, Kirby would invoke the parol evidence rule and say the customer could not urge supposed oral representations contrary to its unambiguous written statements. Kirby would say the purchaser could not reasonably have relied on an oral representation so diametrically opposed to Kirby's obviously important and unambiguous written promises of newness and original purchaser status.

With no testimony by any person participating in a sale that there ever was any oral representation of used status or a prior sale and return, Kirby should not be permitted to conjecture that there were widespread, contrary oral representations and then use what does not exist to defeat causation.

**E.  Differences Between In-Home Presentations Do Not Preclude Certification**

Kirby goes to some length to argue that there are important differences between what individual dealers say during in-home demonstrations that preclude certification. Whatever differences there might be, the proven commonalities are far more important. Every purchaser gets the same set of common, Kirby pre-printed documents—a Blue Card, an Owner's Care Program Warranty document, and an Owner's Manual.[51] Those documents all contain

---

[51] *See* evidence cited in footnotes 42 and 43 above.

representations of newness and original purchaser status which are provably false for the members of the class.[52]

Kirby offers no evidence that anyone actually told any of the members of the class to disbelieve Kirby's false representations.  Kirby offers no evidence that any distributors had any policy applicable to the Blue Card class members to cause them to disbelieve what Kirby said.  Kirby offers no reason why the Court would conclude what the dealers actually told purchasers was inconsistent with Kirby's documents.  Kirby's distributors admit they do not tell purchasers to disregard Kirby's printed misrepresentations.[53]

Kirby says it does not require its distributors to have their dealers use Kirby approved scripts.  The evidence, however, shows that Kirby has the contractual right to control how distributors sell.  Under its Distributor Agreement, distributors are obligated to use their "best efforts" to sell "in accordance with" Kirby's admittedly uniform Marketing System.[54]

Kirby requires its distributors to market according to what Kirby calls the "Kirby Marketing System," and can terminate distributors who fail to do so.[55]  It strains credibility to believe that a large number of Kirby distributors are marketing contrary to the pre-printed forms Kirby provided them.   Indeed, Kirby's distributor witnesses confirm that is not the case.[56]  Kirby's Distributor Agreement allows Kirby to "retain" only distributors "who commit[] to … the System."[57]  Kirby admits that the Blue Card, Owner's Care Program document, and Owner's

---

[52] *See* evidence cited in footnotes 42-44 above.
[53] Taylor-Sears Dep., Docket No. 105-4 at pp. 57-60.
[54] Nichols Dep., Docket No. 49-15, ex. 2 at p. 2, ¶ 2.
[55] The Court described Kirby's Marketing System in its June 30, 2009, Order on Plaintiff's Amended Motion to Compel.  Docket No. 63 at pp. 3-4; *see also* Taylor-Sears Dep., Docket No. 105-4 at pp. 49-50.
[56] Taylor-Sears Dep., Docket No. 105-4 at pp. 57-60.
[57] Nichols Dep., Docket No. 49-15, ex. 2 at p. 2, second and third "Whereas" paragraphs.

Manual are all part of Kirby's Marketing System.[58]   Kirby, thus, admits that its Marketing System is uniform and that is has the contractual right to terminate distributors who act contrary to that uniformity.   Kirby should not now be permitted to argue that its system really is not uniform just to avoid certification.   *Otero v. Vito*, No. 5:04-CV-211 (DF) 2006 U.S. Dist. LEXIS 88464, at *7 (M.D. Ga. 2006) (Royal, J.) (30(b)(6) answers are "binding" on corporation); *Hyde v. Stanley Tools*, 107 F. Supp. 2d 992, 992-93 (E.D. La. 2000) (30(b)(6) testimony binds entity and entity cannot contradict 30(b)(6) testimony to defeat or avoid motion).

Interestingly, Kirby does not tell the Court what its six distributors actually say about their uniformity in training dealers.   The true fact is that five of the six distributor witnesses Kirby chose to present testified that they train their dealers on the Kirby "proof book"—a guide Kirby provides on how distributors should sell Kirby vacuums[59]—or actually provide the proof book to their dealers for the dealers to use.[60]   The other distributor witness testified that he provides very little training to his dealers at all.[61]

Under a rigorous analysis of these circumstances, the most that can be said for Kirby's argument is that it is *possible* that some dealer(s) did tell some purchaser(s) the truth.   As the Eleventh Circuit said in *Kirkpatrick v. J. L. Bradford & Co.*, however, that mere possibility should not defeat certification.   827 F.2d 718, 724 (11th Cir. 1987) ("possibility" that class members received information other than from printed sources did not preclude certification).

Moreover, even if the Court concludes that Kirby's conjecture that something said at some in-home presentation to some unidentified class member was inconsistent with Kirby's

---

[58] Nichols Dep., Docket No. 49-4 at p. 73, Docket No. 49-5 at pp. 81-85 & Docket No. 49-12 at p. 226.
[59] Shumay Dep., Docket No. 94 at p. 155; Nichols Dep., Docket No. 49-4 at pp. 74-75.
[60] *See* evidence cited in footnote 48 above.
[61] Yurcisin Dep. at pp. 65-66, App. B.

printed misrepresentations, that would not defeat certification. Even if the Court concludes that there is not a common inference of reliance because Kirby's representations of newness and original purchaser status would matter to most of the class members, reliance is only one issue. The existence of an enterprise and a scheme to defraud would still be common issues that predominate. In *Brenner v. Future Graphics, LLC*, the Court observed that there might be individualized issues of reliance. 258 F.R.D. 561, 569, 569 (N.D. Ga. 2007). The Court nevertheless certified the RICO claim, observing that it "*is not necessary that all questions of fact ... be common*"; some common questions are enough if they predominate. *Id*. The common questions involved in a "single scheme to defraud" a number of people using "uniform marketing techniques" are enough. *Id*.; *see also Williams*, 568 F.3d at 1356-57; *Klay*, 382 F.3d at 1258-59.

## PART THREE—MR. ROBERTS' LEGAL
## THEORY OF DAMAGES IS VALID

Despite the Court's two prior Orders rejecting Kirby's argument that Mr. Roberts' theory of damages is legally flawed,[62] Kirby persists in making this argument again as a ground for opposing certification.[63]

In its opposition to Plaintiff's Motion to Compel Discovery, Kirby cited *McLaughlin v. American Tobacco Co.*[64] and *District 1199P Health & Welfare v. Janssen, L.P.*[65] in support of its argument that Mr. Roberts' claimed benefit-of-the-bargain damages are not recoverable. Docket No. 55 at pp. 5-8. In response, the Court said,[66]

---

[62] Dec. 4, 2007, Order Denying Def.'s Mot. to Dismiss, Docket No. 17; June 30, 2009, Order, Docket No. 63 at pp. 11-15.
[63] Def.'s Mem. in Opp'n to Mot. for Class Certification, Docket No. 85 at pp. 27-30; *see also* Def.'s Mot. to Exclude Ptf.'s Experts Isaacson & Harrison, Docket No. 86 at pp. 9-12.
[64] 522 F.3d 215 (2d Cir. 2008).
[65] Civil Action Nos. 06-3044 (FLW), 07-2224 (FLW), 07-2608 (JAP), 07-142860 (GEB), 2008 WL 5413105 (D.N.J. Dec. 23, 2008).
[66] Docket No. 63 at pp. 11-12 & 13-14 (emphasis added).

> Defendant contends that Plaintiffs have failed to allege a cognizable injury under 18 U.S.C. § 1964(c). The Court thought it had disposed of this argument when it denied Defendant's motion to dismiss. *See* Dec. 4 Order, 2007 WL 4287719, at \*9 ("[Plaintiffs] clearly allege an injury to property by reason of Defendant's violation of § 1962(c)" where "[Plaintiffs] allege that they, along with other similarly situated consumers, suffered economic damages, measured as the difference in price between a new Kirby vacuum and a used Kirby vacuum ... ") ....
> Allegations that purchasers of a good received something materially different than what was represented to them ... satisfies the requirement of injury to property under § 1964(c).
>
> ...
>
> *Undeterred by the Court's previous ruling*, Defendant maintains that Plaintiffs have failed to allege a cognizable injury under RICO, relying upon *McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) and *District 1199P Health & Welfare v. Janssen* ... .

After analyzing what *McLaughlin* and *Janssen* really hold, the Court concluded they do not bar the theory of damages in this case, and said "*as the Court has previously ruled, Plaintiffs have alleged a cognizable injury under RICO.*"[67]

Mr. Roberts has presented evidence supporting that theory of damages.

Now undeterred by the Court's *two* prior Orders, in its opposition to certification and its *Daubert* challenge to Plaintiff's experts, Kirby again cites *McLaughlin* and *Janssen*, and repeats the same argument. (Docket No. 85 at pp. 27-30; Docket No. 86 at pp. 9-12.) Kirby has only changed the terminology. Kirby now says "expectancy" damages are not recoverable instead of saying "benefit-of-the-bargain" damages. *Compare* Docket No. 85 at pp. 27-30 and Docket No. 86 at pp. 9-12 ("expectancy") *with* Docket No. 55 at pp. 5-8 ("benefit-of-the-bargain"). Except for changing its use of "benefit-of-the-bargain" to "expectancy," Kirby's argument and authorities on this point are the same as when the Court rejected them twice before.

Mr. Roberts has previously demonstrated that the standard for damages and injury under RICO and the Clayton Act are the same.[68] Injury to property under the Clayton Act includes a

---

[67] Docket No. 63 at pp. 14-15 (emphasis added).

consumer overpaying for a good as a result of a violation of the antitrust laws.  Docket No. 58 at pp. 3 & 4 (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339-40 (1979)).[68]

In addition to the authorities the Court already has considered supporting the rule that a consumer's overpayment for a good as a result of a RICO violation is a compensable theory of damages under RICO, Mr. Roberts offers these: *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 976 (9th Cir.), *cert. denied*, 129 S. Ct. 458 (2008) (in RICO case, "a consumer who has been overcharged can claim an injury to her property, based on a wrongful deprivation of her money"); *cf. In re Pharm. Indus. Aug. Wholesale Price Litig.*, 582 F.3d 156, 191 (1st Cir. 2009) (overcharge is injury to property for state law deceptive trade practice claim).  The Court should reject (again) Kirby's argument that Mr. Roberts' theory of damages is flawed.

## PART FOUR—IMPACT OR FACT OF INJURY AND CALCULATION OF DAMAGES

### A. Impact

Kirby predictably tries to make the questions of impact and damages seem more complicated and individualized than they really are.  Although related, class impact or fact-of-injury on the one hand and calculation of class damages on the other hand are distinct issues.  Impact or fact-of-injury is more important at the certification stage.  When there is common evidence of the existence of a RICO enterprise, a scheme to defraud, and widespread impact, these common issues predominate over individualized issues of damages.  *Klay*, 382 F.3d at 1256-57; *see also Williams*, 568 F.3d at 1356-57.

Kirby's economist, Michael Moore, says there is too much dispersion or variation in the amounts of the price differences Dr. Isaacson found to allow use of the means of the

---

[68] Docket No. 58 at pp. 3 & 4.
[69] *See also* cases collected by the Court in Docket No. 63, pp. 12-13.

differences.[70]  But Dr. Isaacson's study shows widespread impact.  Ninety percent of purchasers say the price of a previously owned and returned vacuum should be lower than that of a new vacuum.[71]  Michael Moore agrees that Dr. Isaacson's 90% finding is statistically very precise because it has a very low margin of error.[72]  Professor Harrison says that 100% of purchasers who received the false representations of newness and original purchaser status overpaid—not just 90%.[73]  But whether it is 100% does not matter.  Mr. Roberts satisfies the test for impact at 90%.

What matters for impact at the certification stage is whether there is *common evidence* of widespread impact.  *Wellbutrin*, 2008 U.S. Dist. LEXIS 36719, at *34 (question not "[w]hether or not … plaintiffs will … establish common impact" at trial, but whether they have a colorable common method for proving it); *Polypropylene Carpet,* 178 F.R.D. at 618 (plaintiffs must show "impact can be proven with common evidence" not that "impact in fact occurred on a class-wide basis").  There is common evidence here.  The testimony of Dr. Isaacson and Professor Harrison is common for all class members.  Dr. Isaacson and Professor Harrison only have to testify once, and their testimony would apply with equal force for all class members.

Common evidence of impact does not have to show impact on every single person in the class.  The evidence only needs to show that injury is widespread across many of the people in the class.[74]  Perhaps, as Michael Moore opines, there are a few people in the class who knowingly and sincerely desired to pay more for a used Kirby.  It seems more likely, as Professor Harrison assumes, that Dr. Isaacson's survey respondents who said they would pay

---

[70] Michael Moore Decl., Docket No. 86-4 at ¶¶ 19 & 51-53.
[71] Isaacson Report, Docket No. 72-3 at ¶ 49 & Docket No. 72-16 at ex. 8, table 9.
[72] Michael Moore Dep., Docket No. 105-2 at pp. 79-83 & ex. 2.
[73] Harrison Decl., Docket No. 72-21 at p. 6; Harrison Reply Decl., Docket No. 105-3 at pp. 2-3.
[74] *See* cases cited in Part One above and *Polypropylene Carpet*, 178 F.R.D. at 618.

more for a used vacuum did not understand the question or were not paying attention.[75]  But whether there are a few people in the class who, somehow, knowingly would prefer to pay more for a used vacuum does not matter.

Similarly, there is no evidence of actual disclosure of the fact of a prior sale and return to anyone in the class.  Kirby says some of its distributors have "policies" to teach their dealers to make disclosure.  As demonstrated above, however, these distributors are clearly referring to Kirby's 2006 Purple Card policy.  Nevertheless, Kirby says it is possible some of the members of the class might have received disclosure.  Unlikely as this seems, even if it actually happened, it does not preclude certification.  After certification, Kirby can continue to search for evidence that some members of the class actually received disclosure.  If Kirby finds some, it can move to exclude them from the class.  If there are only a sufficiently small number of them, when Mr. Roberts' experts estimate class damages, they or the jury will factor out the small number who Kirby shows actually received disclosure.  *Wellbutrin*, 2008 U.S. Dist. LEXIS 36719, at * 42-43 (on excluding from class those who have no injury).  If there really are many who actually received disclosure, Kirby could move to decertify the class.  *Kohen*, 571 F.3d at 676-78.

For now, however, three years into this case, when there is not a single dealer testifying "I actually gave disclosure" and not a single purchaser testifying "I actually received disclosure," Kirby's conjecture that some class members might somehow have received disclosure is no basis for denying certification.

### B. Negotiation Does Not Diminish Common Impact

Kirby points out that each class member privately negotiated his or her own purchase price with the Kirby dealer who pitched the in-home sale.  Mr. Roberts acknowledges that is how

---

[75] Harrison Decl., Docket No. 72-21 at p. 6; Harrison Reply Decl., Docket No. 105-3 at pp. 16-17.

Kirby vacuums are sold.   The mere fact of individual negotiations does not diminish the commonality of class-wide impact or the predominance of that question and the common evidence answering that question.

Regardless of the starting price at which a Kirby dealer presented a vacuum represented to be "new," a rational consumer will require a discount to purchase the same vacuum when it is revealed in fact to be used.   At any given price, any rational buyer will pay less for one that is previously sold and returned.   Common sense, economic theory, and empirical evidence all say so.[76]   The fact that prices are individually negotiated does not change the fact that most, if not all, purchase prices for the class probably would have been lower if newness and original purchaser status had not been misrepresented.

Many courts have recognized that individualized negotiations do not preclude class-wide impact.   In addition to the cases cited in his opening Memorandum (Docket No. 72-1 at p. 28), Mr. Roberts refers the Court to *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 171 (S.D. Ind. 2009); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 89 (D. Conn. 2009); *J.B.D.L., Corp. v. Wyeth-Ayerst Labs*, 225 F.R.D. 208, 218 (S.D. Ohio 2003); and *Cardizem,* 200 F.R.D. at 317-18.

### C.  Calculating Aggregate Damages and Allocating Them to the Class

Even if there are individual issues of amounts of damages for the class members, certification of a civil RICO class is superior under Rule 23(b) to many separate, individual cases when there is common evidence of an enterprise, a scheme to defraud, and widespread impact. *Williams*, 568 F.3d at 1356; *Klay*, 382 F.3d at 1257.   This is because proving liability and fact-of-injury once for class members and proving damages individually is always more efficient than

---

[76] *See* Ptf.'s Resp. Opposing Def.'s Mot. (*Daubert* Challenge) to Exclude Experts Bruce Isaacson and Jeffrey Harrison, Docket No. 105 at pp. 5-15.

proving liability and fact-of-injury for those people individually and also proving damages individually. If the same evidence can be used to decide at least the overarching and predominating common issues, it should be, leaving only the individual damage assessment for separate individualized proceedings if necessary. In short, Mr. Roberts need not demonstrate a method for proving damages for the class at all.

Nevertheless, Mr. Roberts shows now that there are methods by which he could present evidence of the aggregate damages for the class. He obviously need not prove those damages now. Mr. Roberts is not required to identify the particular dollar benchmark prices that his expert will use to testify on damages at trial on the merits. *Cardizem*, 200 F.R.D. at 321 ("not necessary to identify specific benchmarks"). Nor is he limited or prevented from developing additional data or evidence or methods for demonstrating damages at a trial on the merits if the Court does certify the class.

Professor Harrison identifies a well-recognized methodology and sources of data that are common to the class. That is enough at this stage. *Id.* at 322 ("methodologies are common to the class" and "economic theory" and "data sources" common to class).

Variation or dispersion in the amounts of individual overcharges to each class member does not matter for this purpose. Davis & Cramer at pp. 33-34 & n.113. Each class member who is injured has injury. If, as Kirby says, there really are some purchasers who actually received disclosure, then before trial on the merits Kirby can identify them or sample the class and estimate their number and move to exclude them from the class or modify the class. *Kohen*, 571 F.3d at 676-78; *Wellbutrin*, 2008 U.S. Dist. LEXIS 36719, at *42-43; Davis & Cramer at pp. 31-32.

The aggregate amount of damages is the product of the average damage amount multiplied by the number of class members who have impact of fact of injury.[77] It is equal to the sum of all individual damage amounts.[78] Kirby's criticism of Professor Harrison's proposal to use an average damage amount to calculate aggregate damages is empty. Davis & Cramer at pp. 33-34 & n.113; *cf. In re Northwest Airlines Corp. Antitrust Litig.*, 208 F.R.D. 174, 223-24 (E.D. Mich. 2002) (rejecting defense criticism of use of averages to calculate aggregate damages).[79] If there really are class members who received disclosure, Kirby will see that they are excluded from the class, and the amount of aggregate class damages will not include any amount for them.

After the jury finds an aggregate damage amount, that amount will be allocated to individual class members by any of several methods.  Class members could submit claim affidavits. *See, e.g., Northwest Airlines*, 208 F.R.D. at 178 n.46; *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 524-26 (S.D.N.Y. 1996) (use of claim forms following aggregate damage award).  The Court could appoint a master to review the affidavits and recommend allocations.  Or if Kirby chose to dispute individual claims the Court, a magistrate judge, or a master could hear disputed evidentiary claim proceedings and make decisions or recommendations. *Northwest Airlines*, 208 F.R.D. at 178 n.46 (on "mini-trials"); *cf. Klay*, 382 F.3d at 1373 (on management tools for assessing or allocating individual damages).

After the number of injured class members and total amount of aggregate damages are adjudicated, it is hard to see how Kirby could have any legitimate concern about the allocation of

---

[77] Harrison Reply Decl., Docket No. 105-3 at p. 18-20.  Of course, as Professor Harrison suggests with his graduated overcharge method, the math may be refined by using a series of overcharge amounts based on percentiles instead of one average.  Each overcharge amount then would be multiplied by the approximate number of people in the class whose actual purchase price corresponded to the percentile and the sum of those multiplications would provide the aggregate damages.  Harrison Decl., Docket No. 72-21 at pp. 9-10.
[78] Harrison Reply Decl., Docket No. 105-3 at pp. 18-20.
[79] *Id.*

damages among injured class members.  *Cf. Boeing Co. v. Van Gemert*, 444 U.S. 472, 482 (1980) (defendant has no interest in distribution of aggregate damage owed or amount of attorneys' fees when defendant did not appeal from judgment awarding damages); *In re Coordinated Pre-Trial Proceedings in Antibiotic Antitrust Litig.*, 333 F. Supp. 278, 282 & 283 (S.D.N.Y. 1971) (defendant has no right to keep ill-gotten gains and cannot object to certification on basis that it will lose what it stole).  If Kirby wished to participate in a claim process, it probably could.

And, of course, if the Court concluded that individual issues of damages were just so complex that individual damage jury trials were necessary, the Court could certify liability only and hold separate proceedings on damages later.  *Cf. Klay*, 382 F.3d at 1373; *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003); *Northwest Airlines Antitrust Litig.*, 208 F.R.D. at 177-78 & n. 46; *NASDAQ*, 169 F.R.D. at 524.  This seems unlikely; we are, after all as the Court has observed, simply valuing used vacuum cleaners.[80]

Admittedly, as Professor Harrison observes, some estimating may be necessary because there is no body of data on market prices of previously sold and returned Kirbys sold again with factory warranties and with conspicuous disclosure of the fact of the prior sale and return.[81]

In any event, there are data from which the estimating can be done.  There is the evidence of the price differences between new and returned Kirby vacuums in the Isaacson Declaration.  There is the evidence of price differences in sales of other appliances in the Isaacson Declaration.  There will be volumes of data on eBay sales of used vacuums.

Ultimately, Kirby should not be permitted to say that the difference in value cannot be calculated with enough precision or certainty.  Kirby has facilitated the fraudulent sales since at

---

[80] Docket No. 63 at p. 14.
[81] Harrison Decl., Docket No. 72-21 at p. 12.

least 1959.[82]  Kirby has prevented the clear evidence that would be necessary for the precision and certainty it demands by facilitating the sale of 100,000 vacuums as new when they really were used.  There would be good evidence of the difference in value if Kirby and its distributors had not misrepresented the vacuums.  Under those circumstances, Kirby should not be allowed to require the evidence of precision and certainty that it prevented from developing.  *NASDAQ*, 169 F.R.D. at 527.[83]

## PART FIVE—SUPERIORITY

Since at least 1959 Kirby distributors have sold returned Kirby vacuums as new.  At some point long ago Kirby knew Kirby distributors sold used vacuums with Kirby's printed representations of newness because Kirby told them in its written policy on Blue Cards to use Blue Cards to register second sales.

Kirby did not change that policy until 2006, and even then, it was a change on paper only. Kirby has allowed distributors to continue the old Kirby way.

There is compelling evidence of a long standing scheme to sell used vacuums to consumers as new.  Kirby can identify about 100,000 of these consumers in the class period.

The actual damages for each of the class members will be $1,500 or less.  Few consumers will pursue claims if this case is not certified.  And even if that turns out to be wrong—*i.e.*, if thousands did pursue individual claims—that would not be more efficient than resolving the claims as a class.

The possibility that Kirby simply escapes answering for its abuses because no one can afford to pursue an individual claim is not satisfying.  *Cf. Upshaw*, 206 F.R.D. at 701 (trying

---

[82] Docket No. 72-1 at p. 14.

[83] *See also* cases cited at page 24 of Mr. Roberts' Response Opposing Defendant's Motion (*Daubert* Challenge) to Exclude Experts Bruce Isaacson and Jeffrey Harrison, Docket No. 105.

small consumer claims together superior); *see also Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 41 (1st Cir. 2003) (purpose of Rule 23(b)(3) is to vindicate small claims).

Trying this case as a class will not be difficult.  Compared to many class actions, there are relatively few witnesses.  In total, Mr. Roberts has deposed eight fact witnesses and two of Kirby's experts.  Kirby deposed four or five Plaintiffs, and Mr. Roberts' two experts.  For almost three years into this case, Mr. Roberts only deposed two fact witnesses, two Kirby representatives; he did not depose the other six, Kirby's distributor witnesses, until after he filed his certification Motion because Kirby only identified them then.[84]

Mr. Roberts has shown methods for proving aggregate class damages and that the aggregate can be allocated to the class.  Even if that turns out not to be feasible, one trial on liability and impact with individual damage assessment proceedings is far superior to any other choice.  *Cf. Klay*, 82 F.3d at 1273 (issue is not if management as class will create problems, but whether it will create more problems than individual actions); *Coordinated Pre-Trial Proceedings in Antibiotic Antitrust Litig.*, 333 F. Supp. at 281 (test for superiority is to compare time spent if certified with time spent with total number of individual cases).

## CONCLUSION

Under these circumstances and under the authorities on superiority presented in Mr. Roberts' initial Memorandum Supporting Certification, this case should proceed as a class.

Dated:  May 28, 2010.

Respectfully submitted,

*/s/ Royal B. Lea, III*
ROYAL B. LEA, III

---

[84] *See* Ptf.'s Mot. to Exclude Evid. for Disc. Sanction, Docket No. 95.

ROYAL B. LEA, III**
Texas State Bar No. 12069680
**BINGHAM & LEA, P.C.**
319 Maverick Street
San Antonio, Texas 78212
Telephone: (210) 224-1819
Facsimile:  (210) 224-0141

J. CLAY FULLER
Georgia Bar No. 280207
DUSTIN BROWN
Georgia Bar No. 086998
**DAUGHTERY, CRAWFORD, FULLER
  & BROWN, LLP**
1430 Wynnton Road
Columbus, Georgia 31906
Telephone: (706) 320-9646
Facsimile:  (706) 494-0221

*Attorneys for Plaintiff, William Roberts*

C. LANCE GOULD**
Alabama State Bar No. ASB-0913-G66C
**BEASLEY ALLEN CROW METHVIN
  PORTIS & MILES, PC**
218 Commerce Street
Montgomery, Alabama 36104
Telephone: (334) 269-2343
Facsimile:  (334) 954-7555

DAVID P. SCHAFER**
Texas State Bar No. 00797865
**LAW OFFICES OF DAVID SCHAFER,
  PLLC**
7800 W. I.H. 10, Suite 830
San Antonio, Texas 78230
Telephone: (210) 348-0500
Facsimile:  (210) 348-0520

**\*\*Admitted to practice pro hac vice**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which automatically serves e-mail notification of such filing to the following counsel of record on this 28th day of May, 2010:

Mr. G. Lee Garrett, Jr.
ggarrett@jonesday.com
Ms. Emily C. Baker
ecbaker@jonesday.com
Ms. Samantha Mandell
smandell@jonesday.com
**JONES DAY**
1420 Peachtree Street NE, Suite 800
Atlanta, Georgia 30309-3053

Mr. Robert P. Ducatman
rducatman@jonesday.com
Ms. Sandra E. Gammie
sgammie@jonesday.com
Mr. Hugh R. Whiting
hrwhiting@jonesday.com
Mr. Jeffrey Saks
jsaks@jonesday.com
**JONES DAY**
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190

*/s/ Royal B. Lea, III*
ROYAL B. LEA, III