IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

WILLIAM ROBERTS,                    *

     Plaintiff,                    *

vs.                                 *
                        CASE NO. 4:07-CV-80 (CDL)
THE SCOTT FETZER COMPANY,            *

     Defendant.                    *

_____

O R D E R

Plaintiff seeks to represent a proposed class of consumers who allegedly purchased from Defendant used home cleaning systems that Defendant misrepresented as new.[1]  Plaintiff contends, among other things, that Defendant committed mail and wire fraud in violation of 18 U.S.C. § 1962(c) of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO").  Plaintiff seeks on behalf of the putative class what Plaintiff's counsel labels "benefit of the bargain damages" allegedly caused by Defendant's fraud.

The parties have completed class certification discovery, and Plaintiff's Motion for Class Certification (ECF No. 72) is presently pending before the Court.  Related to Plaintiff's motion, and also presently pending, is Defendant's Motion to Exclude Putative Experts

_____

[1]The Scott Fetzer Company has several divisions of business.  The Kirby Company ("Kirby") is an unincorporated subsidiary of Scott Fetzer, and most of Plaintiff's facts and evidence relevant to this action involve only the Kirby division.  The Court will refer to "Kirby" and "Defendant" interchangeably in this Order.

Bruce Isaacson and Jeffrey Harrison (ECF No. 86). Plaintiff relies on Isaacson and Harrison to support his methodology for establishing damages on a class-wide basis.

Having thoroughly reviewed the present record and having conducted a hearing on the matter, the Court finds that Plaintiff has failed to establish that questions of law or fact common to class members predominate over any questions affecting only individual members, and thus, the Court is unconvinced that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Accordingly, as explained more fully below, this action cannot be certified under Federal Rule of Civil Procedure 23(b)(3), and Plaintiff's motion for class certification must be denied. In light of the Court's ruling on Plaintiff's motion for class certification, Defendant's motion to exclude the testimony of Plaintiff's experts, Bruce Isaacson and Jeffrey Harrison, is denied as moot.

THE CLASS CERTIFICATION STANDARD UNDER RULE 23

"For a district court to certify a class action, the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as at least one of the requirements set forth in Rule 23(b)." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009) (internal quotation marks omitted). "Under Rule 23(a), every

putative class first must satisfy the prerequisites of numerosity, commonality, typicality, and adequacy of representation." *Id.* (internal quotation marks omitted) (citing Fed. R. Civ. P. 23(a)). Here, Plaintiff seeks to certify the class pursuant to Rule 23(b)(3), which additionally requires: "(1) that common questions of law or fact predominate over questions affecting only individual class members ('predominance'); and (2) that a class action is superior to other available methods for adjudicating the controversy ('superiority')." *Vega*, 564 F.3d at 1265.[2]

---

[2] Federal Rule of Civil Procedure 23(a) and (b)(3) state:
(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

(b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
(A) the class members' interests in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

3

"A district court must conduct a rigorous analysis of the [R]ule 23 prerequisites before certifying a class." *Vega*, 564 F.3d at 1266 (internal quotation marks omitted). "Although the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Id.* (internal quotation marks omitted).

FACTUAL BACKGROUND

## I.   The Kirby Marketing System

Kirby manufactures home cleaning systems, which consist of vacuum cleaners and related attachments and accessories for use by consumers in their homes. Pls.' Mem. Supporting Am. Mot. to Compel Disc. from Def. [hereinafter Pls.' Am. Mot. to Compel] App. A, Nichols Dep. 16:9-11, ECF No. 49-2; *see* Nichols Dep. Ex. 2, Distrib. Agreement 1, ECF No. 49-16. Kirby sells its products to distributors for the distributors to market to consumers through in-home demonstrations. Nichols Dep. 16:12-18.

In its written Distributor Agreements, Kirby requires its distributors to use and follow its "Marketing System" for doing the in-home presentations and sales to consumers. Distrib. Agreement 1. The Kirby "Marketing System" is a uniform and consistent method for Kirby to ensure that its distributors and dealers use the same

4

pre-printed sales materials created by Kirby. Nichols Dep. 61:10-62:8, ECF No. 49-5. Under the uniform and consistent "Marketing System," all purchasers receive the same common printed sales materials created by Kirby containing representations that the systems are new. Kirby provides the distributors with pre-printed documents created by Kirby for the distributors, or the dealers, to use in making the in-home sales, including Owner's Manuals, Warranty Booklets, and Purchaser's Registration Cards, all of which contain written representations that the purchaser is the original purchaser and that the cleaning system is new. Specifically, the Warranty Booklet tells a consumer that he or she is the "Original Purchaser," Nichols Dep. Ex. 10, Owner Care Program, Three Year Ltd. Warranty SF-KY01325, ECF No. 49-23; the Owner's Manual tells the consumer that his or her cleaning system is "new," Pls.' Am. Mot. to Compel App. D, Owner's Manual, ECF No. 49-48; *see* Nichols Dep. 225:7-226:15, ECF No. 49-13; and the Registration Card tells the consumer that he or she is the "Original Purchaser," Nichols Dep. Ex. 8, Kirby Blue Card Registration Card, ECF No. 49-20; *see* Nichols Dep. 73:10-16, ECF No. 49-5. From 2003 to 2007, nearly 96,164 consumers were allegedly sold previously owned Kirby home cleaning systems with these misrepresentations of "newness." Nichols Dep. 120:17-120:22, ECF No. 49-8; Nichols Dep. Ex. 15, Chart of No. of Times a Unit Was Sold More Than Once, ECF No. 49-28.

## II. Registration Cards

During the relevant time period, Kirby provided its distributors with two different sets of Registration Cards for the distributors to use in registering consumer purchasers as the owners of its Kirby systems: Gold Cards and Blue Cards. The Gold Cards were pre-printed forms that were included with the systems in the boxes when Kirby shipped the systems to a distributor. Each system had a unique serial number, and the Gold Card that was included with the system had the unique serial number pre-printed on the form. Nichols Dep. 91:5-10, ECF No. 49-6. The Gold Card contained representations that the purchaser was the "Original Purchaser." Nichols Dep. Ex. 3, Gold Card Sample, ECF No. 49-17. If a consumer rescinded his or her purchase of the home cleaning system, the distributor who sold the system would pick up the system and resell it to a second or subsequent purchaser. Nichols Dep. 93:2-97:4. When distributors provided consumers with these previously sold systems, they registered the subsequent purchasers under a Blue Card instead of a Gold Card.[3] *Id.*

---

[3]The reasons for consumer rescissions included the following. First, under Kirby's three-day cancellation policy, any purchaser was entitled to cancel the purchase within the first three business days after the purchase for any reason. Nichols Dep. 149:22-150:20, ECF No. 49-9. Second, under Kirby's "Golden Ager" policy, senior citizens were allowed to cancel their purchases at any time within one year from the date of the purchase. *Id.* at 149:6-21; *see* Nichols Dep. Ex. 9, Kirby Distrib. Policies & Recommended Practices, Golden Ager Policy 8, ECF No. 49-22. Third, under the "Patch It Up or Pick It Up" policy, if a distributor could not satisfy a consumer,

The Blue Card was identical to the Gold Card, except that the border around the "Original Purchaser" representation on the Blue Card was blue, and not gold; also, the unique serial number of the cleaning system was not pre-printed on the Blue Card like it was on the Gold Card; instead, the distributor wrote in the serial number on the Blue Card during the in-home presentation. Kirby instructed its distributors and dealers to use Blue Cards when either (1) "[t]he original Gold Card [was] lost," or (2) when "[t]he original customer, who completed the Gold Card, cancel[led] the sale or their financing [was] not approved." Nichols Dep. Ex. 13, U.S. Gold Card Procedures, ECF No. 49-28. Kirby expected the distributors and dealers to use the printed materials provided with the Blue Cards, such as the Owner's Manuals and Warranty Booklets, to make the second sales. Pls.' Am. Mot. to Compel App. C, Shumay Dep. 147:8-149:18, ECF No. 49-43. Therefore, each second or subsequent purchaser received the same written representations of newness and original purchaser status

---

the distributor would cancel the purchase and return the consumer's purchase price. Nichols Dep. 150:21-151:17; Kirby Distrib. Policies & Recommended Practices, Patch It Up or Pick It Up Policy 13, ECF No. 49-23. Lastly, a purchase could be rescinded if the financing that the distributors or dealers arranged to finance a consumer's purchase fell through so that the consumer could not qualify for the purchase. Nichols Dep. 152:10-22.

under Blue Card sales that a first purchaser received under a Gold Card sale.[4]  *Id.*

## III. Gold Service Record Payment Reconciliation Reports

Kirby provided its distributors with a monthly written report, known as a Gold Service Record ("G.S.R.") Payment Reconciliation Report, that indicated the number of times distributors sold previously owned and returned units in the prior month.  Nichols Dep. 132:19-134:5, ECF No. 49-8; *see* Nichols Dep. Ex. 16, G.S.R. Payment Reconciliation Report, ECF No. 49-28.  The G.S.R. Reports identify by unique serial numbers which of the sales were first sales of new units and which were sales of resold units.  Based on a summary of G.S.R. Payment Reconciliation Reports made between the years 2003 and 2007, 96,164 customers were sold Kirby home cleaning systems that had previously been sold and returned by prior purchasers.  Nichols Dep. 120:17-120:22; *see* Chart of No. of Times a Unit Was Sold More Than Once.

---

[4]In March 2006, Kirby implemented a new Purple Card policy for its distributors to use when they sold previously returned cleaning systems. Nichols Dep. 173:18-174:3.  The Purple Cards were only to be used by distributors "when the Kirby home care system[s] which [were] the subject of the sale ha[d] previously been returned by another customer," which could have occurred "when the original purchaser cancel[led] the sale within the purchaser's right to cancel period, or financing [was] not approved."  Nichols Dep. Ex. 18, Mem. to All Domestic Factory Distribs., Mar. 29, 2006, ECF No. 49-29.  The individual distributors were instructed to "inform the subsequent purchaser(s) that the merchandise had been previously purchased by another consumer."  *Id.*  These Purple Card purchasers are not included in the proposed class in this action.

## IV. Plaintiff's Damages Theory

Plaintiff seeks damages caused by Defendant's alleged misrepresentation that the previously-owned cleaning systems received by Plaintiff and putative class members were new. Obtaining a complete understanding of Plaintiff's theory of class-wide damages has been elusive. In previous rulings, the Court understood Plaintiff to be seeking for each putative plaintiff the difference in the value of the cleaning system in its represented condition ("new") less the value of the cleaning system in its actual condition ("previously-owned"). *See* Order Denying Def.'s Mot. to Dismiss 18-19, ECF No. 17 (finding that such alleged damages could be recovered under the RICO statute);[5] *see also* Order Granting Pls.' Am. Mot. to Compel 2 n.2, ECF No. 63 (describing the damages sought as "the difference between the value of the item as new and its actual value in used condition").[6] At various times, Plaintiff's counsel has seemed to acknowledge this approach as the appropriate formula for determining damages but has also referred to the damages Plaintiff seeks on behalf of the class as "benefit of the bargain damages." *See, e.g.*, Pls.' Reply to Def.'s Resp. in Opp'n to Pls.' Am. Mot. to Compel Disc. 5, ECF No. 58.

---

[5] *Jordan v. Scott Fetzer Co.*, No. 4:07-CV-80 (CDL), 2007 WL 4287719 (M.D. Ga. Dec. 4, 2007).

[6] *Jordan v. Scott Fetzer Co.*, No. 4:08-CV-80 (CDL), 2009 WL 1885063 (M.D. Ga. June 30, 2009).

At the hearing on the present motion, it became clear that Plaintiff does not intend to prove damages for the putative class using the approach previously approved by the Court. Apparently, Plaintiff recognizes that such an approach would require an evaluation of each sales transaction for each putative plaintiff, including an individual assessment of the actual value of each putative plaintiff's cleaning system. Under this traditional approach, it would be necessary to determine the extent of use of the cleaning system to determine its actual value in its previously-owned condition. Obviously, this method of proving damages would result in individual issues predominating common ones and make class certification inappropriate.

In light of the difficulties of using the traditional approach, Plaintiff proposes a theory which his counsel acknowledged at the class certification hearing is novel in this context. Plaintiff does not intend to introduce evidence of the actual value of each cleaning system for each class member. Plaintiff does not even intend to introduce any evidence of the specific condition of each class member's cleaning system or the extent of use that each cleaning system experienced prior to being sold to each class member as new. Plaintiff theorizes that each class member has been damaged because they paid for a cleaning system they thought was new and yet received a system that was previously owned; thus, they did not receive their

expected "benefit of the bargain."  Under this theory, it does not matter whether the cleaning system had been returned by the previous owner after one day, never having been plugged in, or whether it had been subjected to heavy cleaning for a year.  Each class member, under Plaintiff's theory, is entitled to damages because each of them failed to receive the expected "benefit of their bargain."

Proving class-wide "benefit of the bargain" damages is no easy task.  Plaintiff's counsel have concluded, however, that the task can be accomplished through expert testimony.  Plaintiff's first expert, Dr. Bruce Isaacson, conducted a survey of 1,270 actual Kirby customers "to measure perceptions of the price consumers would expect to pay for a previously-owned Kirby vacuum cleaner."  Pl.'s Mot. for Class Certification App. E, Isaacson Expert Report 1 ¶ 1, ECF No. 72-3; *see also id.* at 1 ¶ 3 (stating survey measured "whether customers expect a previously-owned and/or refurbished Kirby vacuum cleaner to have a different price than a similar Kirby vacuum cleaner that is not previously-owned and/or refurbished.").  Survey respondents were given the following hypothetical situation:

> Imagine that when you purchased a new Kirby vacuum, you could have instead bought an identical Kirby vacuum that had been previously sold to and returned by another customer.  Imagine as well that the previously-owned Kirby vacuum had been cleaned, polished, repaired if necessary, and came with the same accessories, warranty and packaging as a new Kirby vacuum.

Isaacson Expert Report Ex. 4, Isaacson Questionnaire 2, ECF No. 72-12.  Respondents were then told a typical price for a new Kirby cleaning system and asked "would you expect the price of the previously-owned vacuum to be more, less, or the same as the price of a new Kirby vacuum?"[7]  *Id.*  If the respondent said less, he was asked "[h]ow much less [he] expect[ed] the price of a previously-owned Kirby vacuum to be compared to the price of a new Kirby vacuum?"  *Id.* Dr. Isaacson told the survey respondents nothing about the condition or extent of use of the hypothetical previously-owned cleaning systems.

Dr. Isaacson's survey data showed that 90% of respondents expected to pay less for a previously-owned Kirby cleaning system, with expected discounts ranging from $50 to as much as $1,200. Isaacson Expert Report 1 ¶ 5; *see also* Isaacson Expert Report Ex. 9, Survey Results by Respondent, ECF No. 72-17.  Dr. Isaacson averaged all respondents' expected discounts and opined that the average expected discount for a previously-owned Kirby cleaning system was $548 or 36% of the average purchase price.  Isaacson Expert Report 2 ¶ 5.  Dr. Isaacson also conducted online research and found that

---

[7]Respondents were surveyed in seven slightly different interview conditions (or cells).  Respondents in six of the cells were told that the typical price of a new Kirby vacuum was either $1,000, $1,300, $1,500, $1,650, $1,800, or $1,900.  Isaacson Expert Report 1 ¶ 5; Isaacson Questionnaire 2.  Respondents in one cell received no mention of price. Isaacson Expert Report 1 ¶ 5; Isaacson Questionnaire 2.

other consumer appliances and electronic products were listed at a 26% average discount off the new price when sold in used but refurbished condition by the original manufacturer or a reseller. Isaacson Expert Report 2 ¶ 6, 18-19 ¶¶ 59-63; *see also* Isaacson Expert Report Ex. 10, Pricing of New and Previously-Owned and/or Refurbished Products, ECF No. 72-19; Isaacson Expert Report Ex. 11, Selected Screen Captures of New and Previously-Owned and/or Refurbished Products, ECF No. 72-20. From this data, Dr. Isaacson deduces that the discounts expected by survey respondents for a previously-owned Kirby cleaning system are "similar in magnitude" to the discounts expected on other previously-owned consumer appliances and electronics. Isaacson Expert Report 2 ¶ 6, 20 ¶ 66.

Plaintiff's second expert, Professor Jeffrey L. Harrison, offers several creative opinions supporting Plaintiff's "class-wide impact" and "aggregate damages" theories. Pl.'s Mot. for Class Certification App. F, Harrison Expert Report 2-3, ECF No. 72-21. Professor Harrison first concludes that all class members were commonly impacted by Kirby's alleged practice of selling previously-sold cleaning systems as new since people generally value new items more than previously-sold items. *Id.* at 3-4. Professor Harrison explains that the primary reason new items are valued more highly than previously-sold items is because of "information asymmetry," favoring the seller, inherent in the sale of a previously-sold item. *Id.* at

4. Under this class-wide impact theory, the condition of the previously-sold cleaning system is irrelevant. Everyone who buys something they thought was brand new is injured the same when they actually receive something that is not brand new, and it does not matter how used the item is that they actually receive. *Id.* Professor Harrison points to Dr. Isaacson's survey to support his theory. *Id.* at 6.

Professor Harrison further suggests four methods for calculating class members' aggregate and individual damages under his theory. Under the first two approaches, the factfinder (presumably a jury) would determine "a benchmark or 'but for' outcome and then . . . compare that benchmark with the transaction that was affected by the misrepresentation." *Id.* at 7. The first two approaches also rely on data from Dr. Isaacson's survey that purports to show a correlation between the hypothetical price of a new Kirby cleaning system told to respondents and the average discount respondents expected for a hypothetical, previously-owned Kirby cleaning system.[8] *Id.* at 7, 9-10. Using this analytical framework,

---

[8]Dr. Isaacson's survey yielded the following results:

| Hypothetical New Price: | Average Expected Discount: |
|---|---|
| $1,000 | $388 |
| $1,300 | $501 |
| $1,500 | $551 |
| $1,650 | $572 |
| $1,800 | $647 |
| $1,900 | $667 |

Professor Harrison proposes two separate methods for calculating damages. The first method, the least possible overcharge approach, would calculate all class members' damages by applying the average discount ($388) expected by survey respondents who were told the lowest hypothetical new Kirby cleaning system price. *Id.* at 8. In other words, every class member, regardless of what he paid for his Kirby cleaning system, would receive $388 in damages. Professor Harrison admits that the least possible overcharge approach will "understate the actual aggregate level of harm and the individual level of harm for all buyers except, perhaps, for those who paid the least for their Kirby vacuum cleaners." *Id.* at 9. Professor Harrison's second method, the graduated overcharge approach, would award damages to each class member based on the average discount expected by survey respondents who were told the hypothetical price of a new Kirby cleaning system was an amount approximating what the class member actually paid for his allegedly misrepresented Kirby cleaning system. *Id.* at 10. For example, a class member who actually paid any price in the range $1,800 to $1,900 for a previously-sold unit would receive as damages the $647 average discount that survey respondents expected when told that the hypothetical price of a new Kirby cleaning system was $1800. *Id.*; *see also* Harrison Dep. 114:16-115:4, ECF No. 90. Again, Professor

Harrison Expert Report 10.

15

Harrison admits that the graduated overcharge approach will undercompensate and overcompensate various putative class members who paid prices for their previously-sold units that fall between the six hypothetical prices of new Kirby cleaning systems that Dr. Isaacson told survey respondents. Harrison Dep. 111:11-115:12 ("Some people may get a bit more, some less, than the actual damage.").

In addition to the "least possible overcharge approach" and the "graduated overcharge approach," Professor Harrison suggests that two other approaches may be appropriate. First, he opines that regression analysis could be used to form an econometric model that would predict, based on the demographic information and expected discounts of Dr. Isaacson's survey respondents, the discount each putative class member would have expected based on his or her personal characteristics. Harrison Expert Report 11. Professor Harrison admits that he has never used regression analysis of the demographics of consumers to determine damages where the transactions are individually negotiated. Harrison Dep. 119:12-17. Professor Harrison also acknowledges that he has not performed such a regression analysis, does not have all the data he needs to perform such a regression analysis, and he proffers no plan for collecting the necessary data. *Id.* at 119:18-122:5. Finally, Professor Harrison acknowledges that the most direct method for calculating damages is a "market value" approach that compares the fair market

value of a previously-owned Kirby cleaning system with the price each class member actually paid for his allegedly misrepresented cleaning system. Harrison Expert Report 12. This method is precisely the approach the Court has twice approved. *See* Order Denying Def.'s Mot. to Dismiss 18-19; Order Granting Pls.' Am. Mot. to Compel 11-15. Professor Harrison, however, recognizes that the "market value" approach is not feasible in this putative class action given the complexities of determining the market price of a previously-sold Kirby cleaning system resold with the same warranty and benefits of a new Kirby cleaning system. *See* Harrison Expert Report 12.

## DISCUSSION

It is undisputed that Plaintiff can establish the numerosity and adequacy of representation elements of Rule 23(a); and, for purposes of this Order, the Court finds that there are questions of law and fact common to the class and that aspects of the representative Plaintiff's claim are typical of the claims of the putative class members. Therefore, class certification in this action depends on whether Plaintiff has carried his burden under Rule 23(b)(3) of establishing that these common issues predominate over any questions affecting only individual members. This determination requires a preliminary understanding of what Plaintiff must prove to recover damages under the civil RICO statute.

## I.    Essential Elements of a RICO Claim

To prove a RICO violation under 18 U.S.C. § 1962(c), a plaintiff "must satisfy four elements of proof: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006) (internal quotation marks omitted).  The acts of racketeering alleged in this case are mail and wire fraud, which require proof that a person "(1) intentionally participate[d] in a scheme to defraud another of money or property and (2) use[d] the mails or wires in furtherance of that scheme."[9]  *Pelletier v. Zweifel*, 921 F.2d 1465,

---

[9]The elements of mail and wire fraud are identical.  *Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987).  The mail fraud statute reads:
> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341.  The wire fraud statute reads:
> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means

1498 (11th Cir. 1991). For purposes of this Order, the Court assumes that Plaintiff can prove with common evidence that Defendant engaged in a common enterprise, using the mail and wires, to make representations that certain of its cleaning systems were new when they in fact were previously-owned.

In addition to proving the RICO violations, Plaintiff must show that he can prove with common evidence that Defendant's alleged misrepresentations caused damages to each class member that are recoverable under the civil RICO statute. Specifically, 18 U.S.C. § 1964(c) authorizes a plaintiff to "recover threefold the damages he sustains" to "his business or property by reason of" a violation of RICO's substantive provisions. 18 U.S.C. § 1964(c). "The 'by reason of' requirement implicates two concepts: (1) a sufficiently direct injury so that a plaintiff has standing to sue; and (2) proximate cause." *Williams*, 465 F.3d at 1287 (internal citations omitted); *see also Hemi Grp., LLC v. City of New York*, 130 S. Ct. 983, 989 (2010). In the Court's class certification analysis, the issue of whether damages may be ascertained on a class-wide basis

---

of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

or would require individual proof is "a factor that [the Court] must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008).

## II. In Determining Damages, Individual Issues Predominate Common Ones, Thus Precluding Class Certification

The Court recognizes that class certification should not be denied based solely on the difficulty of calculating damages for each individual putative class member. *Klay v. Huamna, Inc.*, 382 F.3d 1241, 1259-60 (11th Cir. 2004) ("Particularly where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification." (footnotes omitted)). However, when Plaintiff's proposed method for calculating those damages is not recognized as a measure of damages under the substantive law, then the Court must examine the measure of damages that the law does recognize and determine whether, using that method, individual issues predominate. In this case, they do. Therefore, certification is not appropriate.

In the following discussion, the Court first discusses the traditional method of proving RICO damages caused by fraudulent misrepresentations and why that method requires individualized evidence that is not amenable to class-wide proof. Next, the Court

explains why Plaintiff's method for proving class-wide damages is not appropriate under RICO.

> A. The Traditional Method of Proving RICO Damages Caused by Fraudulent Misrepresentations

"A plaintiff asserting a claim under 18 U.S.C. § 1964(c) must allege *actual*, quantifiable injury." *McLaughlin*, 522 F.3d at 227. "[A] showing of injury requires proof of a concrete financial loss and not mere injury to a valuable intangible property interest." *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) (internal quotation marks omitted); *Regions Bank v. J.R. Oil Co.*, 387 F.3d 721, 728 (8th Cir. 2004) ("[A] showing of injury requires proof of concrete financial loss, and not mere injury to a valuable intangible property interest." (internal quotation marks omitted)); *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998) ("Injury to mere expectancy interests or to an 'intangible property interest' is not sufficient to confer RICO standing."); *Anderson v. Kutak (In re Taxable Mun. Bond Sec. Litig.)*, 51 F.3d 518, 523 (5th Cir. 1995) (noting that RICO does not protect an "intangible property interest"). Accordingly, the Court has recognized that here Plaintiff could establish actual, concrete, tangible RICO damages by proving the difference in the value of his cleaning system in its misrepresented condition (new) and its value in its actual condition

(previously owned). *See* Order Denying Def.'s Mot. to Dismiss 18; Order Granting Pls.' Am. Mot. to Compel 11-15.[10]

In this case, putative class members' actual, concrete, tangible damages cannot be shown by common evidence because the determination of those damages requires an inherently individual inquiry. Preliminarily, the Court notes that Plaintiff does not seek "out-of-pocket" costs, presumably because he has not suffered any such costs. He, along with the other putative class members, chose to retain their cleaning systems rather than return them and seek a refund of the purchase price. Therefore, Plaintiff's only potential theory of recovery requires proof of the difference between the value of his cleaning system as represented (new) compared to its actual value (previously-owned). Thus, Plaintiff would necessarily have to produce evidence of the condition of the cleaning system and the extent of any prior use. Moreover, in response to any evidence Plaintiff produces, Defendant will certainly be entitled to introduce its own evidence regarding the condition and prior use of each putative class members' cleaning system. *See McLaughlin*, 522 F.3d at

---

[10]This measure of damages is consistent with the approach taken by Georgia courts in state law fraud claims. *See Kunzler Enters., Inc. v. Rowe*, 211 Ga. App. 4, 5, 438 S.E.2d 365, 365 (1993) (stating that in an action based on a fraudulent misrepresentation "the measure of damages is the actual loss sustained by the plaintiff, and if the contract is one of purchase and sale the 'actual damages' are the difference between the value of the thing sold at the time of delivery and what would have been its value if the representations made by the defendants had been true."); *accord McCrary v. Pritchard*, 119 Ga. 876, 47 S.E. 341, 344 (1904).

232 ("'[A]ctual injury cannot be presumed, and defendants have the right to raise individual defenses against each class member.'" (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith*, Inc., 259 F.3d 154, 191-92 (3d Cir. 2001)).  Certainly, the factfinder can determine that a cleaning system returned in the box never used is objectively worth more than one that was repossessed after twelve months of hard cleaning.  Thus, on the issue of actual, concrete, tangible damages, individual questions predominate.  Plaintiff has failed to meet his burden of showing that such damages are amenable to common proof.

    B.    Plaintiff's Alleged Damages Are Not Recoverable Under the
          RICO Statute

    Plaintiff does not even attempt to argue that each putative class members' actual, concrete, tangible damages are amenable to common proof in this action.  Plaintiff, apparently recognizing the difficulties with certifying a class claiming such traditional damages, offers an alternative theory of damages.  Although this theory may provide a method for constructing an estimate of damages as part of a class action *settlement*, the theory does not produce a measure of damages that is recoverable under the civil RICO statute.

        1.   Plaintiff's Theory of Damages

    Under Plaintiff's theory, no class member will testify that his cleaning system did not look new; nor will anyone testify that his

cleaning system did not operate as new; nor will anyone testify that the value of the cleaning system to him was tangibly diminished by the fact that it was previously owned; no one will even attempt to describe the condition of the cleaning system that they contend has diminished in value. Instead, Plaintiff's theory of recovery is that each class member was damaged, regardless of the condition or prior use of the cleaning system purchased, because each class member would have expected to pay a lower price for the cleaning system they bought had they known it was previously-sold.

Put simply, Plaintiff alleges that each putative class member overpaid for his Kirby cleaning system: "Each class member who received the false representation of newness paid more for her vacuum than she would have paid had she known the truth—that it was used." Mem. of Pl. Supporting Mot. for Class Certification 24, ECF No. 72-2. However, each putative class member must still be able to prove his or her actual, concrete, tangible damages. Here, Plaintiff does not seek to prove actual damages based on the difference in the value of the cleaning system in its represented condition (new) and the value of the cleaning system in its actual condition (previously-sold). Instead, Plaintiff takes a "benefit of the bargain" approach based on consumers' expectations and argues that each Plaintiff suffered the same degree of damage simply by purchasing a cleaning system they thought was new but was actually previously-owned. Therefore,

Plaintiff will not produce an expert witness who looked at a particular class member's cleaning system, evaluated its condition, and based on his knowledge of the market, opines that the previously-owned cleaning system is worth a specific amount in that condition, and then subtract that actual value from the represented value to determine that class member's damage. Instead, Plaintiff examines not what a class member has actually lost in terms of the value of the cleaning system he or she owns, but what an "average" consumer may have paid (i.e. expected to pay) for the cleaning system at the time it was originally sold if they had known one fact—that it was previously-owned.

### 2. *Plaintiff's Common Evidence of Damages*

Plaintiff's common evidence supporting his theory of damages consists of: (1) Dr. Isaacson's survey finding that respondents expected, on average, a discount of 36% on a previously-sold Kirby cleaning system; and (2) Professor Harrison's opinion that all class members were commonly impacted (and damaged) since people generally value new items more than previously-sold items, regardless of whether the previously-sold Kirby cleaning systems were actually used or damaged.

The Court does not doubt that subjectively and intuitively many of the putative class members likely share the "feeling" that a previously-owned item has less "value" than a brand new item; but,

that is not an indisputable fact of which the Court can take judicial notice. Moreover, the intangible, expectancy-type, benefit of the bargain damages that Plaintiff seeks are not what are contemplated as being recoverable as RICO damages. *See McLaughlin*, 522 F.3d at 228-29 (holding that expectancy damages are plainly not available in RICO actions that sound in fraud in the inducement); *cf. Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, Civil Action Nos. 06-3044 (FLW), 07-2224(FLW), 07-2608(JAP), 07-2860(GEB), 2008 WL 5413105, at *7 (D.N.J. Dec. 23, 2008) ("Plaintiffs' injury theory based on financial losses of overpayment that Plaintiffs purportedly sustained by paying for this 'inferior' drug is inadequate for sustaining a RICO injury, absent allegations that Defendants' drug was on some level inferior and therefore 'worth less' than what [Plaintiffs] paid for it.") (internal quotation marks omitted); *id.* at *7 n.10 ("[I]f the product simply was *different* than that which was promised to appellants, then there would be no factual basis for an argument that they overpaid, inasmuch as a 'different' but equally good health insurance package would have an equivalent economic value.") (internal quotation marks omitted); *Maio*, 221 F.3d at 489-90 ("[W]here property at issue is in the nature of real or personal property, a reduction in property value is the harm suffered."); *id.* at 493 ("[O]verpayment[] cannot exist absent proof of some level of inferior treatment under Aetna's HMO plan."); *Ivar v. Elk River*

*Partners, LLC*, 705 F. Supp. 2d 1220, 1234-35 (D. Colo. Mar. 30, 2010) ("Plaintiffs' asserted state law property interest consists of an intangible 'lost bargain.' This is not the type of concrete loss that numerous courts have found necessary to support a RICO injury.").[11] The general unavailability of intangible, expectancy-type, benefit of the bargain damages "follows from the text of RICO, which compensates only for injury to 'business or property.'" *McLaughlin*, 522 F.3d at 228 (quoting 18 U.S.C. § 1964(c)).

Plaintiff has not explained how a party's "expectation" can constitute "business or property." *See Heinhold v. Perlstein*, 651 F. Supp. 1410, 1412 (E.D. Pa. 1987) (holding that a plaintiff does not have standing to sue under RICO when "the only property to which a plaintiff alleges injury is an expectation interest that would not have existed but for the alleged RICO violation"); *accord McLaughlin*, 522 F.3d at 228. Plaintiff has also been unable to direct the Court to a single civil RICO consumer fraud case recognizing the recoverability of the expectancy-type, benefit of the bargain damages that he seeks here. Although the Eleventh Circuit Court of Appeals

---

[11] The Court notes that Mr. Roberts testified that his Kirby cleaning system is "a good vacuum cleaner" and that "the only problem I have was that they told me a lie." Roberts Dep. 39:1-2, ECF No. 76; *see id.* at 39:17-41:5 (stating Mr. Roberts is happy with the way his Kirby cleaning system works, that he has no complaints about it, and that he still uses the cleaning system).

apparently has not addressed whether the expectancy-type, benefit of the bargain damages that Plaintiff seeks here are recoverable under the civil RICO statute, the Second Circuit Court of Appeals has decided the issue. The Court finds the Second Circuit's reasoning in *McLaughlin* persuasive. There, the plaintiffs proposed a "loss of value" model that used a survey expert "to measure the difference between the price plaintiffs paid for light cigarettes as represented by defendants and the (presumably lower) price they would have paid (but for defendants' misrepresentation) had they known the truth-that [light cigarettes] are *not* healthier than full-flavored cigarettes." *McLaughlin*, 522 F.3d at 228-29. The Second Circuit concluded that "the loss of value model is designed to award plaintiffs damages based on the benefit of their bargain. Such damages are generally unavailable in RICO suits."[12] *Id.* Here, Plaintiff employed Dr. Isaacson to measure survey respondents' perception of the difference

---

[12]The *McLaughlin* court also characterized the plaintiff's theory and survey as "pure speculation." *McLaughlin*, 522 F.3d at 229. While consumers are no doubt more capable of conceptualizing a previously-owned Kirby cleaning system than "the impossible—a healthy cigarette," the Court notes that Plaintiff's theory and survey also engage in a healthy dose of speculation when they ask respondents what price they would expect to pay for a previously-owned Kirby cleaning system in the complete absence of any information about the cleaning system's condition or prior use and after only being told a hypothetical price for a new Kirby cleaning system. Damages flowing from such speculation are not proper under RICO. *See Anderson*, 51 F.3d at 523 ("[The plaintiff's] claimed damages would have required extensive speculation and would not simply entail a calculation of present, actual damages. Such speculative damages are not compensable under RICO[.]").

between a hypothetical price for a new Kirby cleaning system (i.e. as represented by Defendant) and the lower price they would expect to pay (but for Defendant's misrepresentation) had they known the truth—that the Kirby cleaning system was previously-sold. Similar to the plaintiff in *McLaughlin*, Plaintiff's theory of damages in this case is designed to establish expectancy-type, benefit of the bargain damages that are unavailable in a fraud in the inducement civil RICO action. *Id.* at 228-29.

   3.   *Plaintiff's Novel "Antitrust Method" for Proving Damages*

Even if Plaintiff's theory of expectancy-type, benefit of the bargain damages is cognizable under the civil RICO statute (which the Court finds it is not), Plaintiff must demonstrate a plausible method of proving class-wide damages. *See Klay*, 382 F.3d at 1259. Here, Plaintiff proffers two common methods for calculating class-wide expectancy damages: (1) the benchmark overcharge methods; and (2) regression analysis.[13] Benchmark overcharge methods and regression analysis have been approved to establish class-wide damages in

---

[13]Professor Harrison offered two benchmark overcharge methods: (1) the least possible overcharge approach; and (2) the graduated overcharge approach. Both methods involve the factfinder determining "a benchmark or 'but for' outcome and then . . . compar[ing] that benchmark with the transaction that was affected by the misrepresentation." Harrison Expert Report 7.

antitrust cases.[14]  *See, e.g.*, *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153-55 (3d Cir. 2002); *In re Polyester Staple Antitrust Litig.*, No. 3:03-CV-1516, 2007 WL 2111380, at *28-30 (W.D.N.C. July 19, 2007).  Plaintiff, however, cites no case under the civil RICO statute where the court has approved the calculation of expectancy-type, benefit of the bargain damages using either a benchmark overcharge method or regression analysis, and the Court declines Plaintiff's invitation to blaze such a new trail. Therefore, for the second and independent reason that Plaintiff's "proposed methods [for computing damages] are so insubstantial as to amount to no method at all," *Klay*, 382 F.3d at 1259, the Court finds that class certification is inappropriate.

CONCLUSION

If an individual who bought a Kirby cleaning system, thinking it was new when in fact it was not, brought a lawsuit seeking damages

---

[14]Plaintiff's citation to the Court's Order granting Plaintiffs' amended motion to compel for the proposition that "Mr. Roberts has previously demonstrated that the standard for damages and injury under RICO and the Clayton Act are the same" is inaccurate.  Pl.'s Reply to Def.'s Resp. in Opp'n to Mot. for Class Certification 25, ECF No. 107.  Based on Plaintiffs' representations at that time, the Court repeated its earlier finding that Plaintiffs had alleged a cognizable theory of damages under RICO based on the difference in value of the cleaning system in its represented condition and the value of the cleaning system in its actual condition.  Order Granting Pls.' Am. Mot. to Compel 11-15; *see also id.* at 2 n.2 ("'Benefit of the bargain damages' is used in this Order as shorthand for the difference between the value of the item as new and its actual value in used condition.").  Plaintiff has now made clear that he seeks damages based on a very different expectancy theory not previously recognized as cognizable under the civil RICO statute.

caused by the misrepresentation, that individual would simply produce evidence of either an out-of-pocket loss or the difference in the value of the cleaning system in its represented condition (new) and its actual condition (previously owned). Such a traditional method for proving damages, however, will not work in the class action context because the individual issues will clearly predominate the common ones. Thus, clever and skilled counsel must find a way to prove class-wide damages using a common approach. In this case, they have not figured out how to do that using any traditional measure of damages, but instead they have constructed a theory, using experts and reliance on antitrust law, to try to fit the proverbial square peg in the round hole. This Court finds that under the facts of this case, it simply does not fit.

Since the only recognized method for proving damages under the circumstances in this action requires proof that results in individual issues predominating common ones, Plaintiff's Motion for Class Certification (ECF No. 72) is denied. In light of the Court's ruling on Plaintiff's class certification motion, Defendant's Motion to Exclude Putative Experts Bruce Isaacson and Jeffery Harrison (ECF No. 86) is denied as moot.

IT IS SO ORDERED, this 30th day of September, 2010.

S/Clay D. Land
_____
CLAY D. LAND
UNITED STATES DISTRICT JUDGE